UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No. 1:07-cr-00149-RCL |
| | ) | |
| FARZAD DARUI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FARZAD DARUI'S MOTION
TO DISMISS COUNTS ONE THROUGH FIVE OF THE INDICTMENT**

Defendant, by counsel, pursuant to Rules 7(c) and 12(b)(3) of the Federal Rules of Criminal Procedure, moves this Court to dismiss Counts One through Five (charging violations of 18 U.S.C. § 1341) Mail Fraud.  As more fully set forth in the accompanying memorandum, the facts alleged in these counts fail to establish the essential elements of mail fraud; at the same time it has alleged multiple offenses in the relevant counts, making it impossible for Darui to defend himself, in violation of his Fifth and Sixth Amendment rights.  Such pleading also raises the serious specter of a non-unanimous verdict on these counts.  Moreover, the use of mail was confined to only one bank account, which was not owned by The Islamic Center.

**WHEREFORE**, Defendant Farzad Darui moves this Court to grant the relief requested.

FARZAD DARUI
By Counsel

By:_____/s/ Victoria Toensing_____

    Victoria Toensing  (DC Bar # 304980)
    Joseph diGenova
    Brady Toensing
    diGENOVA & TOENSING, LLP
    1776 K Street, N.W., Suite 737
    Washington, D.C. 20006
    (202) 289-7701
    (202) 289-7706 (fax)

By:_____/s/ Aaron S. Book_____

    Aaron S. Book  (DC Bar # 490815)
    Steven T. Webster (to be admitted *pro hac vice*)
    WEBSTER BOOK LLP
    1 North King Street
    Leesburg, Virginia 20176
    703-779-8229
    703-991-9178 (fax)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                               )
                                            )
        v.                                  )   Crim. No. 1:07-cr-00149-RCL
                                            )
FARZAD DARUI,                               )
                                            )
        Defendant.                          )


**DEFENDANT FARZAD DARUI'S STATEMENT OF THE CASE
AND MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS COUNTS ONE THROUGH FIVE OF INDICTMENT**

Defendant Farzad Darui, by counsel, pursuant to Rules 7(c) and 12(b)(3) of the
Federal Rules of Criminal Procedure, argues that the government has failed to allege
properly the essential elements of mail fraud; at the same time it has alleged multiple
offenses in the relevant counts, making it impossible for Darui to defend himself, in
violation of his Fifth and Sixth Amendment rights.  Such pleading also raises the serious
specter of a non-unanimous verdict on these counts.  Moreover, the use of mail was
confined to only one bank account, which was not owned by The Islamic Center.  Darui
submits facts and authorities in support of his Motion to Dismiss Counts One through
Five of the Indictment.  To assist the Court in understanding the basis for Darui's requests
for motions and certain evidence, this motion includes a Statement of the Case with
Appendix.[1]

---

[1] The Appendix is cited using both the individual Appendix number followed by the page referenced, and
the Bates number.  For example, App. 1, p.1 and SOC-00001 are the same document.

## STATEMENT OF THE CASE

### SUMMARY

For over 25 years Farzad Darui, born in Iran and now a U.S. citizen, has been dedicated to preventing radical fundamentalists from taking over Washington, DC's Islamic Center as they had done in the late 1970's.  At that time, the Center became a headquarters for hate, resulting in Darui's friend Akbar Tabatabai's murder.

Although Darui was officially hired by the Center's Board of Directors in 1984 to maintain security at the Center (he had been a volunteer from 1980-1984), the Saudi Arabian government gradually established sole control of most of what occurred there: first, by selecting its Director, Abdullah M. Khouj, a Saudi and member of the Muslim World League; second, by Khouj firing all other officials—save Darui because he was hired by the Board; third, by limiting Board meetings to only four in over two decades; and fourth, by taking financial control.  The latter was accomplished by the Saudis annually laundering approximately $600,000 of government funds into the personal bank account of Khouj, which he used to pay the Center's administrative costs as well as personal expenses.  Offers of major donations by other Muslim countries, including money for renovation of the façade, were rejected.

Because Darui barred Islamic radicals from the Center, the Saudis, via the Center, have falsely accused him of embezzlement.  In fact, the funds Darui received were payments for a large debt incurred by Khouj to Darui for the housing and feeding of Khouj's additional "wives," or mistresses.

Williams & Connolly represented the Center in bringing a civil case against Darui in September 2006.  After Khouj filed a false affidavit in a motion related to that matter, the case was dismissed under Fed. R. Civ. P. 41.

## FACTUAL BACKGROUND OF THE CASE

On July 22, 1980, Farzad Darui decided to devote a portion of his life to preventing radical Islamism from infiltrating and controlling American Muslims, specifically at The Islamic Center in Washington, DC.  It was on that day that his mentor and close friend, Iranian exile Akbar Tabatabai, was shot three times in the stomach in the entrance of his Bethesda, Maryland home.  [App. 1/ SOC-00001-5; App. 2/ SOC-00006-8]  The murderer, David Belfield (a/k/a Hassan Abdul Rahman and Dawud Salahuddin), was paid $5,000 by the government of Iran for the hit job.[2]  It was later revealed that Belfield was associated with a dissident pro-Ayatollah Khomeini group, which had taken over the Massachusetts Avenue Islamic Center.  [App. 4, p. 6/ SOC-00016; App. 5, p. 1/ SOC-00018]

When he was a college student in the United States, Darui met Tabatabai.  In 1979, when the Shah was deposed, Darui, then 19, volunteered to help Tabatabai in the Iran Freedom Foundation (IFF), an organization dedicated to promoting democracy in Iran.  [App. 6, p. 2/ SOC-00022]  As the IFF head, Tabatabai was a vigorous and vocal critic of Khomeini.  At Tabatabai's request, Darui became IFF's Student Affairs Advisor.

In the spring of 1980, the IFF was planning a mass demonstration, scheduled for July 27, [App. 7/ SOC-00023] five days after Tabatabai's murder.  Darui bravely joined the IFF Board of Directors, which had disbanded in fear in the wake of the July 22 assassination.  At the age of 20, he left school and literally moved into the IFF's Bethesda, Maryland office to support its cause.  Darui and one other remaining IFF Board member proceeded with the scheduled demonstration.  Darui assumed responsibility for all the security arrangements, working with the DC Police Department's Special

---

[2] Belfield escaped to Canada and then to Iran via Paris and Geneva.  He apparently resides there today.  During a 1996 interview with ABC's 20/20, Belfield confessed to the killing.  In March of this year, former FBI Agent Robert A. Levinson disappeared while in Iran to interview Belfield, allegedly for a project for a Canadian author and producer.  Belfield claimed he met with Levinson in a hotel on March 8, 2007.  [App. 3, p. 1/ SOC-00009]

Operation Division and the Park Police.  It was the beginning of a security relationship with local and federal law enforcement that would last for over two and a half decades.

The July 27, 1980 demonstration proceeded as scheduled, a "four ring circus," as described by *The Washington Post*, because the IFF marched in opposition to three pro-Khomeini and Marxist dissident groups.  [App. 8, pp. 1-2/ SOC-00024-25]  After the demonstration and throughout the early 1980s Darui remained fully involved with the IFF, working for no salary.

In 1984, the Executive Committee of the Board of Governors of The Islamic Center[3] hired Darui to be the coordinator of the Center's security and its liaison with law enforcement and other U.S. government agencies.[4]  His specific responsibility was to prevent another takeover of the Center by Islamic fundamentalists.  His annual salary was around $20,000.

Also, in 1984, the Center's Board needed to find a suitable Director, a position historically awarded to a Muslim scholar with a doctorate degree in Islamic studies. [App. 11, p. 8/ SOC-00039]  But several qualified candidates had turned the job down, presumably because of the Center's history of massive demonstrations and its association with fundamentalists.  [App. 12/ SOC-00041-42]  In this vacuum, and because the Center was financially depleted, the Board allowed Saudi Arabia to appoint Abdullah M. Khouj as Director.  Khouj was assistant professor of psychology at Umm Al-Qura University in Saudi Arabia.  He had a PhD in psychology, but no scholarly background or publication

---

[3] The 1984 Board included all Islamic countries with a United States presence (over 50); the Executive Committee was comprised of Bangladesh, Egypt, Pakistan, Sudan, and Edmond Howar (Treasurer), whose father had built the mosque.

[4] In hiring Darui the Board of Governors was probably trying to remedy its late 1970's non-intervention, which resulted in the pro-Khomeini (Belfield) group usurping control of the Center, without regard to the direction and rules of the Board.  At that time, the Chairman, Ardeshir Zahedi, the Iranian Ambassador under the Shah, had departed; the Director, Dr. Mohamed Abdul Rauf, was more concerned about promoting a perception of Muslim unity than controlling the radicals, [App. 9, p.2/ SOC-00029] to no avail as he was abruptly removed from the Center in November 1979.  [App. 10, p. 2/ SOC-00031]

in Islamic studies. Nor did he have a diplomatic background. [App. 13/ SOC-00043-47]

Nevertheless, Khouj was hired; his salary came from the Saudi government until 2002.

The Islamic Center is a non-profit organization registered in the District of

Columbia, governed by its By-Laws and in accord with United States law.[5] The By-

Laws describe the Director's authority and limited role in administering the Center, and

qualifications.[6] On paper, almost all aspects of the administrative functions are governed

by the Executive Committee elected from the Board of Governors. [App. 11, p. 4/ SOC-

00035] The Director is to be the Center's "chief Imam," in charge of its religious

activities, not administration.

When he arrived in Washington in 1984, Khouj was not characterized by the

Saudi Embassy as a religious person—the position for which he was hired—but rather as

an "Attaché," either as an Education Attaché [App.16, p. 3/ SOC-00054] or as an

Administrative Attaché, [App. 17, p. 5/ SOC-00060] to qualify him for a diplomatic (A-

1) Visa.

_____

[5] The Islamic Center was incorporated February 3, 1945, [App. 14/ SOC-00048] as "a religious
organization to provide a place of worship for the members of the Islamic faith and in furtherance thereof,
to acquire land and to effect and permanently maintain a mosque within the District of Columbia for the
members or congregation of said Faith." [App. 15, p. 1/ SOC-00049]

[6] "A. The Director to be appointed by the Board of Governors shall be the Religious and Cultural Officer
of the Center. He shall direct and supervise the religious and cultural activities of the Center in accordance
with the direction of the Board. He shall conduct Friday prayers and all religious activities of the Center,
maintain the relations of the Center with the centers of learning in the U.S.A., and Muslim countries,
organize lecture programs, prepare publications and translations to introduce Islamic culture in the U.S.A.
and to maintain relations with the Islamic Community in Washington, DC., implement the decisions of the
Board of Governors, and receive dignitaries, and conduct the correspondence of the Center, represent the
Center on official meetings, and be an ex-officio member of all standing committees. He shall be the
curator of the museum and the library.
B. He shall be a Muslim scholar of considerable fame in one of the Islamic Countries.
C. He should have academic experience or be a collage [sic] professor, author and lecturer in Islamic
subjects.
D. He should have an academic standard of P.H.D., or equal to that.
E. He should be over thirty-five years of age.
F. He should have personal integrity, piety, and character which should be praiseworthy,
G. He should have ability in Arabic and Literary ability in English in addition to his national language.
H. He must not be affiliated with any political, parochial, or national groups during his term of office in the
Center." [App. 11, pp. 7-8/ SOC-00038-39]

Immediately after his appointment in 1984, Khouj opened a bank account under his own name. [*See, e.g*., App. 18/ SOC-00064, a 2002 Bank of America form reflecting information on this account] This personal account, which Khouj dubbed the "Special Account," enabled him (and by extension the Religious Section of the Saudi Embassy) to circumvent the Board's administrative role in running the Center. The Special Account, thus Khouj, received approximately $50,000 monthly from the Saudi Embassy.[7] From 1998 through 2001, the Saudi Embassy ignored repeated State Department requests to explain Khouj's role at the Center.[8]

In 1985 or 1986, the Religious Section of the Saudi Embassy arranged a fictitious "Board Meeting," to remove Howar as the Board's Treasurer and replace him with its Director, Prince Mohamad Bin-Faisal. Khalil al-Khalil, the number two person in the Religious Section, was named Secretary.[9] A letter sent to the IRS requesting change of Treasurer was rejected because there was no certified Board resolution documenting the change. In this time period, Khouj also fired The Islamic Center's accountant, thus assuming complete control of the finances. Darui's limited financial role never involved signing checks, or deciding whether to make any major expenditures, but rather it was ministerial, keeping track of bills and preparing checks for Khouj's signature.

The By-Laws call for the Director to be appointed every three years by the Board. [App. 11, p. 9/ SOC-00040] After the illegal dismissal of the Treasurer in the mid-

---

[7] This amount does not include Khouj's annual salary of approximately $50,000.

[8] In the aftermath of 9/11, greater scrutiny from the State Department forced the Embassy in 2002 to change Khouj's visa to R (religious). However, Khouj did not change his bank account status to reflect this change until July 30, 2003, [App. 19/ SOC-00065] when he used his Social Security number on the form.

[9] Because the Board technically ran the Center, the Saudis did not have the authority to make unilateral decisions regarding certain personnel. Only by faking a Board meeting could they carry out this "firing." However, by establishing financial control by refusing most aid from other Muslim countries and laundering $600,000 annually through Khouj, the Saudis controlled most Center decisions and actions. On July 9, 1999, Darui was legally named Secretary by Board members at an actual Board meeting. [App. 20, p. 2/ SOC-00067] Thus, Darui could only be fired by the Board or another fictitious Board meeting. Or the Saudis could falsely accuse him of a crime.

1980's, there was no Board meeting until 1999 when the Saudis called one to orchestrate turning control of the Center over to the Muslim World League,[10] an organization that the U.S. government had been investigating "for years because of suspicions that it knowingly or unknowingly provided funds to Osama Bin Laden." [*See, e.g.*, App. 23, pp. 1-2/ SOC-00073-74] Upon discovering the Saudi's intent, Darui contacted a key Ambassador from a member country who agreed to chair a meeting and delay the decision on this issue.

Darui viewed one of his principal roles with the Center as building confidence in U.S. Muslims to attend prayers, free of the vocal dissidents and free from legal threats. Regularly, he had to intercede to permit women to pray at the mosque. [App. 24, p. 1/ SOC-00075] His position regarding Muslim women put him at odds with Khouj, who believes men's Friday prayer attendance is "religiously mandated" in contrast to women who "are allowed to pray at home." A woman's role, according to Khouj, is "cooking and caring for small children." [App. 24, p. 3/ SOC-00077]

Another problem was that the U.S. government was prosecuting radical Islamic protestors, enabling their lawyer, Mark Lane, [App. 25, p. 2/ SOC-00079] to subpoena and depose just about anyone associated with anything happening at the Center. This problem inhibited prayer attendance as potential worshippers did not want to be subjected to legal maneuvers merely for praying at the Center.

Darui's principal personal concern and the basis for his hiring in 1984 was the Center's security. When he first arrived, Darui established an information gathering process as part of his responsibility to prevent radical fundamentalists from once again taking over the Center. Basically, it was important to know who planned to demonstrate and when "spontaneous" demonstrations would take place. Most importantly, it was

---

[10] Khouj was employed by the Muslim World League when he was hired by the Saudis in 1984 to be the Center's Director. [App. 13, p. 1/ SOC-00043] He remained so employed through Spring 1986, [App. 21, p. 1/ SOC-00071; App. 22, p. 1/ SOC-00072] in violation of the Center's By-Laws not to be "affiliated with any political, parochial, or national groups during his term of office in the Center." [App. 11, p. 8/ SOC-00039]

necessary to know the purpose of the dissident groups: Were they planning once again to overtake the Center?

Khouj was not in disagreement with this goal to keep dissidents from taking over the Center; however, his purpose was to keep the Center in Saudi control. Therefore, although Darui and Khouj had different reasons, they shared the same goal: to protect the Center. To this end, Khouj signed checks for various persons under the guise of "security." But these persons were, in fact, providing information about dissidents.

Darui also had to deal with security issues caused by the Saudi Embassy, particularly the Religious Section. He had to bar from the Center individuals who adhered to a radical form of Wahhabism and whom he considered a serious threat. They were invited to preach by Khouj, but he did so at the bidding of the Religious Section. When these radicals preached, it was a message of hate and discrimination against anyone who disagreed. Two specific examples:

**Ali Al-Timimi:** Khouj invited Timimi to preach at the Center. When Darui heard about Timimi's Wahhabi message of hatred toward non-Muslims and non-Wahhabis, he refused to allow Timimi to return even though the Saudis sent messages to overrule that decision. In 2005, Timimi was convicted in Virginia federal court of 10 counts relating to terrorism, [App. 26, pp. 2-3/ SOC-00081-82] and sentenced to life imprisonment. [App. 26, p. 3/ SOC-00082; App. 27, p. 1/ SOC-00084]

**Osama Basnan:** In the 1990s, Darui barred Basnan from the Center notwithstanding an order to admit him from Prince Mohamed Bin-Faisal, the then Director of the Religious Section. Basnan was deported on November 17, 2002 for Visa fraud, [App. 28, p. 2/ SOC-00088; App. 29, p. 3/ SOC-00091] under suspicion of having terrorist ties. Bin-Faisal is now the Director of the Department of European Union and Member States at the Ministry of Foreign Affairs of Saudi Arabia. [App. 30/ SOC-00093]

Not all threats of bad publicity came from external sources. Khouj was an internal source of concern, particularly about women. When he arrived in 1984, Khouj was married and had two children. [App. 31/ SOC-00094] Yet the following incidents took place that Darui had to manage:

- In the summer or fall of 1986, Darui received a call after midnight from Khouj to come to his townhouse at 2550 Massachusetts Avenue because of an "emergency situation." Darui recognized a young lady who had been at the Center a few days earlier seeking information about Islam. Evidently, Khouj had "proposed," she had accepted, and the "marriage" had been consummated.[11] But now Khouj was preventing her from leaving the house without his permission. The young woman was about to call the police. Darui reached a settlement with her for about $5,000, which he received from Khouj and gave to her. Then Darui paid to put her up at a nearby hotel—currently the Windsor Park Hotel—for the night. In return she provided a statement saying she had no further claims against Khouj, which Darui placed in a file titled "Dr. Abdullah M. Khouj." This file was missing from the documents seized from the Center by the FBI.

- Sometime around 1986, Khouj "married" Debbi Estrada, a U.S. citizen. He first "divorced" her from her husband by performing a rite at the Center, and "married" her the following day at the Center. Estrada immediately moved into the 2550 Massachusetts Avenue townhouse with Khouj's two children. At some point Khouj became aware that the District of Columbia recognized common-law marriage and moved his residence to McLean, Virginia but would not reveal the location to Estrada, who was allowed to remain in the townhouse. Khouj visited her daily, usually after noon prayer. He would return to the Center about two hours later.

  Estrada began exhibiting mental problems and Khouj stopped his regular visits. She was arrested at the Saudi Embassy on more than one occasion. Once, Estrada made remarks about the President so the Secret Service interviewed her. It was Darui's responsibility to make sure that her identity was not traced to the Center.

  One day Khouj found Estrada unconscious and called medics. She was hospitalized and released under the supervision of a psychologist. At that time, around early 1992, Khouj asked Darui to move Estrada into one of his rental properties. Darui placed her in Apt. 408, 1021 Arlington Boulevard, Arlington, Va., where the monthly rent was $1500. Khouj irregularly paid Darui a portion of the rent, usually $500 or $550. When he paid the partial amount, Darui recorded it in a notebook. Estrada remained in one of Darui's apartments until 2003.

  Khouj paid Estrada $250 regularly from his Special Account. Although he characterized her as being on the Center's payroll, she had no job there; in fact, he prohibited her from ever going into the Center. Khouj would write checks for Debbi and retain them for about a month (two or three checks would build up) and allow her to cash the checks only if he accompanied her to the bank.

---

[11] Khouj's Saudi wife had returned to her home country in late 1985 or early 1986.

- Sometime around 1996, Khouj "married" Noufisa Zourhi in Georgetown, Washington, DC and once again asked Darui to put up one of his "wives." Sometime that year, soon after the "marriage," she moved into 2132 N. 19 St., Apt. 202, Arlington, Va., a rental owned by Darui. This apartment is in the same building as the apartment Darui would later rent to Estrada, Khouj's other "wife." At that time, however, Estrada was living at 1101 Arlington Boulevard, another rental property belonging to Darui. Noufisa's rent was approximately $1000 a month; she was unemployed. Khouj paid Darui in full only the first few months. After that, Noufisa made only partial rent payments from a bank account that, according to Khouj, he had helped her set up and funded. Darui never met Noufisa and received the partial payments via checks personally from Khouj. When Noufisa moved after about 18 months, approximately $5,000-$6,000 was due Darui.

    At one point Noufisa's sister Rachida moved in with her and Khouj wrote checks to Rachida from his Special Account under the pretense that she was a cook for the Center.

    Khouj's positive view of polygamy is publicly revealed in a February 27, 1988 article in *The Washington Post*. [App. 32/ SOC-00095]

    After a number of years of Khouj increasing his debt to Darui for housing and feeding his "wives,"[12] and always promising to pay but never doing so, Darui became aware that Khouj had numerous bank accounts[13] and appeared to be the recipient of additional moneys from the Saudis. Darui saw checks from the Embassy made out to Khouj but they were never deposited in the Special Account. The day he discovered that Khouj had considerable hidden funds, Darui confronted him and demanded payment. Khouj agreed to repay him from his personal Special Account, which was in his Social Security number and from which he paid other personal expenses. Any check cashed by Darui was with the full knowledge and authority of Khouj. When the debt was repaid, Khouj ceased payments.

---

[12] In addition to Estrada living at several of Darui's properties from (1992-2003), Khouj asked Darui to provide her with cash at regular intervals, twice weekly: Monday and Thursday. When Darui was required to provide additional money or services (one time he had to pay for her dog being impounded) he noted the incident and amount in a notebook.

[13] Darui gradually learned Khouj had accounts at Bank of America, Chevy Chase Bank, HSBC, Suntrust, and Wachovia.

At some point in early 2005, consistent in time with Prince Turki Al-Faisal replacing Prince Bandar bin Sultan as U.S. Ambassador, Khouj began asking Darui to make copies of the Special Account's monthly bank statements for the Saudi Embassy. Darui complied with the request. All these monthly statements were boxed with the relevant original canceled checks in a storeroom adjacent to Darui's office.[14] Khouj asked Darui to make the copies because he never performed "manual labor," even requesting Darui to dial the phone for him whenever he wanted to make a call.[15]

In early 2005, Khouj told Darui that he needed an audit to send to the Embassy, and specifically named the Special Account. Because it was Khouj's personal account in his Social Security number, and only Khouj had signatory authority for it, he could have asked any firm to do an audit at any time. Darui explained to Khouj what an audit would cover, including questions about tax liability. [16] Moreover, Darui said that any good CPA would question why the Center was paying for an audit for an account in Khouj's name and Social Security number. Khouj dropped the request for an audit.

In this same time period (December 2004), Darui initiated a Board meeting, only the third in over two decades, because he learned that Khouj was planning to leave as Director and the Saudis intended to replace him with Ahmad bin Saifuddin Turkistani, former Director of the Institute of Islamic & Arab Sciences in America (IIASA), which Sen. Charles Grassley in December 2003 had included in a list of organizations suspected of laundering funds used for terrorism. The IIASA teaches Wahhabism. By calling a

---

[14] Only Khouj and Darui had a key to this room.

[15] Darui did not rely on his minimal Center salary but rather lived on earnings from his real estate holdings, which he gradually acquired over two decades, a typical American success story. With his wife, also an immigrant, he owns Blue Line Travel. Darui remained at the Center, and tolerated Khouj's demands and attempted to minimize Khouj's various problems because of his commitment to his mission of preventing radical Muslims from taking over the Center.

[16] At times Darui saw large checks (five figures) on Khouj's desk where Khouj was the payee and the Saudi Embassy was the payor. These checks were never deposited in the Special Account. It was when Darui became aware of these checks and Khouj's various other bank accounts that he demanded repayment for the care of Khouj's "wives."

meeting of the Board to assert its hiring authority, Darui planned to thwart the Saudis, who boycotted the meeting.  The Board passed a Resolution providing that when Khouj left as Director, it would be the Board (not the Saudis) that would appoint the new Director.  From this time on, the Religious Section of the Saudi Embassy began spreading the rumor that Darui was embezzling funds.

In August 2006, when Darui was out of the country on a long planned vacation (of which Khouj was well aware), Williams & Connolly filed a civil law suit against Darui on behalf of the Center, alleging embezzlement regarding the checks Khouj wrote to repay his "wives'" debts.  In early November 2006, Khouj filed an affidavit in that case, false on many points.  For example, Khouj stated in Paragraph 8 of that affidavit, "When I reviewed [the cancelled checks] I immediately saw that the copies of the cancelled checks showed that they were cashed by numerous companies that I had never seen and to which I had never authorized the payment of any of the Center's funds.  I have subsequently learned that the payees on these altered checks were companies owned and/or controlled by Mr. Darui."  Subsequently, Williams & Connolly voluntarily dismissed the case under Fed. R. Civ. P. 41.

Yet, the government has had to provide defense counsel, as *Brady* material, "copies of two checks payable to Blue Line Travel written on a personal account of Abdullah Mohammed Khouj."  [App. 33, pp.1-2/ SOC-00096-97]  Counsel has additional evidence of Khouj's transactions with Blue Line Travel and Zaal[17], the real estate company owned by Darui.

When Darui left the Center in August 2006 to begin his vacation, all the bank statements and <u>original</u> cancelled checks—including those written to repay Khouj's debt to Darui—were stored by year in boxes located on shelves to the left of the door of the storage room.  In Darui's absence, only Khouj had access to the storage room.  The

---

[17]  Also, there are numerous additional false statements in this affidavit that defense counsel will not address at this time.

government has informed counsel that its search located those boxes with numerous original cancelled checks but the original cancelled checks to Blue Line and Zaal are missing.

## FACTUAL STATEMENT SPECIFIC TO MOTION TO DISMISS COUNTS ONE THROUGH FIVE

**The Bank Accounts:** During the time period the government alleges the fraud took place, October 2000 to January 2006, The Islamic Center had five bank accounts at Bank of America:

- Administrative Account #XXXXXXXX5929
- Bookstore Account #XXXXXXXX7589
- Charity Account number #XXXXXXXX4037
- Construction Fund Account #XXXXXXXX7548
- Food Account #XXXXXXXX6121

During this same time period, the Center's Director, Abdullah M. Khouj, had numerous bank accounts, at Bank of America as well as other financial institutions. The government has placed only one at issue here: Khouj's Special Account, at Bank of America, #XXXXXXXX2726. This account was in Khouj's diplomatic tax ID until July 2003, and then in his Social Security number. [App. 19, p. 1/ SOC-00065] Throughout the relevant time period Khouj had sole signatory authority.

Twice a month the Saudi Embassy sent a check to Khouj for approximately $25,000, which he deposited into his Special Account.[18]  Khouj used this $600,000

---

[18] After Khouj's arrival at The Islamic Center in the mid-1980's, the Saudi Government sought and achieved full financial control of the Center, mostly by having employees fired and refusing to call Board meetings. Such control included discouraging and refusing monetary donations by other Muslim countries. In the last decade less than $15,000 per year was accepted from non-Saudi sources.

annual funding to pay certain administrative costs of the Center, such as gas, electric, and insurance. He also used these monies to pay personal expenses, such as regular payments of $250 for one of his "wives," Debbi Estrada, and for his cleaning lady, who was the sister of another "wife," Noufissa Zouhri. Khouj also paid car expenses from the Special Account.

In February 2002 Khouj telephonically contacted Bank of America and changed the address so that the bank statements of the Special Account would be mailed to a Post Office Box.[19] At Khouj's request Darui paid for the Post Office Box. He was later reimbursed.

Khouj did not want the Saudi Embassy (or government) to know he was surreptitiously repaying Darui for two of his "wives," Estrada and Zouhri, to live in apartments owned by Darui.[20] Estrada's rental was particularly expensive as she tended to damage the property. For example, she would damage appliances and pull electrical wires from the wall. Darui had to pay for extensive and repeated repairs. Additionally, at the request of Khouj, Darui left money and food for Estrada at regular intervals.

The bank statements for the five Center accounts throughout the relevant time period were always sent to the Center. Only the Special Account's statements were sent to the P.O. Box, but not until February 2002. There were numerous factual differences between Khouj's account and the Center's five accounts. [*See*, Chart, App. 35, p. 1/ SOC-00099]

**The Indictment:** To understand the indictment's fatal flaws regarding mail fraud it is also important to parse the allegations.

---

[19] Bank of America has strict security measures for insuring that no one other than the owner of the account can change the mailing address.

[20] Estrada occupied various apartments owned by Darui from 1992 to 2003; Zouhri occupied one apartment for about 18 months in the mid-1990s.

The government charges Darui with five counts of mail fraud.[21]  Paragraphs 9 and 10 allege that Darui added himself as an authorized signatory "to the bank accounts maintained by the Center" in violation of an unidentified "policy and practice of the Center that only the Director authorized payments and signed checks written on the Islamic Center administrative account and the Islamic Center charity account."[22] Although the government makes much of this act, and such facts should be key to the government's proofs, the indictment does not specify which accounts were changed.

Paragraph 11 alleges that Darui devised, participated in, and executed a scheme and artifice to defraud the Center.  In so doing, it alleges that Darui obtained the Center's "money and property by means of false and fraudulent pretenses, representations and promises."  The indictment does not specify the account or amount of money, or the property.

Paragraph 12 states that Darui wrote and issued, *or* caused to be written, signed and issued, *or* falsely altered checks written on the Center's various bank accounts *or* checks belonging to the Center.  The conjunction "or" permits Paragraph 12 to allege numerous possible *means* of executing the various schemes or, although difficult to discern, perhaps numerous possible *schemes*.

---

[21] These are Counts One through Five.  There are two additional counts:  interstate transportation of stolen property, and theft in the first degree.

[22] Darui signed as signatory only because there had to be two signatories to these five accounts for the Center to retain its 501(c)(3) status.  Khouj clearly accepted the fact there could be additional signatories as reflected in his June 8, 1988 letter to Bank of America.  [App. 36, pp. 1-2/ SOC-00100-01]  Such evidence contradicts the government's allegation that having two signatories was in violation of some practice and policy of the Center.  Moreover, the signatory documents described in the Indictment were signed December 4, 2001, almost two years after the government alleges the scheme began.  Darui never signed a check for any of these accounts.  Darui was never added as an authorized signatory to the Special Account.

Paragraph 13 alleges that Darui[23] received invoices, prepared checks in payment of those invoices for the Director's approval, received approval and the signed checks from the Director (Khouj), copied the approved checks and invoices, and mailed the checks "to the appropriate vendor or creditor."  This paragraph, therefore, alleges that Darui lawfully performed his duties.

Paragraphs 14, 15, and 16 contradict Paragraph 13 by alleging Darui did not, in fact, mail the checks to the appropriate vendor or creditor but, instead, substituted, through forgery, the approved payee with the name of companies owned and controlled by him, and then uttered those checks by depositing them in the "substitute" payee's bank account.  The paragraphs do not specify any account, amount, check number, or payee.

Paragraph 17 alleges another scheme whereby Darui allegedly stole "checks payable to employees or contractors of the Center" and deposited them into his companies' bank accounts.  The indictment does not specify the account, the amount, the check number, or the employee.

In yet another scheme, Paragraph 18 states that Darui submitted duplicate checks and invoices for bills that had already been paid.  He then stole *either* the "original" check or the "duplicate" check and sent the "other" check to the appropriate vendor to "conceal his embezzlement."  No specifics are provided.

Incredibly, Paragraph 18 claims that the Director, who has a doctorate degree, did not "realize" he was signing a "duplicate check for an invoice that supposedly had been paid."[24]  Perhaps this absent mindedness could be believable for one or two check

---

[23] Darui is erroneously identified as "business manager for the Center."  He was titled "manager."  In 1999, Darui was appointed Secretary by The Islamic Center Executive Committee.  He had limited financial duties, mostly ensuring bills were paid by Khouj, who at the behest of the Saudi's had fired almost all key employees including the Treasurer.  Darui's Center salary ranged from $20,000 to $40,000, the latter amount the last full year he worked.  He did not rely on his salary, but earned a living from his real estate investments and Blue Line Travel, which he owns with his wife.

[24] The government is forced to contrive this theory because none of the vendors complained of not being paid.  In fact, all received their checks timely and regularly.

writing incidents, but not for six years and $430,000 worth of checks. The government's claim is further belied by the fact that for every check issued, Khouj also signed a corresponding voucher. [*See, e.g.*, App. 37, p. 1/ SOC-00102]

The government claims an astonishingly simple-minded attempt to conceal the varied schemes detailed above. The indictment alleges Darui furthered those various schemes by changing the mailing address from the Center to a Post Office Box for only <u>one</u> of the multiple accounts from which he was supposedly stealing, the so-called Special Account. *See id.*, ¶¶ 19-22.[25] Darui could not have answered the random security questions required by Bank of America when a person telephonically requests a change in the mailing address. As stated above, this Special Account was in the name and taxpayer identification number of Khouj, not The Islamic Center. It was Khouj, in the presence of Darui, who changed the mailing address so that these bank statements, which included regular stipends of $250 to one of his "wives," Estrada, and payments of a large debt to Darui for the housing and feeding of the "wives," would not be reviewed by others at the Center or by the Saudi Embassy.

Paragraph 23 asserts that Darui "deposited the Center's checks" into his own companies' bank accounts. But not one check is described nor is the specific bank account from which the money was allegedly taken. Such information is crucial to a defense because the Special Account does not belong to the Center. Moreover, the indictment provides no basis for how the accusatory amount of $430,000 is calculated.

Finally, Paragraph 24, which comprises the five mail fraud counts, alleges mailings of five monthly bank statements, which were done "for the purpose of executing *the above-described scheme and artifice* and attempting to do so." *Id.*, ¶ 24 (emphasis added). However, these five mailings consist of five Special Account monthly statements, each one containing hundreds of checks. The indictment does not specify

---

[25] He did so belatedly since the government claims Darui began his scheme in 2000 and the Post Office Box was opened in February 2002.

which of the many checks is involved in which scheme. Moreover, that account was not owned by the Center.

## MOTION TO DISMISS SUMMARY ARGUMENT

The government has failed to allege essential elements of mail fraud while simultaneously alleging multiple offenses in Counts One through Five. The indictment also fails to provide any specificity regarding which checks or bank accounts are part of the alleged scheme. As a result, Darui is unable to discern which scheme or facts he must defend against, in violation of his Fifth and Sixth Amendment rights. Such pleading also raises the serious specter of a non-unanimous verdict. Lastly, the mail was only used for the Special Account, not any other account referred to in the indictment.

## MOTION TO DISMISS ARGUMENT

The Sixth Amendment requires that "in all criminal prosecutions, the accused shall enjoy the right to be informed of the nature and cause of the accusation." U.S. Const. amend. VI; *Russell v. United States*, 369 U.S. 749, 762 (1962). This constitutional requirement is implemented by Federal Rule of Criminal Procedure ("FRCP") 7(c)(1), which states that the indictment "must be a plain, concise, and definite written statement of essential facts constituting the offense charged . . . ." Notice to the defendant of the essential facts that underlie the charge alleged is necessary to protect the defendant and insure he is aware of the charges he must be prepared to meet. *United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004).

Two primary criteria for judging the sufficiency of an indictment are whether:

1. it contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet; and

2. the record shows with accuracy to what extent the defendant may plead a former acquittal or conviction in case other proceedings are taken against him for a similar

offense. *United States v. McBride*, 498 F.2d 683, 685 (D.C. Cir. 1974). *See also Hamling v. United States*, 418 U.S. 87, 116 (1974); *United States v. Conlon*, 628 F.2d 150, 155 (D.C. Cir. 1980) (stating that "[t]he test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment.").

Although Darui has also moved for a Bill of Particulars to assist in preparing his defense, "it is a settled rule that a bill of particulars cannot save an invalid indictment." *Russell*, 369 U.S. at 770. Because they do not fulfill these requirements the five counts must be dismissed. *See United States v. Nance,* 533 F.2d 699, 701 (D.C. Cir. 1976).

### A.    Counts One through Five fail to allege the elements of mail fraud because they do not specify any facts of the scheme and do not state the victim.

18 U.S.C. §1341 punishes:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives there from, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing. . . .

18 U.S.C. §1341.

Mail fraud has two elements: (1) a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts). *Schmuck v. United States*, 489 U.S. 705, 721 (1989); *United States v. Lemire,* 720 F.2d 1327, 1334-35 (D.C. Cir. 1983) (stating that mail fraud requires proof of (1) a scheme to defraud, and (2) use of the mails to further that scheme).

By merely restating the language of the mail fraud statute, the indictment fails to allege the required elements of that offense, impairing Darui's ability to prepare his

defense. *Hamling*, 418 U.S. at 117-18 ("Undoubtedly the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." (citation omitted)).

In reviewing the standards for assessing the sufficiency of charges, the Court of Appeals for the District of Columbia Circuit has the following test:

> In some cases, it is enough if the indictment puts the charge in the words of the statute but this is acceptable only where the statute itself fully, directly, and unambiguously sets forth all of the elements of the offense. The more generally applicable rule is that the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged.

*Conlon*, 628 F.2d at 155 (internal footnotes omitted). *See also Nance*, 533 F.2d at 701 ("[F]ollowing the generic wording of a statute is not necessarily sufficient.").

An indictment that fails to advise the defendant "with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute." *Russell*, 369 U.S. at 765. Although necessary, the statutory language does not of itself suffice. "[T]he statutory language in a mail fraud case without any fair indication of the scheme or artifice relied upon, or the false pretenses . . . forming a part of it [is] insufficient." *Nance*, 533 F.2d at 702 (internal citation omitted). The general description of the offense may include the statutory language but "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Id.* at 701 (citing *United States v. Hess*, 124 U.S. 483, 487 (1888)).

Not one check is identified as having been altered, not by number, or amount, or date. Not one original payee is specified. Nor is the altered payee provided. The account is not identified in the multiple characterizations of the alleged schemes (or means), a crucial omission because the Center's accounts have significantly different legal

consequences than the Special Account.  Thus, the account on which the check is drawn is crucial to a defense.  If Darui were found guilty of the five mail fraud counts as worded in the indictment, what checks or acts would be precluded under double jeopardy for another indictment under some other fraud theory?

Just as important, the indictment fails to allege a scheme to obtain money or property from the one who was deceived.  Mail fraud is a specific intent crime.  *United States v. Rhone*, 864 F.2d. 832, 836 (D.C. Cir. 1989).  In *United States v. Lew,* 875 F.2d 219, 221 (9th Cir. 1989), the court observed that the "[Supreme] Court made it clear [in *McNally*][26] that the intent must be to obtain money or property from the one who is deceived."  Accordingly, within the meaning of the mail fraud statute, the scheme must deceive the same person whom it deprives of money or property.  *Id*.  *See also Rhone*, 864 F.2d. at 836 (holding that the prosecution was required to prove that defendant had the specific intent to defraud the government); *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1074 (D. Md. 1991) ("the better rule is to require that the person allegedly deceived by the misrepresentations be the person injured by the misrepresentations").[27]

Paragraph 11 asserts that Darui devised a "scheme and artifice to defraud" the Center.  However, the government provides no basis that the money or property allegedly obtained by Darui belonged to the Center.  The only bank account in Counts One through Five belonged to Khouj.  Thus, there is no convergence of the deceived and the injured here because the Special Account did not belong to Center.

---

[26] *McNally v. Unites States*, 483 U.S. 350, 358 (1987) (superseded on another point by statute).

[27] Although the Court in *United States v. Mizyed*, 927 F.2d 979 (7th Cir.), *cert. denied*, 500 U.S. 937 (1991), noted that "victims" of fraud do not have to be identified by name in the indictment; "instructions on the elements of mail fraud must require the jury to find that the victim of the scheme was *itself* defrauded of money or property." *United States v. Keane*, 678 F.Supp. 708, 711(N.D.Ill. 1987), *aff*'d 852 F.2d 199 (7th Cir. 1988), *cert. denied* 490 U.S. 1084 (1989) (emphasis in original).

The five counts must be dismissed because they do not sufficiently allege violation of the mail fraud statute.

**B.**     ***The mail fraud charges are duplicitous because, as alleged, each count contains more than one mailing and various allegations of schemes and means.***

"Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Hubbell,* 177 F.3d. 11, 13 (D.C. Cir. 1999); *United States v. Robin*, 693 F.2d 376, 378 (5th Cir. 1982); *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980). The prohibition on duplicity "reflect[s] fundamental due process rights of defendants[.]" *United States v. UCO Oil Co*., 546 F.2d 833, 835 (9th Cir. 1976).

The indictment is duplicitous regarding the mailings in two ways:

1)  The indictment attributes more than one mailing to each of the five counts.

In addition to the five mailings of the bank statements in Counts One through Five, paragraph 13 alleges, as part of the "Manner and Means" of the scheme to defraud, that Darui "received mail and gathered invoices received from various vendors and creditors of the Center" and mailed checks "via the United States Postal Service, to the appropriate vendor or creditor." (Because nothing in paragraph 13 is illegal, it is difficult to discern how receiving a valid bill and mailing the payment is using the mail as part of a scheme to defraud.) To the legal point: the indictment does not specify the count or counts to which each of the paragraph 13 mailings refers.

2)  Each mailing contains over 100 transactions.

At first blush the indictment appears to comply with the requirement of containing only one mailing (one crime) per count but, in fact, it fails the test. Although each count cites just one mailing (a monthly statement), each mailing (monthly statement) contains over 100 checks or transactions. The indictment charges various schemes. Which scheme

or method is used in which of the over 100 monthly check transactions that comprise the five monthly bank statements?[28]

The Justice Department's guidance for prosecuting mail fraud cases concedes that such pleading renders an indictment duplicitous:

> Each mailing or transmission in furtherance of the scheme and artifice to defraud is a separate offense. *See, e.g.*, *United States v. Pazos*, 24 F.3d 660, 665 (5th Cir. 1994) (mail fraud); *United States v. Rogers*, 960 F.2d 1501, 1514 (10th Cir.) (each use of mails is separate offense), *cert. denied*, 506 U.S. 1035 (1992); *United States v. Castillo*, 829 F.2d 1194, 1199 (1st Cir. 1987) (wire fraud). Accordingly, proper draftsmanship requires that only one mailing or transmission should be alleged in each count. Otherwise, the count may be duplicitous.

United States Attorney's Manual, Criminal Resource Manual, §974.

The dangers inherent in a duplicitous indictment are the following:

> 1) the indictment may fail to inform the defendant of the charges against him;
> 2) the defendant could be subjected to multiple prosecutions for the same offense;
> 3) the defendant could be prejudiced by evidentiary rulings at trial; and
> 4) the defendant could be convicted by less than a unanimous verdict.

*Robin*, 693 F.2d at 378.

Here, the five counts implicate all four concerns. Concerns 1) and 2) have been addressed in the argument for failure to fulfill elements of the offense.

Concern 3): If the Court permits the government to present the evidence as alleged in the indictment, at the very least there will be serious confusion as to which facts relate to which transactions. Counsel question how the Court can even make rulings based on the non-specific wording of the five counts. The government has gathered the checks and the accounts, pureed them, and wants the resultant mush to taint any and all allegations.

---

[28] Again, the specified mailed bank statements and cancelled checks in Counts One through Five are only from the Special Account, which did not belong to the Center.

Concern 4):  Each of the five counts contains multiple distinct and separate offenses and schemes; therefore, a conviction could be obtained without a unanimous verdict because each juror could pick a different scheme within the count.  *See United States v. Bruce,* 89 F.3d 886, 890 (D.C. Cir. 1996).

The mail fraud counts must be dismissed.  In the alternative, the Court should require the government to elect only one scheme and describe it by specifying the account, check number, date, amount, payee, and the relevant use of the mail.  Additionally, the government must identify the person deceived.

**C.     As a matter of law, the mailings described in Counts One through Five could only have furthered a scheme to steal from the "Special Account," not the other accounts and other schemes unrelated to those mailings.  Therefore, if the mail fraud counts are not dismissed the only evidence admissible for mail fraud must be related to the Special Account.**

Use of the mails to further a scheme to defraud is an element of mail fraud.  *Parr v. United States*, 363 U.S. 370, 390 (1960) (holding that only if the mailings were "a part of the execution of the fraud" or were "incident to an essential part of the scheme" do they fall within the proscriptions of the federal mail fraud statute) (internal quotation omitted).  Although the mailings need not be an *essential part* of the scheme to qualify, they must be "*incident* to an essential part of the scheme."  *Schmuck*, 489 U.S. at 710-11 (citation omitted) (emphasis added).

The government alleges that Darui caused Bank of America to mail monthly account statements for *only* the "Special Account."  The government claims that Darui surreptitiously rented the Post Office Box to conceal his activities.[29]  ¶ 19-22, 24.  *A fortiori*, such mailings could *only* further a scheme to defraud as to the "Special Account" and none other.  Such mailings have nothing to do with an alleged scheme to steal from

---

[29]  Darui refutes this allegation but argues that even if true, there is no allegation any other account was changed.

any other accounts, much less to convert and forge "checks payable to employees or contractors of the Center."   ¶ 17.  The indictment concedes as much:

> ¶19:  "In approximately February 2002, the mailing information *for the Islamic Center special account* was changed."
>
> ¶21:  "It was further part of the scheme and artifice that to conceal his diversion of *the Center's funds withdrawn from the Islamic Center special account*."
>
> ¶22:  "It was further part of the scheme and artifice that to conceal his diversion of *the Center's funds withdrawn from the Islamic Center special account* ."
>
> ¶24:  "On or about each of the approximate dates listed below, in the District of Columbia and elsewhere, defendant FARZAD DARUI, *for the purpose of executing the above-described scheme* and artifice and attempting to do so, knowingly caused the following items to be delivered by mail by the United States Postal Service according to the directions thereon."

(Emphasis added).

On the face of the indictment, the mailings at issue could only have furthered a scheme to defraud whoever is the owner of the "Special Account."  Therefore, mailings as to any other account could not have been "a part of the execution of the fraud" or "incident to an essential part of the scheme."  If the Court does not dismiss Counts One through Five, it should prohibit the government from using evidence from any account other than the Special Account, the only account where the Post Office Box is alleged to have been used.

## CONCLUSION

For the reasons stated above and those that may be stated at any hearing on this motion, the Court should dismiss Counts One through Five of the indictment.

FARZAD DARUI

By: _____/s/ Victoria Toensing_____
    Victoria Toensing  (DC Bar # 304980)
    Joseph diGenova
    Brady Toensing
    diGENOVA & TOENSING, LLP
    1776 K Street, N.W., Suite 737
    Washington, D.C. 20006
    (202) 289-7701
    (202) 289-7706 (fax)
    Counsel for Defendant

By: _____/s/ Aaron S. Book_____
    Aaron S. Book (DC Bar # 490815)
    Steven T. Webster (admitted *pro hac vice*)
    WEBSTER BOOK LLP
    1 North King Street
    Leesburg, Virginia 20176
    703-779-8229
    703-991-9178 (fax)
    Counsel for Defendant

## CERTIFICATE OF SERVICE

I certify that on August 15, 2007, a true copy of the foregoing was served electronically on the following:

Ronald Wesley Sharpe
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530

_____/s/ Victoria Toensing_____
Victoria Toensing

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No. 1:07-cr-00149-RCL |
| | ) | |
| FARZAD DARUI, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER RE:**
**DEFENDANT FARZAD DARUI'S MOTION**
**<u>TO DISMISS COUNTS ONE THROUGH FIVE OF INDICTMENT</u>**

THIS CAUSE came to be heard on Defendant's Motion to Dismiss Counts One

through Five of the Indictment and Defendant's Memorandum of Law in Support thereof,

and good cause having been shown, it is this _____ day of _____ 2007,

hereby

**ORDERED** that defendant Darui's Motion is granted; and it is further

**ORDERED**, that Counts One through Five are dismissed.

_____
Royce C. Lamberth, U.S. District Judge

WE ASK FOR THIS:


By:_____/s/ Victoria Toensing_____

    Victoria Toensing  (DC Bar # 304980)
    Joseph diGenova
    Brady Toensing
    diGENOVA & TOENSING, LLP
    1776 K Street, N.W., Suite 737
    Washington, D.C. 20006
    (202) 289-7701
    (202) 289-7706 (fax)




By:_____/s/ Aaron S. Book_____

    Aaron S. Book  (DC Bar # 490815)
    Steven T. Webster (to be admitted *pro hac vice*)
    WEBSTER BOOK LLP
    1 North King Street
    Leesburg, Virginia 20176
    703-779-8229
    703-991-9178 (fax)


## CERTIFICATE OF SERVICE

       I certify that on August 15, 2007, a true copy of the foregoing was served by electronically on the following:

    Ronald Wesley Sharpe
    U.S. ATTORNEY'S OFFICE
    555 Fourth Street, NW
    Washington, DC 20530


    _/s/ Victoria Toensing_____
    Victoria Toensing


◄ **Back to Article**        🖶 **Click to Print**



Monday, Sep. 08, 1980

# The Wars of Assassination

By Roger Rosenblatt

Shortly before noon on the morning of July 22, the sort of day when Washingtonians go Southern and fan themselves and sigh, Ali Akbar Tabatabai, late of the Shah's employ, strode to answer the bell of his contemporary rustic two-story home and found Iran standing in the doorway. You may imagine his surprise. Who would have thought to find Iran in such a place; in tasteful suburban Bethesda, Md., no less; dressed up as a postman, of all things; with a gun in its hand to boot? But there it was, large as death for Mr. Tabatabai to contemplate in the second or two before his homeland in disguise made its special delivery to his abdomen. Assassins are not what they used to be.

What has changed, especially in the past few years, is that assassination has become an official form of warfare. National leaders like Libya's Gaddafi and Syria's Assad announce open season on their enemies, and whether or not they actually hire the hit men or, more likely, merely encourage assassins by their lusty rhetoric, they leave little doubt of their connivance. Not far from where Mr. Tabatabai met his postman, former Chilean Ambassador Orlando Letelier was blown apart on Embassy Row in 1976. The day before the Tabatabai assassination, former Syrian Prime Minister Salah Eddin al-Bitar was shot to death in Paris. Two days before that, former Prime Minister Nihat Erim of Turkey was murdered in a suburb of Istanbul. That brings to nearly 1,000 the number of people killed in these "wars" since 1970—not all under the tutelage of governments, yet enough to create a problem. There is not much the world can do about a lone screwball or a roving band, but is it equally powerless to deal with an assassin state?

Of course, in order to stop these assassinations one must first sincerely want to do it. One big reason that places like Libya, Syria and Iran may get away with murder in other countries is that those other countries have decided that they prefer oil to order. The absence of sanctuaries in the modern world must be of general help as well. He who would mow down an archbishop

saying Mass in a chapel in San Salvador (or storm a mosque, or sack an embassy) would hardly hesitate to invade Bethesda. The public heart recoils at such goings-on, but briefly. Before Mr. Tabatabai's murder, someone suggested to his neighbors, the Milks, that they paint a purple arrow on their garage, with the message: "The Milks live here—Tabatabai lives over there." Just funning, of course, but on the money.

To many, assassination appears to have become a kind of international adventure serial, available both in paperback and next door, and so is to be considered as something quasi-fictional, set apart by razzle-dazzle technology and melodrama from the life of real grief and real blood. The bestselling Matarese Circle has at the base of its plot the idea of the original assassins, the hashshashin, a bunch of hashheads who practiced contract murders at the behest of an "Old Man of the Mountains." We have had Three Days of the Condor, one Day of the Jackal, even a Day of the Dolphin—all equally preposterous and plausible, thanks to the strapped imaginations of real-life bureaucrats. Who but a hack could have thought up 1978's Bulgarian defector "poison umbrella" caper in London? The first time a dolphin is hauled in for questioning, who will giggle?

Perhaps fiction writers have hit on a truth that murderous regimes have always known: that many people secretly admire murders, even real ones, provided they can be kept at a respectable distance and performed with a touch of class. After all, murder can be the most romantic, if temporary, solution to a problem, which is why the Romantics could not get enough of it. Thomas De Quincey, the Romantic essayist, went so far as to propose "Murder as One of the Fine Arts." Historian Franklin Ford observed, in a brilliant article in Harvard magazine (February 1976), that throughout most of the 18th century there were no important political murders in Europe or America (until the final decade, when the Age of Reason could no longer contain itself) primarily because that period was notably short on fanaticism. Not so the 20th century. It has given birth to a cause a minute, and causes make heroes, and heroes targets.

It may also be that the world has never really shaken its revolutionary cast of mind since that final decade of the 18th century, when the French Reign of Terror wed murder to freedom. All the revolutions since have sealed the knot, if only theoretically, and somewhere in the modern mind may lie the automatic connection of assassination with something good and hopeful. That would be especially true of places where corrupt administrations are unseated at gunpoint. The assassin states in turn may depend on that connection, trusting that the elimination of ex-employees of defunct governments will be held akin to the expunging of the Tsars.

The leaders of those states might argue that assassination is booming because it is in fact better than

bona fide warfare, better for everybody for being relatively neat (a black van, a bloody lawn) and involving fewer losses. That is the practical argument, and on the surface it holds. The moral argument is much harder to make because the justifications will vary with particular situations. Yet tyrannicide has had strong moral defenders throughout history. In the years following the St. Bartholomew's Day massacre of 1572, in which 20,000 French Huguenots were slaughtered on the hysterical command of Charles IX, a famous treatise called Vindiciae Contra Tyrannos was drawn up by a group of French political theorists known as the Monarchomachi (bearers of the sword against monarchs) that specifically outlined the circumstances for doing in a tyrant. Assassins have even been rewarded. Ching Ko, who made a stab at ending the hegemonic ambitions of Emperor Ch'in Shih Huang-ti (259-210 B.C.), was elevated to Chinese folklore. Those who killed Trujillo in 1961 have long been honored by the Dominican Republic.

In fact, America is one of the few places that has taken a consistently dim view of assassinations, perhaps because the country came to life without a reign of terror, perhaps too because those who have yelled or thought "Sic semper tyrannis!" in America have murdered some of the country's best-loved leaders. Hardly an American can hear the word assassination without silently mourning the Kennedy brothers and Martin Luther King Jr. When the American public learned of the CIA's brainstorm to poison Castro's cigars, the laughter covered the shame. Still, there are plenty of Americans among others who, looking backward, would gladly have seen Hitler and Stalin knocked off in their prime, and then fretted about the moral issue later. The trouble is that tyrannicide can be habit-forming. A member of the Argentine federal police recently told TIME's George Russell: "If the U.S. had not been blind, how much it could have saved by killing Khomeini in France. All that was needed was $2,500 for the contract and a good meal. But they did not have the necessary vision."

The main flaw in the tyrannicide argument these days, of course, is that the current brand of murder-by-government has nothing to do with tyrannicide. Khomeini may claim that the execution of those who served the Shah is killing a tyrant by proxy, but, as is the case with so many claims from the frenzied quarters, that is deadly nonsense. The purpose of such murders, which is one of the two principal purposes of modern assassinations, is revenge—revenge affixed to an insurance policy against past enemies having a future. When Stalin engaged a fellow to place an ice ax in Trotsky's head, he was making a similar point.

That kind of killing is only distinguishable from pure terrorism, the other principal purpose of modern assassinations, by a matter of intention. Like the assassin state, the outlaw terrorists, even those who destroyed 83 innocents in the Bologna train station on Aug. 2, might also claim that their work is superior to conventional warfare. On moral grounds, they have their all-encompassing,

Case 1:07-cr-00149-RCL     Document 20-3     Filed 08/15/2007     Page 4 of 102

all-justifying cause. And at the level of effectiveness they may point to whole sections of cities reduced to battle zones because of their bloody diligence. The real difference between assassin states and terrorists is that the states are not out to menace other countries as much as they are their own citizens. In a way, the leaders of these states have the best of both odd worlds: they are in power, and they act as if they are continually trying to usurp it.

Apparently these leaders believe that murder will ensure their longevity. They could be right, but history is discouraging on this point. Though a natural target for tyrannicide, Charles IX died of tuberculosis at the age of 23; but his brother Henry III, who was responsible for a couple of assassinations of his own, was stabbed to death by a fanatic, and his cousin and successor, Henry IV, who deserved much better, met the same end. In South America, Pizarro, who assassinated the Inca Emperor Atahualpa, was himself assassinated, thus setting a trend on that continent. Jean Paul Marat, who advocated bloodbaths for the French Revolution, wound up with a bloodbath to himself. Nestled in his suds, he assured Charlotte Corday, before she stabbed his heart, that his enemies "shall soon be guillotined."

If history does not favor assassins, literature offers no encouragement either. Characters like Brutus and Macbeth admitted such impediments to the success of their dark deeds as guilt and contemplation. One of the most interesting studies in assassination, Alfred de Mussel's Lorenzaccio, offers a bit more hope to Gaddafi & Co. in that everyone agrees that the murdered Alessandro de Medici was a first-class scoundrel. Yet, like Hamlet, the assassin Lorenzo goes to pieces in the play. The real Lorenzo was judged as much a traitor as a liberator. And De Mussel's Lorenzo, like his real-life model, is assassinated in turn, presenting yet one more example of lethal pigeons coming home to roost.

But an appreciation of the humanities is not the long suit of political murderers. Simple folk on the whole, they traffic mainly in the capacity of human fear, especially the fear of sudden death, and they trust the raddled citizenry to watch and sit still. The claiming of credit for assassinations is thus at once a show of force and a philosophy. The governments of Syria, Libya, Iran and elsewhere are not to be counted on for pity, or for maintaining a sense of international community. They may, however, be counted on for killings, which often give governments a stature they might never earn by more subtle or complex means.

If such attitudes were perceived in an individual, he would be exported to the lunatic fringe of whatever society he sought to live in. Feverish, volcanic, he would appear to be emotionally out of this world, existing in something very close to a social vacuum, in which his personal or political

cause may mature and fester until it is both ripe and rotten for some terrible act. Love and respect are probably beyond his reach; he merely wishes to be noticed. If society should notice him by putting him away, his dreams would be both dead and complete.

When a government proves to function in a social vacuum, the process of putting it away is more of a problem. Short of war there are words of protest, but in the middle distance the assassin has free rein. The rein might be shortened considerably if the words of protest were harsher or more frequent, or, better still, if they were attached to an economic quarantine. To treat killer governments as pariahs would only be fair, after all, and the purpose of a quarantine is to prevent contagion. To date, however, the world seems to be going on the hope that the postman always rings twice, that the assassins of Mr. Tabatabai and others may eventually turn on their masters. So it opens the door and awaits the mail. By Roger Rosenbaltt

 Click to Print

**Find this article at:**
http://www.time.com/time/magazine/article/0,9171,924429,00.html

---

◄Return to Full

## LexisNexis™

Copyright 1980 The Washington Post
The Washington Post

July 23, 1980, Wednesday, Final Edition

**SECTION:** First Section; A12

**LENGTH:** 765 words

**HEADLINE: Activist Was Nearly a Stranger to His Bethesda Neighbors**

**BYLINE:** By Dale Russakoff and Benjamin Weiser, Washington Post Staff Writers

**BODY:**
"Mr. Tabatabai's shot!" the dark-haired young man blurted out in broken English, his left leg bleeding, as he banged on the sliding-glass door of the two-story brick Bethesda home.

Inside, a terrified teen-aged girl looked up from the television show, "Loveboat," and slid open the door.

Shawn Tabatabai, his left trouser leg rolled up to expose a gashed and bleeding shin, hobbled into the richly decorated living room leaving a track of blood through the house. He climbed the stairs to the master bedroom and called the police.

Minutes earlier, the man's cousin, Ali Akbar Tabatabai, a leading opponent of Ayatollah Ruhollah Khomeini, had been fatally shot -- terrorism had come to a quiet Bethesda neighborhood.

Stretching out for several blocks off Greentree Road, the neighborhood comprises contemporary, two-story homes whose prices average about $250,000.

Tabatabai had lived there for two years, keeping a distance from most of his neighbors, rarely seen outside the brick and wood home where he was killed.

"He was a bachelor in a neighborhood of families. He didn't have children, he didn't have animals, he didn't work out in the yard. We had very little in common," one of his neighbors said yesterday.

But Tabatabai did cultivate a friendship with one family, Dr. Murray Kirshner, a dentist, and his wife and children who lived next door.The Kirshners said Tabatabai's home was expensively furnished and decorated with his own art work.

The Kirshners said Tabatabai expressed fear to them, as he had to other neighbors, about his own safety Dr. Kirshner said Tabatabai told him he frequently had secret meetings in shopping centers, but recently felt safer in his own home.

Ever since the shah was overthrown, neighbors had joked in black comic fashion, that the aloof

Tabatabai might be targeted for attack by antishah forces.

"A friend of mine said I should put a big purple arrow on my garage, pointing toward his house and saying, 'The Milks live here, Tabatabai lives over there,'" said Leslie Milk, who lives behind Tabatabai.

Tabatabai seemed increasingly worried about his own safety in the aftermath of the Iranian revolution and the ascendency of Ayatollah Khomeini, neighbors said.

He directed neighborhood children not to use the public sidewalk running behind his house. He started keeping his shades and curtains tightly drawn round the clock. He had a burglar alarm system installed and tested it repeatedly, letting it blare throughout the neighborhood. He called Montgomery County police several times to report threats on his life. Police said they made numerous trips to inspect the house.

But neighbors said none of this seemed particularly frightening until yesterday, when even mundane happenings began to come under the scrutiny of swarms of police and FBI agents probing the assassination of their neighbor.

On nearby Fernwood Road, police found an abandoned U.S. Postal Service delivery truck, believed to have been driven by Tabatabai's assassin. s

Michael Kirshner, 15, one of Tabatabai's next-door neighbors, recalled seeing a man driving such a jeep-type mail truck toward Tabatabai's house about 11:40 a.m. yesterday. "The mailman had already come, so I thought it was pretty strange to see a mailman coming up the street," Kirshner said.

Police guarded the abandoned red, white and blue truck and dusted it for fingerprints before towing it away.

Meanwhile, curious neighbors flocked to the murder scene to learn more details of the assassination of the man they hardly knew.

The neighbors recalled that in recent days, many expensive cars -- including a Rolls Royce -- had been parked outside the house.

"Some business was obviouly going on in there," one neighbor remarked.

Police cordoned off Tabatabai's property with a yellow plastic ribbon and later swept the rain-soaked rolling lawn with metal detectors looking for bullet casings.

A late afternoon thunderstorm cleared away most of the curiosity seekers, and by early evening the only other evidence that anything was amiss was a broken window and glass littering the ground behind the slain man's home. w

It was from that window that the young man had fled from Tabatabai's house to the home about 50 feet away where the teen-aged girl let him use the telephone.

The girl and her family were later besieged by police and reporters, who upset what was to have been a full day of house cleaning. "This was the day I'd set aside to do all the housework that I hadn't gotten

done," the girl's mother said.

**GRAPHIC:** Picture, Police officers and FBI agents search the area around the home of Ali Akbar Tabatabai after the Iranian opponent of Khomeini was slain at his front door. By Larry Morris -- The Washington Post

◄Return to Full

## LexisNexis™

Copyright 2007 The Financial Times Limited
Financial Times (London, England)

April 13, 2007 Friday
London Edition 1

**SECTION:** WORLD NEWS; Pg. 9

**LENGTH:** 522 words

**HEADLINE: Fugitive says he met missing ex-FBI agent in Iran**

**BYLINE:** By NAJMEH BOZORGMEHR and GUY DINMORE

**DATELINE:** WASHINGTON and TEHRAN

**BODY:**

An American fugitive living in Iran since he murdered an Iranian opposition activist in the US in 1980 has revealed that he met a former Federal Bureau of Investigation agent shortly before thelatter disappeared on theIranian island of Kish a month ago.

US authorities have been anxiously seeking information about the former agent, Robert Levinson, for several weeks. The Iranian foreign ministry says it is trying to clarify his whereabouts. US officials suspect he is in Iranian detention.

European diplomats in Washington hesitate to describe Mr Levinson as a "hostage", saying details of his case remain murky.

They are concerned that the US, Britain and Iran are stumbling into a newphase of tit-for-tat prisoner-taking that was kicked off when the US detained five Iranian officials in Iraq in January, sparking anger in Tehran.

The US State Department has revealed few details about Mr Levinson's visitto Iran, insisting he was there on purely privatebusiness.

 But Dawud Salahuddin, an American who converted to Islam and was given refuge in Iran in 1980, shed light on the mystery when he confirmed to the Financial Times in Tehran that he had met Mr Levinson in a hotel on Kish on March 8.

Mr Salahuddin, known in Iran as Hassan Abdulrahman, said he was detained by officials in plain clothes at 11pm and taken fromthe room he shared with Mr Levinson to be questioned about his Iranian

passport. Mr Salahuddin was freedthe next afternoon and told by the officials that Mr Levinson had flown back to Dubai.

"I don't think he is missing, but don't want to point my finger at anyone. Some people know exactly where he is," Mr Salahuddin said. "He came only to see me."

According to Mr Salahuddin, the meeting was only to put Mr Levinson in touch with Iranian authorities to help his investigations on smuggling of cigarettes as part of the former agent's work for a tobacco company.

"What he was trying to do in Kish was to find a channel to introduce him to authorities in Tehran to help find out about networks involved in smuggling of cigarettes, because his contractor company has been losing a lot of money."

His account of their meeting confirmed the suspicions of friends of Mr Levinson in the US who believe he was arrested after meeting Mr Salahuddin.

Mr Salahuddin has admitted in interviews to killing Ali Akbar Tabatabai, a former Iranian diplomat under the shah, in Maryland in 1980, shortly after the 1979 Islamic revolution in Iran.

In the past he has expressed an interest in returning to the US to face justice. He has also written about his long-distance relationship with another FBI agent, the late Carl Shoffler, who wanted to get him back to the US.

US officials have stressed that Mr Levinson, whose expertise lies in Russian criminal gangs and counterfeiting, was not in Kish on US government business.

Mr Salahuddin is worried about Mr Levinson's health but he is also confident "he is well taken care of" by Iranian authorities.

He insisted Mr Levinson was innocent, blaming both Iranians for their "paranoia" about Americans and the US for its foreign policy which had made the former FBI agent "an innocent victim".

**LOAD-DATE:** April 12, 2007

MotherJones.com   News   Commentary   Arts   Discuss   Reader Services   About Us

**To print this page, select "Print" from the File menu of your browser**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

MotherJones.com / News / Feature

# Cold War, Holy Warrior

Ike was president. Washington was desperate for Arab allies. Enter an Islamist ideologue with an invitation to the White House and a plan for global jihad.

**Robert Dreyfuss**
January/February 2006 Issue

In the fall of 1953, the Oval Office was the stage for a peculiar encounter between President Dwight D. Eisenhower and a young Middle-Eastern firebrand. In the muted black-and-white photograph recording the event, the grandfatherly, balding Ike, then 62, stands gray-suited, erect, his elbows bent and his fists clenched as if to add muscle to some forceful point. To his left is an olive-skinned Egyptian in a dark suit with a neatly trimmed beard and closely cropped hair, clutching a sheaf of papers behind his back, staring intently at the president. He is just 27 years old, but he already has more than a decade of experience deep inside the violent and passionate world of militant Islam, from Cairo to Amman to Karachi. Alongside him are members of a delegation of scholars, mullahs, and activists from India, Syria, Yemen, Jordan, Turkey, and Saudi Arabia, some dressed in suits, others wearing robes and shawls.

The president's visitor that September day was Said Ramadan, a key official and ideologue of a secretive, underground fraternity of Islamic fundamentalists known as the Muslim Brotherhood. As he stood at the president's side, Ramadan appeared respectable, a welcome guest if not a fellow statesman.

Officially, Ramadan was in the United States to attend a colloquium on Islamic culture at Princeton University, cosponsored by the Library of Congress. It was an august event, held with much pomp and circumstance in Princeton's Nassau Hall. Delegates sat neatly arrayed in stiff-backed pews in the high-ceilinged Faculty Room and attended lavish luncheons, receptions, and garden parties in the shade of bright fall foliage.

According to the published proceedings, the conference was the fortuitous result of the fact that a number of celebrated personages from the Middle East were visiting the country. "During the summer of 1953 there happened to be an unusually large number of distinguished Muslim scholars in the United States," the document notes. But the participants didn't just "happen" to have crossed the Atlantic. The colloquium was organized by the U.S. government, which funded it, tapped participants it considered useful or promising, and bundled them off to New Jersey. Conference organizers had visited Cairo, Bahrain, Baghdad, Beirut, New Delhi, and other cities to scout for participants. Footing the bill—to the tune of $25,000, plus additional expenses for transporting attendees from the Middle East—was the International Information Administration (IIA), a branch of the State Department that had its roots in the U.S. intelligence community; supplementary funding

was sought from U.S. airlines and from Aramco, the U.S. oil consortium in Saudi Arabia. Like many of the participants, Ramadan, a hard-edged ideologue and not a scholar, was visiting the conference as an all-expenses-paid guest.

A now-declassified IIA document labeled "Confidential—Security Information" sums up the purpose of the project: "On the surface, the conference looks like an exercise in pure learning. This in effect is the impression desired." The true goal, the memo notes, was to "bring together persons exerting great influence in formulating Muslim opinion in fields such as education, science, law and philosophy and inevitably, therefore, on politics.... Among the various results expected from the colloquium are the impetus and direction that may be given to the Renaissance movement within Islam itself." At the time, the United States was just beginning to feel its way around the Middle East, and American orientalists and academics were debating the extent to which political Islam might serve as a tool for American influence in the region.

For an organization established as a secret society, with a paramilitary arm that was responsible for assassinations and violence, to be characterized as a harbinger of a rebirth of Islam may seem odd. But such a view was entirely in character with U.S. policy at a time when virtually anyone who opposed communism was viewed as a potential ally. Whenever I interviewed CIA and State Department officials who served in the Middle East between World War II and the fall of the Soviet Union, they would repeat, almost like a catechism, that Islam was seen as a barrier both to Soviet expansion and to the spread of Marxist ideology among the masses. "We thought of Islam as a counterweight to communism," says Talcott Seelye, an American diplomat who, while serving in Jordan in the early 1950s, paid a visit to Said Ramadan. "We saw it as a moderate force, and a positive one." Indeed, adds Hermann Eilts, another veteran U.S. diplomat who was stationed in Saudi Arabia in the late '40s, American officials in Cairo had "regular meetings" with Ramadan's then-boss, Muslim Brotherhood leader Hassan al-Banna, "and found him perfectly empathetic."

Over the four decades after Ramadan's visit to the Oval Office, the Muslim Brotherhood would become the organizational sponsor for generation after generation of Islamist groups from Saudi Arabia to Syria, Geneva to Lahore—and Ramadan, its chief international organizer, would turn up, Zeliglike, as an operative in virtually every manifestation of radical political Islam. The hardcore Islamists of Pakistan (see "Among the Allies," page 44), whose acolytes created the Taliban in Afghanistan and who have provided succor to Al Qaeda since the 1990s, modeled their organization on the Brotherhood. The regime of the ayatollahs in Iran grew out of a secret society called the Devotees of Islam, a Brotherhood affiliate whose leader in the 1950s was the mentor of Ayatollah Ruhollah Khomeini. Hamas, the Palestinian terrorist organization, began as an official branch of the Muslim Brotherhood. The radical-right Egyptian Islamic Jihad and allied groups, whose members assassinated President Anwar Sadat of Egypt in 1981 and which merged with Osama bin Laden's Al Qaeda in the 1990s, grew out of the Brotherhood in the 1970s. And some of the Afghan leaders who spearheaded the anti-Soviet jihad that was run by the CIA in the 1980s, and who helped bin Laden build the network of "Arab Afghans" that was Al Qaeda's forerunner, were Brotherhood members.

It's no exaggeration to say that Ramadan is the ideological grandfather of Osama bin Laden. But Ramadan, the Muslim Brotherhood, and their Islamist allies might never have been able to plant the seeds that sprouted into Al Qaeda had they not been treated as U.S. allies during the Cold War and had they not received both overt and covert support from Washington;

Ramadan himself, documents suggest, was recruited as an asset by the CIA.

The United States and its partners in nations like Saudi Arabia and Pakistan didn't create radical political Islam, whose theological forebears in the Middle East can be traced back to the eighth century. But consider, for a moment, an analogy with a movement closer to home. In America, Christian fundamentalism dates back at least to the 1840s, and right-wing evangelicals were an inchoate force throughout the 20th century. Yet until the emergence of the Moral Majority, the Christian Coalition, and such leaders as Jerry Falwell, Tim LaHaye, and Pat Robertson in the late 1970s, the religious right had no true political leaders and very little real-world impact. Similarly, the Islamic right did not arise as a true political movement until the emergence of Banna, Ramadan, and their co-thinkers. By tolerating, and in some cases aiding, the development of these early activists, the United States helped give radical Islamism the structure and leadership that turned it into a global political hurricane.

SAID RAMADAN was born in 1926 in Shibin el Kom, a village about 40 miles north of Cairo in the Nile delta. He encountered Banna and joined his movement when he was 14; six years later, after graduating from Cairo University, he became Banna's personal secretary and right-hand man. A year later, Ramadan was named editor of the Muslim Brotherhood weekly, *Al Shihab*, and he married Banna's daughter, giving him an important claim to leadership within the organization.

Ramadan became Banna's roving ambassador, amassing a network of international contacts. In 1945, he traveled to then British-controlled Jerusalem, where the storm clouds of war between Arabs and Jews were beginning to gather. Over the years that followed, Ramadan would spend a great deal of time shuttling between Jerusalem, Amman, Damascus, and Beirut to build Brotherhood chapters. At the time, Palestine was still British-controlled territory, a desperately poor desert region inhabited by warring Arab and Jewish populations. Traveling to mosques and university campuses and focusing on Muslim youth like himself, Ramadan preached a militant gospel and helped to create paramilitary groups made up of young men angry at British colonialism and Zionist immigration. By 1947, there were 25 branches of the Brotherhood in Palestine, with between 12,000 and 20,000 members. In 1948, Ramadan helped the Brotherhood send Islamic fighters into battle with the Jewish armed forces that established Israel that year. Compared to the armies of Egypt and Syria, the Brotherhood's forces were small and militarily insignificant, but the symbolic gesture would enhance the group's prestige for decades to come.

By the 1950s, Ramadan had become an itinerant preacher, sort of an Elmer Gantry of the Islamist movement. In 1949 and 1951 he traveled to Pakistan, taking part in the meetings of the World Muslim Congress in Karachi—the first transnational body connecting the world's Islamist movements—where he flirted with becoming secretary-general of the organization. Pakistan, the world's first state organized around the principle of Islam, was becoming a magnet for fundamentalist ideologues, and it would be a kind of second home for Ramadan. The fledgling government gave Ramadan a broadcast slot on the national radio network, and Prime Minister Liaquat Ali Khan wrote the preface to one of Ramadan's books.

In Pakistan, Ramadan worked closely with a young Islamist named Abul-Ala Mawdudi, who had founded a Muslim Brotherhood-style movement called the Islamic Society. Just as he had recruited angry young Muslims to take up arms in Palestine, so Ramadan helped Mawdudi mold a muscular phalanx of fanatical Islamic students into a battering ram against Pakistan's left. Known by its Urdu initials as the IJT and modeled on Mussolini's fascist *squadristi*, the group deployed its often-armed thugs to do battle with left-wing students on

campus. "Egg tossing gradually gave way to more serious clashes, especially in Karachi," writes Seyyed Vali Reza Nasr, a leading expert on the movement. In the process, the IJT trained the generation of radicals who seized control of Pakistan in 1977 under the far-right dictator General Zia ul-Haq, sponsored the jihad in Afghanistan, sheltered Al Qaeda, and even today represents a threat to General Pervez Musharraf's shaky regime.

In between his trips to Pakistan, Ramadan also worked with Arab fundamentalists, especially Palestinians and Jordanians, to found the Islamic Liberation Party, which would later metastasize throughout Muslim Central Asia. By the 1990s, the party—known by its Arabic name, Hizb ut-Tahrir, and increasingly supported by Saudi Arabia—had become an important radical force aligned with Al Qaeda, with a presence in London, Germany, and throughout Europe. While in Jordan in the '50s, Ramadan also helped found the Jordanian branch of the Muslim Brotherhood, which, as in Pakistan, became a tool for suppressing the left and Arab nationalists.

But Ramadan's efforts in Palestine, Jordan, and Pakistan were mere skirmishes ahead of the mid-1950s showdown in Egypt. Egyptian President Gamal Abdel Nasser, a mercurial military officer who led the coup d'etat that toppled the country's dissolute monarchy in 1952, achieved almost legendary status overnight. By insisting on Egypt's independence, demanding that Britain abandon its military bases in Egypt and turn over the strategically vital Suez Canal, Nasser emerged as a hero to millions of Arabs—and he terrified both Great Britain and the United States, not least because his brand of nationalism threatened U.S. and British oil interests in the Gulf. (British Prime Minister Anthony Eden came up with a variety of schemes to have Nasser assassinated.)

The Brotherhood saw Nasser as a hateful secularist who had abandoned Islam and who was too willing to cooperate with communism—beliefs that endeared them to both London and Washington. In 1954, a Brotherhood fanatic fired eight shots at the Egyptian leader and Nasser cracked down on the organization, arresting many of its leaders. Ramadan, by then an unofficial foreign minister for the Brotherhood, was in Syria at the time, furiously generating anti-Nasser propaganda. In September 1954, Nasser stripped Ramadan of his Egyptian passport. But his exile would not last.

ONCE AGAIN, it was the Cold War that saved Ramadan and his movement. This time, his destination was Germany, an ally of Islamic fundamentalism going back to the Nazi era. When Egypt and Syria established diplomatic relations with East Germany, West Germany made overtures to both countries' opposition—and that included the Brotherhood. Ramadan got official West German help in fleeing to Munich from his certain death sentence in Egypt; a few years later he settled in Geneva, hub of international diplomacy and intrigue. There, in 1961, he created the Islamic Center of Geneva, which would serve for decades as the base and organizational headquarters for the Muslim Brotherhood in Europe.

As Washington's ally in the struggle to undermine Nasser, Ramadan benefited from a fateful choice made by the United States in the 1950s and '60s. Rather than allying itself with Nasser's brand of Arab nationalism, the United States had made perhaps its biggest mistake in the Middle East since World War II: It chose to make common cause with Saudi Arabia's reactionary monarchy. Starting in the 1950s, Washington encouraged the kingdom to create a network of right-wing Islamic states and Islamist organizations, thus helping to build the foundation on which Al Qaeda would ultimately rest. Ramadan's Islamic Center was a major beneficiary of the policy, reaping generous funding from the kingdom.

The center soon became a place for Islamists from across the entire Muslim world to meet and make plans; it also acted as a publishing house for Islamist literature. Its purpose was to promote the Muslim Brotherhood's ideology, according to Hani Ramadan, Said's son, who has assumed his father's mantle as director of the center. "The creation of the Islamic Center was supposed to realize my father's desire of creating a center from which he could spread the teachings of Hassan al-Banna," he says, "a place where students coming from various Arab countries could meet and be trained in the message of Islam." According to Richard Labeviere, a French journalist who has written about the Brotherhood's ties to terrorism, Said Ramadan used Geneva as the launching pad for the Brotherhood's international expansion; the group even created its own Swiss bank, Al Taqwa, with offices in the Swiss town of Campione d'Italia as well as the Bahamas. After September 11, 2001, Al Taqwa was listed by the United States as having supported terrorists.

There's another intriguing question that emerges from this period in Ramadan's life: Had he been recruited by the CIA during his 1953 visit to the United States? Ramadan's family denies that he was, but declassified documents in the Swiss National Archives, uncovered by Sylvain Besson of Geneva's *Le Temps* newspaper, reveal that in the 1960s the Swiss authorities considered him to be, "among other things, an intelligence agent of the British and the Americans." In July 2005, the *Wall Street Journal*, after extensive archival research in Switzerland and Germany, reported: "Historical evidence suggests Mr. Ramadan worked with the CIA." Documents from West German intelligence archives, uncovered by the *Journal*, reveal that Ramadan traveled on an official Jordanian diplomatic passport secured for him by the CIA, that "his expenditures are financed by the American side," and that Ramadan worked closely with the CIA's American Committee for Liberation from Bolshevism, Amcomlib, which ran Radio Free Europe and Radio Liberty (both CIA front groups) in the 1950s and 1960s. According to the Journal, in May 1961, a CIA officer with Amcomlib met with Ramadan to plan a "joint propaganda effort against the Soviet Union."

As it turned out, the Islamic Center was only the beginning of Ramadan's ambitions. In 1962 he helped create a broader, more powerful organization that would become the central nervous system for far-right Wahhabi internationalism: the Muslim World League. "My father wasn't just one of the leaders of the founding group of the league," says Hani Ramadan. "He had the original idea for its creation."

With vast Saudi funding, the league sent out missionaries, printed propaganda, and doled out funds for the building of Wahhabi-oriented mosques and Islamic associations from North Africa through Central Asia, even outside the Islamic world. According to Gilles Kepel, a noted French scholar of Islam, it also served as a conduit for Saudi money to radical Islamists, from the ultraright Islamic Society in Pakistan to Afghan jihadists to the Muslim Brotherhood itself. "The league identified worthy beneficiaries, invited them to Saudi Arabia, and gave them the recommendation (tazkiya) that would later provide them with largesse from a generous private donor, a member of the royal family, a prince, or an ordinary businessman," Kepel wrote in his book, *Jihad: The Trail of Political Islam*. "The league was managed by members of the Saudi religious establishment...along with *ulemas* [Muslim clergy] from the Indian subcontinent connected to the Deoband Schools or to the party founded by Mawdudi." The Deobandi movement, a school of ultraorthodox Muslim fundamentalism founded in India, was instrumental in establishing the system of madrasas in Pakistan that trained the Taliban.

In 1970, the Brotherhood and Ramadan saw their ultimate vindication when Nasser died and

Anwar Sadat, a member of the Brotherhood decades before, became president of Egypt. The next year, Ramadan returned to Egypt at the head of a Muslim Brotherhood delegation, organized and financed by Saudi Arabia, to broker a deal with Sadat to reestablish the Muslim Brotherhood, 17 years after it was first outlawed. (In the words of Robert Baer, a former CIA operations officer who has written about ties between the CIA and the Muslim Brotherhood, Saudi Arabia "pimped for the Brothers.")

At the time, Sadat was trying to reorient Egypt away from its ties to the Soviet Union, moving the Arab world's most powerful country into the orbit of the United States and Saudi Arabia. But Sadat lacked any real political base, and he had to purge scores of Nasserists from key positions in the government. He turned to the Muslim Brotherhood to help create a new base of support, and the group seized its chance.

During the 1970s, the Egyptian Islamist movement spread wildly, taking over key institutions and spawning a host of radical Islamist offshoots, which in turn mobilized to support the CIA's anti-Soviet jihad in Afghanistan in the 1980s. These volunteers also established a new organization, Islamic Jihad, which would later join with Osama bin Laden as part of Al Qaeda. And in 1981, the radicals turned on their protector: An Islamist assassin gunned Sadat down in full public view during a televised army parade.

AS INFLUENTIAL as he was in the Middle East throughout the '60s and '70s, Ramadan was virtually invisible to the West. The first time Americans might have heard his name was in connection with a bizarre murder in Washington; it would turn out to be the first instance of Islamist terrorism in the United States. On July 22, 1980, the doorbell rang at the home of Ali Akbar Tabatabai, a former press counselor at the Iranian Embassy in Washington who, after the fall of the shah in 1979, had founded the Iran Freedom Foundation and had become a leading opponent of the Ayatollah Ruhollah Khomeini's Islamist regime. On his doorstep that day was a young man, dressed as a mailman. He fired several shots into Tabatabai's abdomen, killing him.




The assassin, who'd borrowed a mail truck from an unsuspecting friend, was an American Muslim named David Belfield. Investigators tracking Belfield, who was now calling himself Daoud Salahuddin, found that he'd fled first to Geneva and then to Iran. Then they discovered a curious fact: Just before the murder, a series of phone calls to Said Ramadan were placed from a pay phone near Belfield's workplace in Washington. Ramadan—an enthusiastic supporter of Khomeini's revolution—also spoke with the fugitive in Geneva, coordinated his escape with the Iranian Embassy in Switzerland, and made a call to Ayatollah Khomeini's son in Iran to make sure that Belfield made it safely to sanctuary in Tehran. It later turned out that Belfield had talked to Ramadan before accepting a job as a security guard at the Iranian Embassy in Washington; according to *The New Yorker*, Belfield pocketed $5,000 for the assassination from his "handler" in the Iranian government.

Belfield and Ramadan had first met in June 1975 when Ramadan spent several months in the United States, a tour that included speaking engagements at Washington's Islamic Center, an Eisenhower-era mosque on Massachusetts Avenue adjacent to Rock Creek Park. Their first encounter was in Ramadan's hotel room; after that, Ramadan stayed for three months at Belfield's modest home on Randolph Street in Washington. Ramadan regaled Belfield with tales of jihad, and the young American began almost to worship the Egyptian. According to an account of the relationship published much later in the Washington Post, Belfield became Ramadan's "personal secretary, special emissary and devoted servant. Ramadan became his spiritual leader for life." Ramadan told Belfield that if he were to undertake violent action in

support of Islamic revolution, "he wouldn't be emotionally scarred by it—it would 'be accomplished and simply forgotten.'" Belfield would later tell *The New Yorker*, "His tone was emphatic. And for me it was taken as a command."

From Iran, Belfield became an emissary of sorts for Ramadan. At one point he contacted Libya's Muammar Qaddafi on Ramadan's behalf; later, he delivered a missive from Ramadan to Afghan President Burhanuddin Rabbani. For two years, Belfield himself served in Afghanistan as a jihadist, fighting the Soviet occupation.

By the 1980s and 90s, with Khomeini's regime in Iran and Zia ul-Haq's Islamist dictatorship in Pakistan firmly entrenched, the Afghan jihad under way, and the Muslim Brotherhood established as a potent, underground opposition movement in Egypt, Syria, Palestine, and elsewhere, Ramadan's early spadework had borne fruit throughout the Middle East. But even as Islamism came into its own, an aging Ramadan was fading from prominence, and in 1995, at age 69, he passed away. His son Hani took over the reins of the Islamic Center while another son, Tariq, a professor in Switzerland, publicly eschewed his father's radicalism. In 2004, Notre Dame University invited Tariq Ramadan to come to Indiana as a professor, but he was barred from entering the United States when the Department of Homeland Security refused to grant him a visa.

Today, Ramadan's legacy is evident everywhere. The Muslim Brotherhood remains a powerful, transnational secret society committed to the creation of a fraternity of Islamic republics that would be governed according to their vision of seventh-century Muslim laws. And it has used the backing of Iranian and Arab petroleum potentates to create a powerful political infrastructure, from Egypt to Syria (where its violent underground presence poses a direct threat to the secular, nationalist regime of Bashar al-Assad) to the chaos of Iraq, where the Sunni opposition is being steered in a fundamentalist direction by, among others, the Iraqi Islamic Party, a Brotherhood branch.

Among American analysts, the Brotherhood still has its defenders. Professors John O. Voll and John L. Esposito of Georgetown University, both scholars of Islam, defend it as a moderate Islamist organization that rejects extremism and violence and note with approval that some U.S. officials see the Brotherhood as "important potential allies in the war on terrorism." Reuel Marc Gerecht, a former CIA officer who is now a fellow at the neoconservative American Enterprise Institute, argues in his 2004 book, *The Islamic Paradox*, that even if the Brotherhood were to seize power in Egypt and suppress democracy, "the United States would still be better off with this alternative than with [the current] secular dictatorship." From the U.S.-allied theocracy emerging in Baghdad to the right-wing Islamists of Pakistan, America's fatal fascination with fundamentalism continues.

**Robert Dreyfuss is a contributing writer for *Mother Jones* and the author of *Devil's Game: How the United States Helped Unleash Fundamentalist Islam*. His writing frequently appears in *Rolling Stone*, *The Nation*, and the *American Prospect*, as well as on his website, The Dreyfuss Report.**

✉ E-mail article

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

◄Return to Full

## LexisNexis™

Copyright 1980 The Washington Post
The Washington Post

July 24, 1980, Thursday, Final Edition

**SECTION:** First Section; A1

**LENGTH:** 1146 words

**HEADLINE: D.C. Man Sought In Assassination of Iranian Exile;**
Suspect Belongs To Pro-Khomeini Muslim Group;
Slaying Suspect Belongs To Muslim Group Here

**BYLINE:** By Donnel Nunes and Dale Russakoff, Washington Post Staff Writers

**BODY:**




Daoud Salahuddin, whom police yesterday accused of killing the leader of an Iranian group opposed to Ayatollah Ruollah Khomeini, is one of a small, militant circle of black American Muslims who have fervently adopted the Khomeini brand of revolutionary Islam.

Many of them, including Salahuddin, were drawn into the group while attending Islamic discussion sessions led by Ali Agah, the head of the Iranian Embassy delegation who was expelled along with his staff in April by President Carter.

Serveral served as guards at the Iranian Embassy before the expulsion. Some later joined in efforts to expand the influence of pro-Khomeini Muslims at the Islamic Center, the long-placid spiritual home of Washington's 50,000-member Islamic community.

With the departure of the Iranian diplomats, many gathered around Bahram Nahidian, a 41-year-old Georgetown carpet dealer who in the months after the overthrow of the shah has become the inspirational force behind the supporters of the Iranian revolution here.

Today, the blacks see themseleves as foot soldiers fighting a battle against the great American Satan 6,000 miles from the wellspring of their faith in Tehran.

The blacks are involved "because it is a communality of oppression," said Kwasi Lumumba, a former black power activist who now is a regular in the black Islamic community here. "Like the blacks in the 1960s, the Muslims of the world are oppressed. You see the same slogans, the same aspirations, the same desires. It's an overriding desire to change the moral fiber of society."

"It's a universal tenet of the religion -- to unite and struggle against the oppressors, against the nonbelievers," he said.

The blacks in the circle form a loose federation rather than a tightly knit group, according to D.C.

police. Only a few apparently have ties to the World Community of Islam in the West -- known in the past as Black Muslims.

Salahuddin is the only one of the three named suspects in Tuesday's killing of Ali akbar Tabatabai clearly known to be a Muslim. Yet, police and many Muslims believe that the shooting is related to the political turmoil that recently has shaken the Middle East and spilled over into other world capitals, including Washington.

Thought their numbers here are small -- estimates range from 10 to several dozen -- these American blacks have made their weight felt in local Islamic circles, thanks largely to the leadership of Nahidian, a naturalized American citizen who is acknowleged by all as the most prominent supporter in this country of Khomeini.

It is not a group that has endeared itself to the majority of Muslims here, however. Fearful that many Americans have come to see Islam as a radical tool of revolution, many feel the Nahidian-inspired Muslims are further tarnishing their religion.

In one incident last spring, several supporters of Khomeini scuffled with leaders of the Islamic center over proper attire for women, wrenching the neck of one of the center's officials. Several non-Iranian Muslims claimed that they disrupted prayer services with their demands for a voice in center policy.

For the past eight months, D.C. police have been investigating the activities of a small sub group that calls itself the Islamic Guerrillas in America, which they believed to be involved in the strife at the center. Police sources say Salahuddin is a member of the guerrilla organization, a Washington-based, cadre of Muslims suspected of planning terrorist acts to further adherence to strict Islamic discipline.

There are those at the Islamic Center who accuse Nahidian of encouraging such incidents as part of a move to align the center more closely with the Ayatollah's policies and interpretations of Islamic law. One of Nahidian's critics, Ezzart M. El Dak, an Egyptian who runs a clothing shop on Capitol Hill, said he believes Nahidian has recruited American blacks to the center in an attempt to swell his power base.

"Nahidian gave wrong information to the American brothers," El Dak said. "He brought them in here to catch them like fish. I was worried that this would happen, that the American brother is used in a bad way."

El Dak said Salahuddin was coaxed into the pro-khomeini group by Nahidian shortly after the Iranian embassy was closed. Nahidian gave the American blacks free room at the Islamic House, a building Nahidian once owned but now says he cares for as part of a nonprofit Islamic education effort, and also let them use his car.

Nahidian, interviewed yesterday at the Islamic Center, said his recruiting efforts were color blind. He said he was no closer to Salahuddin than he was to the other Muslims at the center, and denied that he is a leader of any group or segment. He characterized the charges against Salahuddin as harassment.

"He was not involved," Nahidian said. "Islam does not allow you to go ahead and kill someone unless the Islamic Court approves it, and he is a good Muslim. He's good brother."

Despite Nahidian's denial that he was close to Salahuddin, the two were arrested together in New York

on Nov. 4, the day the American hostages were seized in Tehran. Nahidian, Salahuddin and five others briefly took over the Statue of Liberty and unfurled a banner down its 22-story side.

Salahuddin stayed for a time at the Islamic House. Until recently, the building was the site of large prayer gatherings attended by many black American Muslims, neighbors said, but the numbers dwindled and the prayer services no longer are held there.

Nahidian said Salahuddin believes the same doctrine as the other Muslims at the center -- that there is no difference between being a muslim and being pro-Khomeini.

"All of us are pro-Khomeini. There is none of us who are anti-Khomeini. Khomeini hasn't done anything to the Muslims. He's done something to U.S. imperialism."

Nahidian's stress on Khomeini was a major cause of the rift between him and other Muslims like El Dak, who insisted that Islam should not focus on nationalism or on one particular leader.

Some black Americans at the center have stayed outside of the conflict. One of the, who declined to give his name, characterized himself as part of the "silent majority."

He attributed the differences between Nahidian and other Muslims to the larger age-old struggle between Sunni and Shiite Moslems that came to world attention during the Iranian revolution. Nahidian is a Shitte, a sect that stresses the teachings of one descendant of Mohammed over others. Moslims from other nations are largely Sunni and interpret the Koran to teach that no person should be elevated above others in Islam.

The black American said he believed the differences between the two sects may have led the non-Iranians to read dark motives into Nahidian's attention to "the American brothers."

**GRAPHIC:** Picture DAOUD SALAHUDDIN . . . former Iranian Embassy guard

◄Return to Full

## LexisNexis™

Copyright 1983 The Washington Post
The Washington Post

August 12, 1983, Friday, Final Edition

**SECTION:** First Section; A1

**LENGTH:** 757 words

**HEADLINE: State Dept. Takes Over 3 Embassies**

**BYLINE:** By Caryle Murphy, Washington Post Staff Writer

**BODY:**
The State Department has taken over the vacant embassies of Iran, Cambodia and Vietnam, and after making extensive renovations will rent out the three diplomatic properties, officials said yesterday.

State also has requested permission from the Treasury Department to pay for the repairs out of impounded funds of the three governments. Treasury sources said that permission has been granted to use Vietnamese funds, but that the two other requests are still under review.

The three embassy buildings, formerly occupied by countries that no longer have diplomatic relations with the United States, have fallen into disrepair and need to be refurbished "before they disintegrate before our eyes," said Harvey Buffalo, deputy director of the State Department's office of foreign missions.

The State Department is acting under authority given it in legislation passed last year setting up the office of foreign missions, which oversees diplomatic property in Washington.

The secretary of state was given the responsibility to protect and preserve the property of foreign missions here and, if desired, sell the property one year after diplomatic relations ended.

Instead of selling these three embassies, State has decided to hold them "until such time as relations are reestablished and then they would be reverted back," Buffalo said. "Obviously there will be some linkage with our properties" in the affected countries.

The former Iranian Embassy on Massachusetts Avenue NW, once the site of splendid parties given by the shah's emissaries, was closed down when the Carter administration broke diplomatic relations with the Islamic government of the Ayatollah Khomeini in April 1980.

A diplomatic note was sent to the Iranian Interests Section at the Algerian Embassy here early this year informing officials of the decision to restore the embassy and six other properties the Iranian government owns and then to rent them out, a State Department official said.



The Iranians made no reply, and an official at the interests section said yesterday that "we are not authorized to make any comment, no matter how much I would like to."

Farzadi Darui, a member of the anti-Khomeini Iran Freedom Foundation, which keeps unofficial tabs on local developments affecting Iran, said the move was "a surprise to us."

Although the United States has no relations with Iran, it recognizes that its government still is the legal owner of the embassy and the six residences it is taking over, Buffalo said.

A moving van was parked in front of the embassy on Wednesday. Buffalo said furniture that is "not of historic nature or antique" will be auctioned off and the proceeds will help pay for the repairs.

The U.S. Embassy in Tehran, which was the site of the year-long hostage crisis, is still under the control of Iranian revolutionary guards, officials said. A recent advertisement in a Tehran newspaper solicited students for a new school operated by revolutionary guards. Its location was given as "the former den of spies"--a description applied to the embassy by militant Iranians during the hostage crisis.

The Vietnamese Embassy is in the worst condition, Buffalo said. He estimated it will cost about $500,000 to repair the building.

As was the case with Iranian officials, the Vietnamese were notified of State's plans for their embassy on R Street NW, which has been empty since Saigon was overrun by communist forces in April 1975. The Vietnamese did not reply, a State Department official said.

No attempt was made to inform Cambodian government officials about the rental plans for their former embassy on 16th Street NW, which has not been occupied since communist forces took over there in April 1975, the official said.

The former residence of the Cambodian ambassador, which had been vandalized, also will be rented. Preparatory cleaning and clearing began on that building a couple of weeks ago, Buffalo said.

The State Department is soliciting bids for the renovation work on the buildings and was unable to give an estimate of the total cost for repairing the properties. "But the damage is so great, we are going to need a lot of money," Buffalo said, adding that leaky roofs were a problem in some cases.

"It's good for the building and for the neighbors who complained a lot," said another State Department official. "It's hard to maintain an empty building. I think it's good for everybody."

So far, all prospective tenants are welcome. "At this point in time we haven't ruled anyone out," Buffalo said.

**GRAPHIC:** Map, EMBASSIES TO BE RENOVATED AND RENTED. The Washington Post



# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### NATIONAL PARK SERVICE
NATIONAL CAPITAL REGION
1100 OHIO DRIVE, S. W.
WASHINGTON, D. C. 20242

NCR-71

REPLY REFER TO:

## PUBLIC GATHERING PERMIT
### 80-582

Date: July 15, 1980

In accordance with Park Regulations as contained in C.F.R., Title 36, Chapter 1, Section 50.19, permission is granted to conduct a public gathering to the following:

Iran Freedom Foundation
(Person(s) and/or Organization(s))

Date(s)      July 27, 1980

Time:  Starting:      1:00 p.m.          Ending:        6:00 p.m.

Location(s)     Lafayette Park and White House sidewalk

Purpose(s)  To proclaim support for human rights of Iranians and Iran, and for release of American hostages.

Anticipated Number of Participants Laf. Park 7,000 and W. House sidewalk
(1,000)

Person(s) in Charge     Ali Tabatabai

Address(es)      P.O. Box 34422, Bethesda, Md.  20034

Telephone Nos. Day  897-5520      Evening     none

This permit is granted subject to the following conditions:

1. Permittee and all participants authorized herein must comply with all of the conditions of this permit and with all reasonable directions of the United States Park Police.

2. All sidewalks, walkways, and roadways must remain unobstructed to allow for the reasonable use of these areas by pedestrians, vehicles, and other park visitors.

◄Return to Full

## LexisNexis™

Copyright 1980 The Washington Post
The Washington Post

July 28, 1980, Monday, Final Edition

**SECTION:** First Section; A1

**LENGTH:** 1500 words

**HEADLINE: Iranian Groups Clash in D.C.; 169 Arrested;**
Rival Iranian Groups Clash in District; Police Arrest 169

**BYLINE:** By Donald P. Baker, Washington Post Staff Writer; Also contributing to this story were staff writers Neil Henry, Alexandra Korry, Camille Recchia,, Eugene Robinson, Mike Sager and Leon Wynter.

**BODY:**
Rival Iranian demonstrators, many chanting slogans and waving banners and some wielding sticks, clashed with each other and with police in a series of skirmishes yesterday on the streets of downtown Washington.

By the time the series of rallies ended in late afternoon, more than 35 persons -- including two police officers -- had been treated for injuries, mostly minor, and 169 persons had been arrested. Traffic was periodically disrupted as police chased protesters through downtown streets on foot, scooter and horse.

And to add to the mix of conflicting ideologies and police-demonstrator clashes, scores of American tourists, servicemen and other bystanders jeered the Iranians and occasionally fought with them in the streets.

What the rival factions lacked in size -- the four separate groups attracted a total of about 1,500 demonstrators -- they made up for in the intensity of their rhetoric.

The focus of the day's activities was a rally in Lafayette Square sponsored by the Iran Freedom Foundation, whose founder, exiled Iranian diplomat Ali Akbar Tabatabai, was assassinated last Tuesday in the doorway of his Bethesda home.

Police said yesterday that Daoud Salahuddin, 29, an American member of a Moslem sect who is charged as the triggerman in Tabatabai's killing, is still at large.

 Among the 400 persons who attended the IFF rally were some who lamented the death early yesterday of Shah Mohammad Reza Pahlavi. But the IFF supporters, who unanimously denounced the regime of Ayatollah Ruhollah Khomeini, were outnumbered by three disparate pro-Khomeini and Marxist groups, whose 1,100 followers taunted them from Nearby streets and sidewalks, and occasionally made forays into their midst, setting off free-for-alls. 




The biggest side show in the four-ring circus that clogged downtown streets and bewildered unprepared tourists occurred on the lawn of the Capitol Hilton Hotel at 16th and K streets NW.

The lawn became a refuge for several hundred pro-Khomeini Moslem students who had been routed from nearby Lafayette Square by police about 1 p.m. to make room for the anti-Khomeini rally. About 110 to 120 of the arrests made yesterday occurred near the hotel.

Two persons closely associated with the slain Tabatabai also figured in confrontations. The murdered man's twin brother, Mohammad Tabatabai, was grazed with a stick while making a speech, and a witness to the murder, Seyed Ali Mortazavi, was arrested on a charge of carrying a pistol without a license.

Mortazavi, 29, who answered the door at Tabatabai's house when a fake U.S. Postal Service letter carrier lured Tabatabai to the door by saying he had two special delivery packages for him, was arrested on Constitution Avenue after he flashed a holstered 45-caliber pistol at an Iranian passerby.

Police quickly frisked the frightened Mortazavi and confiscated his gun, as he pleaded, "I'm a target for Nahidian's people." (Bahram Nahidian, a Georgetown rug merchant, is viewed by many Iranians here as an unofficial representative of the Khomeini regime).

Mortazavi, 29, a graduate archeology student at Temple University in Philadelphia, was released from jail after posting $1,000 bond.

Mohammad Tabatabai was in the midst of a long speech, delivered alternately in English and Persian, when one or two men in the crowd in the northeast quadrant of Lafayette Square, rushed toward the microphone.

"They attacked me," said Tabatabai, rubbing the back of his neck.

Ferydoon Khoee, of Los Angeles, a member of the IFF central committee, grabbed the microphone and implored the crowd to "calm down, calm down. These are our enemies, but the police are in control. Don't panic. We want to prove we are not animals. We are intelligent."

As Khoee spoke, the attackers fled through the crowd, but one of them was wrestled to the ground near Lafayette's statue. IFF loyalists kicked and beat him until police pulled them away and placed plastic handcuffs on the attacker.

Meanwhile, Tabatabai, who wore a black suit and tie and white shirt, resumed his speech, at one point telling the sun-bathed crowd in a near whisper, "I wish my brother were here."

The IFF rally began at the Capitol, from which its members walked along Constitution Avenue and 15th Street to Lafayette Square, followed on the sidewalk by about 70 pro-Khomeini demonosrators. The rival groups taunted each other with chants, including "Death to Khomeini" by the IFF and "Long Live Khomeini" by their opponents, who included mostly members of the Moslem Students Association but also some from the leftist Iranian Students Association and the Confederation of Iranian Students, another leftist group.

When the line of march reached 15th and G Streets NW, police attempted to pinch off the pro-Khomeini forces. The pro-Khomeini students linked arms in defiance, and the police swooped in, swinging clubs and scattering the students, several of whom were whacked randomly by police. Eight or 10 students, their heads bleeding, were taken to George Washington University Hospital for treatment.

"Those cops were just waiting for us," complained Lisa Ghazansari, a 20-year-old New Yorker who is married to a pro-Khomeini Iranian. "I've heard these things, but I didn't believe it. See this, it is the blood of one of my friends," she said.

When the IFF passed the Ellipse, where police on horseback maintained 50 yards of grass between pro- and anti-Khomenini groups, dozens of Americans stood on bleachers in blue tents in the park and taunted the pro-Khomeini students with obscene gestures and calls for release of the Americans being held hostage in Iran.

Later, Americans booed and delivered catcalls as an IFF speaker, facing the White House across Pennsylvania Avenue in Lafayette Park, asked rhetorically, "what did you do, Mr. President, when your friends in Iran (under the shah) were threatened?"

Many of the Americans on the streets yesterday made no attempt to discriminate among the various Iranian groups. A similar attitude prevailed among police. Asked how he could tell the troublemakers from the peaceful demonstrators, one officer clutched his billyclub and said, "i don't try."

Meanwhile, at 16th and K Nw, 150 pro-Khomeini students, ordered out of Lafayette Square to make room for the IFF rally, joined arms, knelt and prayed while lunchgoers and hotel guestsgawked from nearby windows.

Throughout the afternoon, passers-by taunted the demonstrators, shouting "go home" and "stars and stripes forever." Several youths waved a makeshift cardboard placard that said, "Down with the Ayatoilet."

The ugliest skirmish occurred near the White House when a dozen Khomeini supporters encountered an equal number of U.S. Army enlisted men on leave from Fort Knox, Ky. A scuffle ensued over an American flag that was being carried on a pole by one of the soldiers. A Khomeini loyalist grabbed at the flag, and in the struggle, the flagpole snapped in two. l

Motorists and pedestrians alike movedout of the way as the Khomeini supporters fled north along 16th Streettoward toward their refuge at the hotel with the soldiers and police on motorscooters in hot pursuit. Outside the hotel, a stalemate developed, with police in the middle of the street separating the two groups.

Another battle of words between U.S. mlitary personnel and pro-Khomeini forces occurred on Constitution Avenue, where several marines chanted "We want war" and U.S. airman John Kozjak shouted, "I hate them. Nuke Iran.

The shah's death was applauded by some demonstrators. Mohammad Egtedari of the Confederation of Iranian Students said, "it's a blessing." The familiar "death to the Shah" chant of the leftist revolutionaries was changed yesterday to "death to Bakhtiar," a reference to former Iranian prime minister Shahpour Bakhtiar.

Mohammad Tabatabai said, "I think the death of the shah will unite different factions in Iran." He added that "since there is no government in Iran," the shah's death will not affectthe American hostages.

The Iff rally fell far short of the 5,000 to 7,000 demonstrators its sponsors had preidcted, but Khoee, attributed the poor turnout partly to the shah's death.

"We are very sad," said Khoee, but he added, "it will change absolutely nothing in Iran."

The Iff supporters who gathered in Lafayette Square were distinguished by their relatively formal dress. Manyof the Iff women wore black dresses and high heels or designer jeans and gold jewelry, and some of the men wore expensive suits. Members of the various factions took pictures of each other, as did the police.

The Iff rally broke up about 4 p.m. As the Tabatabai supporters boarded chartered buses across from the White House, safely removed from the pro-Kohmeini factions, they applauded their police protectors. D.C. police information officer Gary Hankins observed, "That's the first time in 10 years I've seen demonstrators give us a hand."

**GRAPHIC:** Picture 1, Anti-Khomeini Iranians march down Constitution Avenue toward Lafayette Park, separated from opposing demontrators by police. By Gerald Martineau -- The Washington Post; Picture 2, American attacks Iranian demonstrator with butt of flag pole near intersection of 16th and K streets as rival Iranian groups rally and clash in the District. By James A. Parcell -- The Washington Post; Picture 3, Group of Americans rushes Iranians on K Street NW in confrontation sparked by demonstrations of rival Iranian groups. Scores of bystanders jeered protestors and some fought with them. By Jamees A. Parcell -- The Washington Post; Picture 4, Park policeman hits an Iranian demonstrator near Layette Park. By Jim Bourg; Picture 5, Park policeman wades into crowd of Khomeini supporters. By Gary A Cameron -- The Washington Post; Picture 6, Iranian girl injured in clashes is led away by a friend. By James A. Parcell -- The Washington Post

Try the Beta release now...

Home | Sources | Site Map | What's New
| Help

Search Terms: moslem strife reaches islamic center here

FOCUS™ [                              ]    Search Within Results

Print | Email

Document List | Expanded List | KWIC | Full

Document 1 of 1.

Copyright 1980 The Washington Post
The Washington Post

April 21, 1980, Monday, Final Edition

**SECTION:** Metro; C1

**LENGTH:** 1053 words

**HEADLINE: Moslem Strife Reaches Islamic Center;**
**Moslem Strife Reaches Islamic Center** Here;
Militants Challenge Leadership

**BYLINE:** By Donnel Nunes, Washington Post Staff Writer

**BODY:**
Abdel Osman, his neck in a brace walks softly past the gurgling foutain in the quiet, tiled courtyard of Washington Islamic Center. He turns his neck with difficulty, his thin face wincing in the spring sunlight.

About 6,000 miles from the passions of the Middle East, where the Ayatollah Ruhollah Khomeini is calling for a holy war against the great American satan, Osman assistant director of the center, has to his surprise and the surprise of many other Moslems here fallen victim to that distant resurgence of Islamic militancy.

Osman was beaten to the ground a week ago in this very courtyard by two fellow Moslems who favor a purist approach to the faith. He is mute testimony to the fact that the backwaters of Islam are not immune to the tensions that have stirred Islam in the Middle East and Asia. Washington has about 50,000 Moslems.

In the last month the once-placid courtyard with its gurgling fountain has become the scene of heated debates, pamphletering, and even a few shoving matches between contending Moslem factions.

According to one prominent black American Muslim moderate, these factions, which include perhaps 50 people, are made up of militants who urge that strong stands against Zionism and American imperialism be taken by the mosque, some black American Muslims agitating for action against what they see as an antiblack and anti-Islam U.S. society, and foreign-born Moslems, including a number of Iranians and Egyptians, who argue for support of the Iranian revolution and other Middle East Islamic movements.

To those who favor maintaining the traditional tranquility of the center, the larlgest in the United States, the shift in tone is deeply distressing. They say that the actual number of militants and agitators is small and that most Moslems have little or no interest in encouraging the disruptions.

But if the militants are few, their presence has been felt, and some leaders of the black American Moslim community, who oppose the agitators, and many foreign-born Moslems with a more moderate view are clearly worried.

"There are people who want to take advantage of the situation," said Gen. Hassan Jeru-Ahmed, a prominent black American Muslim. "Islam is separate and apart from politics. They can't change that."

To many of the militants, the central issue is that the center should take an active role in guiding American Moslems and others on how they should feel about the events shaping Islam in the Middle East and elsewhere. s

They contend that, because the center is financially supported by such conservative Arab countries as Saudi Arabia and Egypt, a country that has become somewhat of a pariah in the Islamic world, needed guidance is not being provided by men such as Osman and the center's director, Dr. Muhammad Abdul Rauf.

"Islam believes that important issues should be addressed in the mosque," said Bahram Nahidian, one of the most promient Iranians is Washington, who has been an outspoken supporter of the Iranian revolution and has talked regularly by phone with Iranian leaders and militants holding the American hostages.

"Many of our Moslem brothers have been killed around the world now," he said. "There is a saying in our faith: whoever wakes up in the morning and does not care about his fellow Moslems is not a Moslem. We must take stands [at the Islamic Center] and let people discuss the issues."

Nahidian does not dispute that assertion. "We want the center to tell the truth, even if they don't want to hear about Khomeini as a leader of the Muslims," he said. The prophet Mohammed -- the peace and blessings of Allah be upon him, the life of his companions -- what he did was a politcal action."

While the discontent with the center's leadership has been festering for a number of years, the dissidents say, two people close to the mosque say that the agitation has increased steadily since the Iranian students took American diplomats hostages in November.

The latest escalation of troubles took a sharp swing upward four weeks ago when the shah was permitted to enter Egypt, another said.

Jeru-Ahmed and others who align themselves with the leadership of Dr. Rauf clearly distrust the motives of Nahidian and leaders of the other factions. One moderate, who like many asked not to be identified, said that Nahidian and others are "clearly trying to use what you would call the pulpit for political action."

As an example of both the politicizing of the mosque and of the mosque's own openness to discussion, these moderates cite a confrontation three weeks ago between some militants and Dr. Rauf, who declined to be interviewed.

The miltants, demanded then that someone other than Dr. Rauf give the Khutab (sermon) at the regular worship service that Friday. According to Jeru-Ahmed, Dr. Rauf allowed Nahidian to do so out of his own "gooness and understanding" The militants say they were able to win that concession only after a vote of those present.

Later, about 25 to 35 of the 1,000 or so area Moslems who attended the service remained behind to demand changes that they would make the mosque more open to debate and the discussion of International and local issues, said one militant. Ten of them, including Nahidian, were elected by the group -- over Jeru Ahmed's objections that it was not a representative one -- to serve as a "temporary interin committee of the directors" of the center.

The militants say that, as a result, Dr. Rauf has not given the Khutbah since then. Instead, his place has been taken by members of the various factions.

On Friday, Dr. Rauf issued a statement intended to smooth the troubled waters at the center. He announced that a committee of the board of governors had been set up to look into complaints or suggestions from the mosque membership. The committee consists of the ambassadors of Tunisia, Bangladesh, Kuwait, Libya, Mali, and Pakistan.

Yet, while some of the Moslems who attend agree taht changes in the administration should be made, they are also disturbed by the disruptions that the militants have caused.

"Our ladies complain to us," said one Moslem from Pakistan. "They go for prayer and don't appreciate the shouting. Sometimes they are shouting the prayers. We hope it will change soon.

**GRAPHIC:** Pictures 1 through 5, The Islamic Center has been the scene of conflict between Moslem groups as the result of the revolution of Iran's Ayatollah Ruhollah Khomeini. Among those whose lives are affected are Dr. Muhammad Abdul Rauf, director of the center; Bahram Nahidian; and Gen. Hassan Jeru-Ahmed. The Islamic Center, by Sharon Farmer of The Washington Post

◂ Return to Full

## LexisNexis™ ,

Copyright 1983 The Washington Post
The Washington Post

March 6, 1983, Sunday, Final Edition

**SECTION:** Metro; B1

**LENGTH:** 663 words

**HEADLINE: Raid on Mosque Ousts Fundamentalist Leader**

**BYLINE:** By Courtland Milloy, Washington Post Staff Writer

**BODY:**
A group of private security officers hired by owners of the Islamic Center on Massachusetts Avenue NW staged a predawn raid on the mosque yesterday, evicted one of its fundamentalist Moslem leaders, then closed the center indefinitely to change its door locks and search the premises for a rumored weapons cache.

The incident immediately set off protests among the followers of the ousted religious leader, Imam Mohammad Asi. About 75 protesters congregated behind a police barricade a few blocks away from the mosque at 2551 Massachusetts Ave. NW, shouting, "Police, get out of our house."

Several persons who crossed police lines were struck with nightsticks and protesters hurled rocks at police, authorities said. Three persons were reported arrested and charged with crossing a police line and two persons received minor injuries in the scuffle. One of the injured suffered a broken nose and was taken to George Washington University Hospital where he was treated and released, police said.

Traffic near the mosque was rerouted for about four hours while police searched the building. No weapons were found.

Cherif Sedky, a lawyer for the center's board of governors, told reporters yesterday that he had tried unsuccessfully to "persuade and cajole unauthorized persons" to leave the mosque in accordance with a 1981 D.C. Superior Court injunction forbidding anyone from living in the mosque.

Two weeks ago, he said, the board of governors, which is composed of ambassadors from nearly 60 Moslem countries with embassies here, elected a new imam, appointed a new administrator and voted to evict anyone living on the premises.

"We had hoped to avoid a scene such as this," Sedky said. "There are about 20,000 to 30,000 Moslems in the Washington area, and this small group who were occupying the mosque did not represent them."

Imam Muhammad Asi later told reporters that he had been selected by a nine-man Council of Guidance, elected from the Islamic community at large, who requested that he live at the mosque. Asi moved into

the mosque a year ago with his wife and one-year-old son.

The Council of Guidance claims that it represents the "dedicated" members of Washington's Islamic community, while it says the board of governors represents only well-to-do Moslems.

The struggle between the two groups is ultimately for control of the Washington mosque, considered a "tone setter" for other mosques across the country. It is part of a longstanding religious division between Sunni and Shiite Moslems.

In November 1979, Dr. Mohammad Rauf, a Sunni Moslem who was director of the mosque, was suddenly replaced and called back to his homeland, Egypt.

A year later, in 1980, Moslem fundamentalists, led in part by Iranian supporters of the Ayatollah Ruhollah Khomeini, seized control of the mosque's Friday prayer services.

The board of governors retaliated in October 1981 by closing the mosque for repairs, but a dozen demonstrators occupied the mosque and refused to leave. The demonstrators were arrested, but the charges were later dropped.

At about 5 a.m. yesterday, Sedky, security guards, locksmiths and a backup unit from the D.C. police Special Operations Division arrived at the mosque.

"We had a choice of starting before the prayer services which begin at 6:30 a.m. or after," said Sedky. "We had also heard that there were arms and bombs being stored at the mosque, so we asked the local police to come check it out."

Asi recalled that he and his family were asleep when they heard a loud knock on the bedroom door. Before he could get dressed, the door had been opened, he said.

"If we had guns and bombs, I would have used them then," he said. "But we are not terrorists." Asi said he and his family were taken by van to an apartment in Arlington, held for four hours then returned to the mosque. He was greeted by a cheering crowd.

The board of governors is expected to meet today to determine when the mosque will be reopened.

**GRAPHIC:** Picture, D.C. police stand guard at the Islamic Center while supporters of the ousted imam protest his eviction. By Lucian Perkins -- The Washington Post



**THE ISLAMIC CENTER**
Telephone: 332-8343
FAX (202) 234-5035

2551 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20008    U.S.A.

# THE ISLAMIC CENTER
## BY-LAWS

# The Islamic Center
## By-Laws

### Section I-NAME AND HEADQUARTERS

The name of the foundation is "The Islamic Center." Its headquarters is in Washington, D.C.

### Section II-Objectives and Activities

**A. Objectives**

1. To make known the ideology of Islam, Its teachings, culture and philosophy.

2. To enlighten American public opinion on the Islamic countries and people and to promote friendly relations between the Muslim world and the Americas.

3. To provide Muslim communities in the Americas with religious guidance and the necessary means toward the following:

    A. Maintenance of their faith based on real Islamic teachings.

    B. Adaptation to the present social environment without violating the basic concepts of Islam.

**B. Activities**

To attain these objectives, the Center shall undertake activities such as:

1. To maintain properly the Center for offering prayers and for the performance of other religious functions.

2. To maintain classes for Muslims and their children where they can learn the Quran and Islamic teachings.

3. To provide a research center equipped with an adequate library stocked with books and publications on Islam.

4. To print Quran, issue pamphlets, periodical, and other Islamic literature that would create awareness and knowledge of Islamic truth.

5. To provide lectures, symposiums, and seminars.

6. To extend assistance (Zakat) whenever required, especially to families in distress.

7. To establish and maintain a museum of Islamic Art and Culture.

8. To invite scholars from the Muslim world and other countries to give lectures at The Islamic Center and throughout Americas.

9. To make arrangements for advanced studies in Islamic Theology, Culture, History, Civilization, Art and Jurisprudence.

### Section III- Membership

A. The membership of The Islamic Center consists of:

1. *Permanent Members;*

    a. Ex-officio Members-The chiefs of missions accredited to the United States from countries with predominantly Muslim populations, who pay their annual contribution to The Islamic Center.

    b. Foundation Trustees-Officers of the Foundation legally responsible for The Islamic Center, Corporation. Should be United States Citizen and of good standing.

    c. Honorary Members-Elected by a majority vote of the Board of Governors for significant services rendered to the Center.

2. *Non-Permanent Members:*

Muslims and Muslim societies in the United States and abroad who pay their Annual dues and are elected by the majority vote of the Board of Governors.

B. Cessation of Membership

    1. Any non-permanent member may resign from the Center.

    2. The Board of Governors, by a two-third majority, can terminate the membership of any non-permanent member for any reason deemed detrimental to the objectives of The Islamic Center.

### Section IV – FNANCIAL RESOURCES

The financial resources of the Center are composed of:

A.  Annual contribution by the Muslim countries.
B.  Donations.

## Section V-- ADMINISTRATION

The Center shall be administered by a Board of Governors, which shall consist of twenty five contributing members, composed of all ex-officio members and elected non-permanent members and Corporation officers of record. The Board shall have a Chairman, two Vice Chairman, a Treasurer and a Secretary.

A.      The attendance of the ex-officio members at the meetings of the Board of Governors should be on Chief of Mission level. In case of absence of a Chief of Mission, or his inability to attend, he may delegate the next senior representative of his mission to attend the Board meeting.

B.      Non-permanent members of the Board shall be chosen from non-permanent members mentioned in section III, at the annual meeting of the Board, by a majority of its vote. They shall be elected yearly and shall be eligible for re-election.

C.      Any vacancy of non-permanent members may be filled by co-optation by the Board of Governors and a member thus elected shall serve the unexpired term of his predecessor.

D.      The property and assets of the Center shall be held and managed by the Board of Governors.

E.      The Board shall hold its annual meeting during the first ten days of September for purposes of:

1. Adopting an annual Report.

2. Designating from it members a Chairman and two Vice Chairman and a treasurer and the members of the various committees of the Center.

3. Approving the proposed budget for the new fiscal year.

4. Electing non-permanent members of the Board.

F.      If a vacancy occurs in the office of Chairman, vice Chairman, treasurer or Secretary the Board of Governors shall elect a member to fill the office; and a member thus appointed shall serve the unexpired term of his predecessor.

G.        A written notice with agenda for the annual meeting shall be sent to all members at least ten days before the date of the meeting.

H.        Discussions at the annual Meeting of the Board of Governors shall be limited to the agenda. New items can be introduced provided a forty-eight hours' notice in writing shall have been given.

I.        The Board of Governors shall hold as many meetings as necessary to fulfill its responsibilities.

J.        The majority of the members of the Board shall form the quorum.

### Section VI—GENERAL ASSEMBLY

The Center shall have a General Assembly.

A.        Permanent and non-permanent members mentioned in section III shall have the right to attend the annual Meeting of the General Assembly in person.

B.        **The Annual Meeting will take place in Washington, DC during the first ten days of September.**

C.        A written notice with agenda shall be sent to all members at least two weeks before the date of the meeting.

D.        The Chairman of the Board of Governors shall preside over the General Assembly.

E.        Discussions in the General Assembly meeting shall be limited to the agenda.

F.        The Agenda of the Annual Meeting of the General Assembly shall include the following items:

    1.  Minutes of the last General Assembly meeting.

    2.  The annual Report of the Executive Committee.

    3.  The annual report of the Finance Committee.

    4.  Budget and treasurer's report.

    5.  The annual report of Cultural and public relations Committee.

    6.  The annual report of the Director.

    7.  Secretary's report.

G.      Suggestions and recommendations of the General assembly are to be submitted to the Board of Governors for consideration.

## Section VII—OFFICE BEARERS

A.      The Chairman of the Board of Governors shall be the senior most Chief of Mission of a Muslim country. The Vice Chairman shall be the next senior, and the Second Vice Chairman shall be the third. The treasurer shall be elected by the board of Governors. The Secretary shall be elected from the Corporate Trustees.

B.      The offices will be held for one year. After the vacation of the office by the Chairman, the senior most Vice Chairman shall be the president. The Second Vice Chairman shall the Senior one, and the next Chief of Mission according to the order of precedents shall become the Second Vice Chairman. The same procedure shall be followed if a vacancy occurs in these offices during the year, and those newly appointed shall serve the unexpired term of their predecessors.

C.      The appointment of the Director as well as the termination of his services shall be made by the Board of Governors.

## SECTION VIII—CHAIRMAN AND VICE CHAIRMANS

A.  The Chairman shall call the annual Meeting; and shall make reports to the board of Governors; and perform duties and exercise such powers as may be vested in him by the Board of Governors.

B.  The Vice Chairman, in the absence of the Chairman, shall exercise all the functions of the Chairman. He shall also perform all other duties assigned to him by the Board.

C.  In the absence of the Chairman and Vice Chairman from the meetings of the Board of Governors, the senior most ex-officio member present shall preside.

## SECTION IX –TRESURER

A. The Treasurer shall be in charge of all finances of the Center. He shall keep a correct record of all members and collect all dues. He shall render to the Board of Governors a statement of his accounts once every six months. He shall be an ex-officio member of the Financial Committee.

B. He shall recommend expenditures on Capital improvements on behalf of the Center jointly with the Chairman.

C. The Islamic Center's financial year is based on calendar year (January 1 to December 31).

## Section X—SECRETARY

A. The Secretary shall be in charge of all legal documents and other legal instruments of the Center authorized by the Board of Governors. He shall keep a current record of all members; give notice of all meetings of the Board and committees, furnish the treasurer with the names of all persons elected to membership, provide each of them with a copy of these By-Laws and record all minutes of the Board meetings, and register all changes to Board and the By-laws. He shall be a Foundation Trustee member of the Executive Committee.

B. He shall prepare a written notice with the agenda for the annual meeting, and shall record all meetings. He shall render to the Annual Board of Governors meeting a statement of Center's legal activities and status.

## SECTION XI--DIRECTOR

A. The Director to be appointed by the Board of Governors shall be the Religious and Cultural Officer of the Center. He shall direct and supervise the religious and cultural activities of the Center in accordance with the direction of the Board. He shall conduct Friday prayers and all religious activities of the Center, maintain the relations of the Center with the centers of learning in the U.S.A., and Muslim countries, organize lecture programs, prepare publications and translations to introduce Islamic culture in the U.S.A. and to maintain relations with the Islamic Community in Washington, DC., implement the decisions of the Board of Governors, and receive dignitaries, and conduct the correspondence of the Center, represent the Center on official meetings, and be an ex-officio member of all standing committees. He shall be the curator of the museum and the library.




B.  He shall be a Muslim scholar of considerable fame in one of the Islamic Countries.

C.  He should have academic experience or be a collage professor, author and lecturer in Islamic subjects.

D.  He should have an academic standard of P.H.D., or equal to that.

E.  He should be over thirty-five years of age.

F.  He should have personal integrity, piety, and character which should be praiseworthy,

G.  He should have ability in Arabic and Literary ability in English in addition to his national language.



H.  He must not be affiliated with any political, parochial, or national groups during his term of office in the Center



I.  Appointment Procedure,

    1.  The Board of Governors shall send requests for nominations to all Islamic Governments represented on the Board Through their respective embassies.

    2.  The time allowed for nomination should not exceed three months from the date of the decision of the Board.

    3.  The nominations shall be reported by a personal letter addressed to the Board and signed by the country's chief of mission.

    4.  The chairman will invite the members of the Board to consider the candidates and their qualifications.

        a.  The Board may appoint a special committee to consider the qualifications and status of the candidates. It can also consider some other names that could be chosen as director according to the above regulations. The committee will, within two weeks from the date the matter was referred to it, submit to the Board the names of the persons deemed fit for the position.

        b.  The names of the candidates shall be arranged according to their ability. In case the committee fails to fulfill its assignment within the

given time period, the Board itself shall consider the whole, question and appoint the Director according to the above mentioned procedures.

5. The Board of Governors will decide upon one of the candidates to be appointed as Director; the decision will be by majority vote.

6  The Board will inform the diplomatic mission of the candidate about its decision.

7. The candidate selected will be required to sign an agreement, on the basis of these regulations, which the government of the candidate will endorse and forward to the Board and the Board will make final decision and appoint the candidate after the presentation of the agreement with the proper presentation documents by the government.

8. The Director should, at the beginning of the last year of his term, notify the Board so that the Board may request new nominations. The Board shall take the necessary steps for the appointment of the new Director. The Board can also extend the Director's term for a full term or a part. thereof by a majority vote. The same procedure for his appointment is to be followed.

9. The director shall take an oath, before the Board, of his devotion as a servant of Islam, and to the by-laws of the Center without any reservation.

10. The Director and his wife and children will be entitled to travel expenses from their home to Washington, DC. and return.

J.  Term of office, salary, and vacation

   1. The term of office of the Director shall be three years.

   2. The Board of Governors pays from the budget of the Islamic Center the salary of the Director which will be decided upon by the Board.

   3. The manner of payment of the salary and travel expenses of the Director, if the government of the appointed Director should offer to pay them, shall be decided between the Board and the Government, by agreement.

   4. The Director will be entitled to the proper privileges of annual vacation and sick leave. The first is one month per year, not to taken until completion of one year of service; sick leave is fifteen days per year.

   5. The Director can not leave his duty for any purpose without the permission of the Board.

◀Return to Full

## LexisNexis™

Copyright 1982 The Washington Post
The Washington Post

February 4, 1982, Thursday, Final Edition

**SECTION:** Metro; B4

**LENGTH:** 382 words

**HEADLINE: 4 Moslem Fundamentalists Ordered To Stand Trial in Mosque Takeover**

**BYLINE:** By Al Kamen, Washington Post Staff Writer

**BODY:**
A D.C. Superior Court judge yesterday ordered four Moslem fundamentalists to stand trial for criminal contempt of court and criminal trespass as a result of the four-month long takeover of the Islamic Center Mosque on Massachusetts Avenue NW by demonstrators.

The dispute over the center, part of longstanding religious divisions between Sunni and Shiite Moslems that came to world attention after the Iranian revolution, came after an Oct. 18, 1981, order by the center's board of governors to close the mosque for several weeks to repair the building. Part of the building had been damaged last May in a firebombing.

About a dozen demonstrators -- allegedly led by Bahram Nahidian, an Iranian-American rug dealer in Georgetown believed by law enforcement officials to be the leader of Moslems here who support the Ayatollah Ruhollah Khomeini -- occupied the mosque and refused to leave. The group also filed suit to stop the closing.

The center's board, made up of ambassadors of a number of Islamic nations to the U. S., countersued. A Superior Court judge last October ordered the demonstrators to leave the building and end the protest.

The center's lawyers reported to the court last week that the demonstrators had not left the building. Judge Robert Shuker yesterday ordered Nahidian, Mir Zarrin, also from Iran, Tariq Khan, from Pakistan, and Aboul-Qassim, an American Muslim, to stand trial for defying the court order and for trespass. Criminal contempt of court and criminal trespass each carry maximum prison sentences of six months.

All four said they could not afford an attorney. Shuker ordered them to return today to see if they qualified to have lawyers appointed for them. He set no date for trial.

Shuker also ordered them, as a condition of their release, not to return to the mosque or to a house across Massachusetts Avenue also owned by the center.

Nahidian, who told reporters after the hearing that he was not a leader or a "follower of anyone, only

Islam," said the court battle was a "problem among Moslems" and blamed the police and the media for "trying to divide the Moslem community."

Nahidian, carrying a religious book, said he had a petition of support with 545 signatures and predicted his side eventually would win the legal battle.

ABDULLAH M. KHOUJ, Ph.D.
2551 Massachusetts Avenue, N.W.
Washington, D.C. 20008
(202) 332-8343


EDUCATION:   Doctorate of Education, Department of Humanistic and
             Behavioral    Studies,    Boston    University,
             Massachusetts, 1980; Dissertation Topic: Humanistic
             Psychology and Islam.

             M.A., Education in Social Studies, School of
             Education. Boston University, Massachusetts, 1976.

             B.A., Educational Psychology, King Abdulaziz
             University, Saudi Arabia, 1972 - 73
             High school, Beauty Emphasis in Religion. AL-A8aBia
ACADEMIC POSITIONS: High school, Makkah, Saudi Arabia, 1969,

Sept. 1984-    Director of The Islamic Center, Washington, D.C.
Present:       — proffesor, Educational, Psychology
1998

1985:          Adjunct    Professor,    Department    of    Theology,
               Georgetown University, Washington, D.C.

1984-9/1998    Associate Professor, Educational Psychology, Umm Al-
               Qura University, Makkah, Saudi Arabia.

June - August  Deputy Assistant for the Secretary General of Muslim
1984:          World League, Makkah, Saudi Arabia.

March - June   General Supervisor of the Research Education June
1984:          Section, Muslim World League, Makkah, Saudi Arabia.

Jan. - March   Acting Dean, School of Education, Makkah, Saudi
1984:          Arabia.

1982 - 1984:   Deputy Dean, Higher Education and Research, Makkah,
               Saudi Arabia.

1982 - 1984:   Supervisor    of    the    Educational    and    Psychology
               Research Center, Makkah, Saudi Arabia.

1982 - 1984:   Supervisor of the In-Service-Training Center for
               Teachers and Administrators, Makkah, Saudi Arabia.

Sept. 1980:    Director of the Educational and Psychology Research,
               Center, Makkah, Saudi Arabia.

May 1980-1982: Assistant Professor, Educational Psychology, Umm Al-



Qura, Makkah, Saudi Arabia.

Aug. - Sept. 1980:   Vice Director of the Educational and Psychological Research Center, King Abdulaziz University and Umm Al-Qura University, Makkah, Saudi Arabia.

MEMBERSHIPS:

1985 - 1986:   Chairman of the Curricula and Research Committee, Saudi Academy, Virginia.

1985 - 1984:   Board Member, Saudi Academy, Virginia.

Jan. - March 1984:   Chairman of the School of Education Board, Umm Al-Qura University, Makkah, Saudi Arabia.

Jan. - March 1984:   Member of the University Board, Umm Al-Qura University, Makkah, Saudi Arabia.

1983 - 1984:   Member of the board of Education for Makkah, Saudi Arabia.

1982 - 1984:   Member of the In-Service Training Center for Teachers and Administrators, Makkah, Saudi Arabia.

1982 - 1984:   Member of the Educational and Psychology Research Center, King Abdulaziz University and Umm Al-Qura University.

1982 - 1984:   Vice Chairman of the Board of the School of Education, Umm Al-Qura University.

1982 - 1984:   Vice Chairman of the Higher Education and Research Center Board, Umm Al-Qura University.

1980 - 1984:   member of the Psychology Department Board, Umm Al-Qura University.

1980 - 1082:   Vice Chairman of the Educational and Psychological Research Center Board, King Abdulaziz University and then Umm Al-Qura.

ACTIVITIES:

Nov. 1984 - Present:   Established The Bulletin of The Islamic Center, *magazine* a quarterly publication of The Islamic Center in Washington, D.C.

1981 - 1984:   General Editor of the Journal of the School of Education, Umm Al-Qura *Islamic university*

Some of the major conferences I attended were:

| 1983: | Conference of Educational and Psychology Research Center, Makkah, Saudi Arabia. |
|---|---|
| 1983: | Conference on *Islamic Education* Education, Riyadh, Saudi Arabia. |
| 1982: | Conference of Deans of Education, ~~text~~ *Kuwait* |
| 1982: | Cooperative *on* Education conference, Boston, MA |
| 1981: | Conference on Educational Research, Kuwait. |

PUBLICATIONS:    *Islamic Publications:*

"The Depth of the Human Self: Internal and External Dimensions of the Self (in Arabic)" ~~(forthcoming article)~~

Characteristics of Prophethood in Islam: Prophets as Models", Washington, D.C., The Islamic Center (forthcoming book)

"War & Peace in Islam", Washington, D.C. The Islamic Center, 1991

"Essentials of Human Understanding *in the Qur'an*", Washington, D.C., Islamic Center, 1990

"Education in Islam", Washington, D.C., The Islamic Center, 1987

"The End of the Journey: An Islamic perspective on Death and the Afterlife", Washington, D.C., The Islamic Center, 1987

"Handbook of Marriage in Islam", Washington, D.C., The Islamic Center, 1987

"The Relevance of the Qur'an to Human Nature", Washington, D.C., The Islamic Center, 1986

"Self-Control: An Islamic perspective", The Bulletin of The Islamic Center, 1985

Teachers' Mobility in the Arabic World, (in Arabic), Tunisia: ALESCO, 1984 (co-author)

"A casual Model for Determining the Inter-relation Effects of Self-Concept, Peer Acceptance, and Family Support on School Achievements" (in Arabic), Journal of Office of Arab Education for the Gulf Countries, 1984

*Fasting*

*'994 Islam, its*
*- Tolerance*
*- Accent to Freedom*

*- under publication*
*Woman in Islam*
*- Prophethood in Islam*
*- self understand*
*Self maintance*
*and self actualisation*

"The Muslim Family and the Prevention of Crime and Delinquency" (in Arabic), Riyadh, Arabic Center for Safety and Training Studies, 1983

Psychology Between Philosophy and Science and the Philosophy of Science: A Brief Historical Overview of the Major Psychological Theories and Approaches, (in Arabic), Makkah: Umm Al-Qura University, 1983

Manpower and Social Demand in Education in the Arab World, (in Arabic), 1982 (co-author)

"A study of the Relationship of Student test Scores on Math and Science Subjects to Their Test Scores in other Subjects in a Sub-Urban School in Jeddah, Saudi Arabia". ERIC 1982

Problems in School Administrations in Saudi Arabia: An Applied Research Study, (in Arabic), a publication of the Educational and Psychological Research Center, 1982

The Nature of Problems of the New Teacher who has Recently Received His Degree: An Applied Research Study, (in Arabic), a publication of the Educational and Psychological Research Center, Makkah, 1982

The Nature of Problems of the Teacher with at Least Five Years Experience, (in Arabic), a publication of the Educational and Psychological Research Center, Makkah, 1982

"A Study of the Relationship of Students' Test Scores in English Literature to Their Scores in Other Subjects", ERIC 1982

"Degrees of Reciprocity of Peer Acceptance Among High School Students in Jeddah, Saudi Arabia: An Occasional Research Paper", ERIC, June, 1981

A Model for Education in the Arabic World, (in Arabic), a publication of the Arab Center for Safety and Training Studies, Riyadh.

"Suggestions for Course Review and Strategies for Teaching," Journal of the School of Education, 1981, Umm Al-Qura University, Makkah

"Teachers' Responsibility: A Comparison Between Islam and Humanistic Psychology (in Arabic)," Journal of the School of Education, 1980, Umm Al-

Qura University, Makkah

LECTURES:

December 1986: "Causes of Juvenile Delinquency," Seminar on Muslim youth, The Islamic Center, Washington, D.C.

1985:          "Prophethood in Islam"
               Interfaith conference, Washington, D.C.

               "The Effects of the Breakdown in the family Unit on Children's Lives", (in Arabic)

               Recidivism: A Case Study of Several Criminal Records, (in Arabic)

PERSONAL
INFORMATION:   Date of Birth:  12/07/1951
               Citizenship:    Saudi Arabia

REFERENCES:    Available on request.



| DC HOME | ABOUT DC | RESIDENTS | BUSINESS | VISITORS | DC GOVERNMENT |

WELCOME TO WASHINGTON
**District of Columbia**



MAYOR
Adrian M. Fenty

## Organization Information



**DCRA HOME**

**SERVICES**
Basic Business License
Business Resource Center
Building/Land Regs
Compliance/Enforcement
Organization Registration
Inspections
Land Plats
Licensing Center
Building Plan Review Status
Permits

**INFORMATION**

**ONLINE SERVICE REQUESTS**

## Online Organization Registration
### Search Registered Organizations

Organization Details - Step  [1]  [2]  [3]

To view another organization from the search, select the **Return to Search Results** button below. You may also **print** the organization details, or start a **new search**. Use the **Back to Main Page button** to continue the registration process.

| Organization | Registered Agent |
|---|---|
| **Organization Name:** ISLAMIC CENTER, THE | Washington, DC |
| **State:** DC | |
| **Status:** OLD ACT | |
| **Initial Date of Registration:** 2/3/1945 | |
| **File No.:** 028712 | |
| **Organization Type:** DOMESTIC NON PROFIT CORPORATION | |

[ << Back to Main Page ]  [ < Return To Search Results ]  [ Print Results ]  [ New Search ]

For more information, contact the BBL Info Center at (202) 442-4432 or Ask the Director.

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDD Directory

Telephone Directory by Topic  |  Agencies  |
DC Council  |  Search  |
Elected Officials

Feedback  |  Translation
|  Accessibility  |
Privacy & Security  |
Terms & Conditions

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004



**THE ISLAMIC CENTER**
Telephone: 332-8343
FAX (202) 234-5035

2551 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20008   U.S.A.




## BREIF HISTORY OF THE ISLAMIC CENTE

Washington Mosque Foundation (later named The Islamic Center) was incorporated on February 3, 1945 as "a religious organization to provide a place of worship for the members of the Islamic faith and in furtherance thereof, to acquire land and to effect and permanently maintain a mosque within the District of Columbia for the members or congregation of said Faith." The Certificate of incorporation was signed by Mr. Abraham Caspor, Ameen David and A. Joseph Howar, as foundation trustees; and it was recorded the following day as "Liber No. 62, Folio 112." These Three men were American Citizens of Syrian, Lebanese and Palestinian origin respectively.

## LAND ACQUISITION

On April 30, 1946 the site on the corner of Massachusetts Avenue and Belmont Road was purchased from Mr. Eugene B. Roberts at a total price of $95,000.00. The contract was dated May 1, 1946, the purchase was closed on July 25, 1946, the same date of the certificate of the title; and the Deed was dated July 22, 1946.

## LAYING THE FOUNDATION STONE

The Well publicized ceremony of laying the corner stone of the Islamic Center took place on January 11, 1949, (12 Rabi' Al-Awal, 1368 A. H.). In the Executive meeting which followed the ceremony, in accordance with the newly promulgated bylaws of the Mosque foundation, the first executive committee was formed. Representative of Afghanistan, Egypt, Iran Iraq, Pakistan, Saudi Arabia and Syria were present at the first meeting.

## BY-LAWS

An Executive Committee held on March 27, 1953, approved the draft of the new bylaws and on April 17, 1953, the first annual meeting of the general assembly formed under the new setup convened. Approval of the new bylaws and banning political discussion within the sanctuary of the Islamic Center were its major decisions.

These bylaws set forth objectives for the Islamic Center, and defined the categories of its membership. They also prescribed the formation of its Executive Board, hence forth to be called, "The Board of Governors," consisting mainly of the permanent Ex-Officio Members, the Chief of diplomatic missions of Muslim countries and the foundation Trustees.

The bylaws also provided for the election of a chairman and a vice Chairman of the Board of Governors.
Immediately after that first General Assembly meeting, the Board of Governors set up under the new bylaws held its first meeting, in which Ambassador Shaykh Assad Al-Faqih, of Saudi Arabia, was elected as first Chairman of the Board of Governors.

## OPENING CEREMONY

The Islamic Center was officially opened on June, 28, 1957, by President Dwight D. Eisenhower and Chairman of the Board of Governors; Ambassador Shaikh Abdullah Al-Khayyal of Saudi Arabia.

## MISSION

I.  To make known the ideology of Islam, Its teachings, Culture and Philosophy.

II.  To enlighten American public opinion on the Islamic countries and people and to promote friendly relations between the Muslim world and the Americas.

III.  To provide Muslim communities in the Americas with religious Guidance and the necessary means toward the following:

A. Maintenance of their faith based on real Islamic teachings.

B. Adaptation to the present social environment without violating the basic concept of Islam.

CORPORATION

The Islamic center is a non-profit tax exempt organization under the provisions of section 101(6) of the Internal Revenue Code of 1939, which corresponds to section 501(C) (3) of the 1954 Code.

The legal corporate structure of the Center "the Board of Governors" is based on two entities,

A. Trustees (Corporation Officers).

B. Ex-Officio Members defined in 1953 bylaws as "The Chiefs of Missions accredited to The Unites State from countries with predominantly Muslim population".

*"The property and assets of the Center shall be held and managed by the Board of Governors".*

Today The Islamic Center is the "face of moderate Islam in the United States" as reaffirmed by visits and acknowledgments from Kings, Presidents, Prime ministers and other U.S. and world leaders. As a historic landmark over 75,000 visitors visit the Center annually. The Center is the largest provider of Islamic information (Quran, books and pamphlets) in the United States. Last year the Center distributed over 250000 (2003) publications.



United States Department of State

# DIPLOMATIC LIST
## November 1984

JX1705
.A22
484

60   Saint Christopher (St. Kitts) and Nevis–Saudi Arabia

Mr. Kutayba Y. ALGHANIM
*Counselor*
1730 Rhode Island Ave., Suite 601, NW. 20036

## SAINT LUCIA—Embassy of Saint Lucia

Chancery: 2100 M St., Suite 309, NW. 20037
(463-7378, 7379)
National Holiday: Independence Day, February 22

His Excellency Dr. Joseph Edsel EDMUNDS; Mrs. Edmunds
*Ambassador E. and P.*
2100 M St., Suite 309, NW. 20037

Mr. Donatus ST. AIMEE
*Minister-Counselor*
2100 M St., Suite 309, NW. 20037

Ms. Sonia JOHNNY
*First Secretary*
2100 M St., Suite 309, NW. 20037

Ms. Thais MEROE
*Attaché (Administration)*
2100 M St., Suite 309, NW. 20037

## SAINT VINCENT AND THE GRENADINES—Embassy of Saint Vincent and the Grenadines

National Holiday: Independence Day, October 27.

His Excellency Hudson Kemul TANNIS; Mrs. Tannis
*Ambassador E. and P.*
(Resident in Saint Vincent)

## SAUDI ARABIA—Embassy of Saudi Arabia

Chancery: 601 New Hampshire Ave. NW. 20037 (342-3800).
National Holiday: Unification of the Kingdom, September 23.

His Royal Highness Prince Bandar BIN SULTAN; Her Royal
Highness Princess Hafa Al-Faisal
*Ambassador E. and P.*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Ahmed A. SIRAJ; Mrs. Belkis Basrawi Siraj
*Minister (Deputy Chief of Mission)*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Abdullah A. ALUM; Mrs. Alira
*Minister*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Dr. Faysal M.H. ZEIDAN; Mrs. Zeidan
*Counselor*
644 N. Armistead St., Alexandria, Va. 22312   Tel. 354-9790

Mr. Faisal Abdullah A. FADL
*Counselor*
3709 S. George Mason Dr., #802E, Falls Church, Va. 22041
Tel. 931-4146

Mr. Badr Othman BAKHSH; Mrs. Bakhsh
*First Secretary*
3709 S. George Mason Dr., #1411 E, Falls Church, Va. 22041
Tel. 931-4146

Mr. Saleh M. AL-RAMY
*First Secretary*
5501 Seminary Rd., #1601, Falls Church, Va. 22041   Tel. 379-1117

Mr. Habib A. SHAHEEN; Mrs. Shaheen
*First Secretary*
1716 Larkmead Dr., Vienna, Va. 22180   Tel. 938-1344.

Mr. Mohamed Jameel HASHEM; Mrs. Hashem
*Second Secretary*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Mohamed E. ABUO AL-HMEYL; Mrs. Abuo Al-Hmeyl
*Second Secretary*
3713 S. George Mason Dr., #510W, Falls Church, Va.   Tel. 998-8205

Mr. Nasser Mohammed AL-RESHAIDAN; Mrs. Al-Reshaidan
*Second Secretary*
2801 Park Center Dr., #603, Alexandria, Va. 22203   Tel. 379-4970

Mr. Ahmed A. KATTAN; Mrs. Kattan
*Second Secretary*
601 New Hampshire Ave. NW. 20036   Tel. 342-3800

Mr. Fawzi M.A. Ali MOSLI; Mrs. Mosli
*Third Secretary*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Saleh R. AL-REHALE
*Third Secretary*
1001 Wilson Blvd., #808, Arlington, Va. 22209   Tel. 528-2684

Mr. Abdullah S. AL-SOMAIRI; Mrs. Al-Somairi
*Third Secretary*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Emad A. MADANI; Mrs. Madani
*Third Secretary*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Nezar A. SHARIF; Mrs. Sharif
*Attaché*
1920 Autumn Chase Court, Falls Church, Va. 22043   Tel. 241-2053

Mr. Abdulbast Ahmid GHAZAL; Mrs. F. Hashwin
*Attaché*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Ghazi Fahmi AL-HASHANI
*Attaché*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Abdulkader M. AL-HBSHI
*Attaché*
205 Yoakum Pkwy., Alexandria, Va. 22304   Tel. 751-9448

Mr. Mohamed Jameel RADWAN; Mrs. Al-Aish
*Attaché*
3800 Powell Lane, #PH20, Falls Church, Va. 22041   Tel. 342-3800

Dr. Zohair Ahmed AL-KAZMI; Mrs. Hamza
*Attaché*
5500 Seminary Rd., #1612S, Falls Church, Va. 22041

Mr. Sameer KURDI; Mrs. Najwa Kurdi
*Attaché*
601 New Hampshire Ave. NW. 20037

Mr. Mesha'al A. ALJOBAIR
*Administrative Attaché*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Abdulaziz A.M.S. NAZER; Mrs. Salma Hamza I. Ghoth
*Administrative Attaché (Executive Assistant to the Ambassador)*
601 New Hampshire Ave. NW. 20037

Mr. Khalid M. A. ALSAIF
*Administrative Attaché*
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Mr. Said Mohammed BADEB; Mrs. Badeb
*Attaché*
1232 Meyer Court, McLean, Va. 22101   Tel. 734-5783

Mr. Ibrahim F. KHOJA; Mrs. Khoja
*Counselor (Commercial Affairs) (Head of Commercial Office)*
1101 Pine Hill Rd., McLean, Va. 22101  Tel. 342-3800

Mr. Yehyia M. ASHARY; Mr. Ashary
*Commercial Attaché*
5501 Seminary Rd., #1708-S, Falls Church, Va. 22041

Dr. Abdulrahman S. HASNEIN; Mrs. Hasnein
*Attaché (Medical)*
3709 S. George Mason Dr. #905E Falls Church, Va. 22041
Tel. 331-1076

Mr. Saleh D. AL-HARTHY; Mrs. Al-Harthy
*Administrative Attaché*
2612-D S. Arlington Mi. Dr., Arlington, Va. 22206

Mr. Ali M.S. AL-MOHAMEO; Mrs. Al-Mohamedi
*Administrative Attaché*
3709 S. George Mason Dr., #1713 E., Falls Church, Va. 22001

Mr. Khamis Ahmed AL-DOSARY
*Attaché (Employment)*
3636 - 16th St. NW.  Tel 342-3800

Mr. Abdulaziz AL-FADEL; Mrs. Al-Fadel
*Attaché (Education)*
3709 S. George Mason Dr. #1410E, Falls Church, Va. 22041

Dr. Muhammad AL-MASS'ARI; Mrs. Al-Mass'ari
*Attaché (Education)*
601 New Hampshire Ave. NW. 20037

Mr. Abdulla KHOJ; Mrs. Khoj
*Attaché (Education)*
3800 Powell Lane, #1132, Falls Church, Va. 22305

Commander Omar Abdelaziz AL-BASSAM; Mrs. Al-Bassam
*Asst. Armed Forces Attaché (Navy)*
2109 E St. NW. 20037  Tel. 857-0122

Lieutenant Colonel Homoud L. AL-RASHOUDI; Mrs. Al-Rashoudi
*Asst. Armed Forces Attaché (Air Force)*
2109 E St. NW. 20037  Tel. 857-0122

Lieutenant Colonel Mohammed S. AL-GHOFAILEY;
Mrs. Al-Ghofailey
*Asst. Armed Forces Attaché (Army)*
2109 E St. NW. 20037  Tel. 857-0122

Lieutenant Colonel Mosleh A. OMAIR; Mrs. Omair
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Major Baker Mohamad FADAG; Mrs. Fadag
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Major Abdullah H. KABLY; Mrs. Kably
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Major Abdulaziz ASEEL; Mrs. Aseel
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Lieutenant Commander Fawwaz AL-FAYEZ; Mrs. Al-Fayez
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Major Mohammed S. AL-TURKI
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Captain Saleh A. AL-JAWINI; Mrs. Al-Jawini
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Captain Saleh A. AL-AMEEL; Mrs. Al-Ameel
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Captain Sulaiman S.S. AL-BASSAM; Mrs. Al-Bassam
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Captain Ibraheem AL-FRIEH; Mrs. Al-Frieh
*Administrative Attaché*
2109 E St. NW. 20037

Lieutenant Ibrahim A. AL-ORAINY; Mrs. Al-Orainy
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Abdullah A. MAWYAH; Mrs. Mawyah
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Fahad S. AL-GHOFAILEY; Mrs. Al-Ghofailey
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Ibrahim D.M. AL-HARBI; Mrs. Al-Harbi
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Hajed M. AL-BEKMI; Mrs. Al-Bekmi
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Jamil Fares AL-JAMIL; Mrs. Al-Jamil
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Tareq A. ASHRAF
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Fahed M. HUWEIMEL; Mrs. Huweimel
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Ahmad M.A. HINDI
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Fahd S. AL-MHQANI; Mrs. Al-Mhqani
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Abdulrahman AL-ATIQI; Mrs. Al-Atiqi
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Ahmed A. AL-HOSAINI
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Mohammed A. AL-KOBAILY
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Hussain M. AL-OTAIBI
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Said M. AL-HATHOOL
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Mr. Mohammed S. AL-SHAMMARI; Mrs. Al-Shammari
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

Colonel Anwar M. ESHKI; Mrs. Eshki
*Administrative Attaché*
2109 E St. NW. 20037  Tel. 857-0122

82   Saudi Arabia–Singapore

Mr. Mussallam A. MUSSALLAM
*Administrative Attaché*
2109 E St. NW. 20037   Tel. 857-0122

Mr. Saleh AL-RAKAF; Mrs. Rakaf**
*Administrative Attaché*
2109 E St. NW. 20037

Mr. Mabrouk ALBRAHIM; Mrs. Albrahim
*Administrative Attaché*
2109 E St. NW. 20037

Commercial Office
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Office of Defense and Armed Forces Attaché
2109 E St. NW. 20037   Tel. 857-0122

Information Office
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

Office of Citizen Services
601 New Hampshire Ave. NW. 20037   Tel. 342-3800

## SENEGAL—Embassy of the Republic of Senegal

Chancery: 2112 Wyoming Ave. NW. 20008
(234-0540 and 0541).
National Holiday: Independence Day, April 4.

His Excellency Falilou KANE; Mrs. Rabia Kane
*Ambassador E. and P.*
4500 Linnean Ave. NW. 20008   Tel. 362-1338

Mr. Henri A. TURPIN; Mrs. Virginie Turpin
*Counselor*
14501 Cobblestone Dr., Silver Spring, Md. 20904   Tel. 236-4041

Mr. Ibra Deguene DIOP
*Counselor (Economic Affairs)*
3636 - 16th St. NW. 20010

Mr. Lamine BOYE
*Counselor*
2112 Wyoming Ave. NW. 20008

Mr. Emile J. SENGHOR; Mrs. Aissatou Senghor
*Counselor (Press Affairs)*
306 Pinewood Ave., Silver Spring, Md. 20901   Tel. 593-7740

Mr. Djibril SALL; Mrs. Rougui Sall
*Counselor (Cultural Affairs)*
2112 Wyoming Ave. NW. 20008   Tel. 234-0540

Mr. El Hadj Oumar NDAO
*First Secretary*
2112 Wyoming Ave. NW. 20008   Tel. 234-0540

Mr. Samba NDIAYE
*First Secretary*
710 Roeder Rd., #905, Silver Spring, Md. 20910

Mr. Gana GUEYE
*Attaché*
2144 California St. NW. 20008   Tel. 234-0540

Mr. Matar DIOUF
*Attaché*
5410 Connecticut Ave., #805, NW. 20015   Tel. 244-8537

Lieutenant Colonel Mamadou WADE; Mrs. Wade
*Defense, Military, Naval and Air Attaché*
2112 Wyoming Ave. NW. 20008

Major Khalilou FALL; Mrs. Fall
*Asst. Defense, Military, Naval and Air Attaché*
2112 Wyoming Ave. NW. 20008

SEYCHELL

Chancery (te
Sey
820 Second

National

Her Excellency Giov
*Ambassador E.*

SIERRA LEO

Chancery: 1
National I

His Excellency Daud:
*Ambassador E. a*
7312 Bradley Blv

Mr. William B. WRIGH
*Counselor and He*
1816 Metzerot R

SESAY; Mrs. Emma Ses
*Second Secretary*
1816 Metzerot R

Mr. Alfred M. JACOBS
*Financial Attaché*
3704 Astoria Rd., 1

SINGAPOR

Chanc

Natic

His Excellency Tommy
*Appointed Ambasso*
4229 Lenore Lane

Mr. Jack E.K. CHOO; M
*Counselor*
3984 Georgetown C

Mr. T.Y. CHOU; Mrs. Gil
*Counselor*
9216 Beech Hill Dr.,

Mr. Freddy ORCHARD;
*Counselor (Financia*
1099- 22nd St., #802

Miss Sharon TAN
*First Secretary (Polit*
3918 Georgetown Co

Mr. Peter S.H. KUOK; Mr
*First Secretary*
4601 North Park Ave
652-0957

Mr. Nithianandum RAMA
Nithianandum
*Third Secretary*
4437 Westover Pl. NW

Mr. Cheng-Huat SIM; Mrs.
*Third Secretary (Comr*

Office of the Third Secretary (
Suite 1509, 745 Fifth A
421-2207

The State Department web site below is a permanent electronic archive of information released prior to January 20, 2001.  Please see www.state.gov for material released since President George W. Bush took office on that date. This site is not updated so external links may no longer function.  Contact us with any questions about finding information.

NOTE: External links to other Internet sites should not be construed as an endorsement of the views contained therein.

**Continuation of the:**

# Diplomatic List
# Winter 1998

---

**SAUDI ARABIA**

**Embassy of Saudi Arabia**

**Chancery: 601 New Hampshire Avenue, NW 20037 (202-342-3800)**

**His Royal Highness Prince Bandar BIN SULTAN;**
Her Royal Highness Princess Haifa Al-Faisal
*Ambassador Extraordinary and Plenipotentiary*

---

**His Royal Highness Prince Mohamed Bin Faisal AL-SAUD;**
Mrs. Wafa Fayyad Al-Saud
*Minister*

**Mr. Ahmed A. KATTAN;** Mrs. Omaya Kaki Kattan
*Minister*

**Mr. Ali M. AL OMARI;** Mrs. Asia S. Al Daajani
*Counselor*

**Mr. Zain M. K. AL-ZAHIRY;** Mrs. Asia Hussein M. Murad
*Counselor*

**Mr. Rehab M. MASSOUD**
*Counselor*

---

App. 17, p. 1

**Mr. Mohamad A. M. S. AL-GHAMDI;**
Mrs. Fatemah A. A. Al-Hamdan
*First Secretary*

**Mr. Adel A. AL-JUBEIR**
*First Secretary*

**Mr. Abdulaziz A. AL OTHMAN;** Mrs. Nourah S. Al Helali
*First Secretary*

**Mr. Fouad Mohammed GASSAS;** Mrs. Elham Mohammed Osta
*First Secretary*

**Mr. Khalid J. KATTAN;** Mrs. Sohair A. Kattan
*First Secretary*

**Mr. Emad A. MADANI;** Mrs. Sahar Madani
*First Secretary*

**Mr. Jamal NASEF;** Mrs. Inman M. Al-Muhayawi
*First Secretary*

**Mr. Majid A. AL DREES;** Mrs. Nawal A. Al-Shalhoub
*Second Secretary*

**Mr. Khaled A. Al FADL;** Mrs.Ebtsam A. Abdulwahab
*Second Secretary*

**Mr. Azzam A. AL-GAIN;** Mrs. Ahlam N. Basrawi
*Second Secretary*

**Mr. Nail Ahmed AL-JUBIER**
*Second Secretary*

**Mr.Abdullah Mohamed AL RASHIDAN;** Mrs. Asma A. Al Yaseen
*Second Secretary*

**Mr.Saud Homoud AL ZAID;** Mrs. Najah Fahad Al-Salloum
*Second Secretary*

**Mr. Hamzah Ahmad EDREES;** Mrs. Khadijah Ahmad Al Sawi
*Second Secretary*

**Mr. Mohammed I. AL ZAMIL;** Mrs. Jamilah O. Al Zamil
*Third Secretary*

––––––––––

**Mr. Abdulatif Yahia ABDULWAHAB;** Mrs. Maryam M. Gorban
*Attaché (Administrative)*

**Dr. Saad H. AL-ADWANI;** Mrs. Monerah M. Al-Angary
*Attaché (Administrative)*

**Mr. Bandar Mohammed AL-AIBAN;** Mrs. Asma A. Al-Jomaih
*Attaché (Administrative)*

**Dr. Khalid M. AL-AIBAN;** Mrs. Haifa S. Al-Sewilem
*Attaché*

**Mr. Nassir Kh. AL-AJMI;** Mrs.Al Joharah Al-Sudairi
*Attaché (Administrative)*

**Mr. Abdullah M. N. AL ATHEL;** Mrs. Feryal Ali Al-Mojhed
*Attaché (Commercial)*

**Lieutenant Commander Ateyat Allah AL-BALADI;**
Mrs. Latifa M. Al-Baladi
*Attaché (Administrative)*

**Colonel Sulaiman S. S. AL-BASSAM;** Mrs. Hend Al-Faris
*Attaché (Administrative)*

**Mr. Omar A. AL-BASSAM;** Mrs. Fawziah Rashid Al-Ashban
*Attaché (Administrative)*

**Major. Ali S. AL FRAIJI;** Mrs. Soha Saleh A. Al Omair
*Attaché (Administrative)*

**Dr. Majed H.N. AL-GHESHEYAN;**
Mrs. Badria Fahad Al-Ghesheyan
*Attaché (Administrative)*

**Mr. Fahad S. AL-GHOFAILEY;**
Mrs. Marian Al-Ashban
*Attaché (Administrative)*

**Mr. Abdullah Saifi AL HARBI;**
Mrs. Lolowa S.H. Al-Jalhami S. Al Harbi
*Attaché (Administrative)*

**Colonel Saleh A. AL-JAWINI;** Mrs. Mariam A. Al-Jawini
*Attaché (Administrative)*

**Mr. Mohammed A. AL-KOBAILY;** Mrs. Alaf Al-Sorayai
*Attaché (Administrative)*

**Dr. Fahad Turki AL-MADHI;** Mrs. Salwa A. Al-Khateeb
*Attaché (Medical)*

**Captain Nezar M. AL MALEK;**Mrs. Jawaher A. Al Malek
*Attaché (Administrative)*

**Dr. Mazyed I. AL MAZYED;** Mrs. Wendy M. Al Mazyed
*Attaché (Cultural)*

**Mr. Mohammed A. A. AL MESFER**
*Attaché (Administrative)*

**Mr. Fahad S. AL-MHQANI;** Mrs. Al-Ghazwa E. Al-Otaibi
*Attaché (Administrative)*

**Mr. Saud Saleh AL-MUHANNA;** Mrs. Amal Mohammed Al-Nejaidi
*Attaché*

**Mr. Salem M. AL MURRI**
*Attaché*

**Mr. Saleh A. A. AL QAHTANI;** Mrs. Khadra H. M. Al Ghamdi
*Attaché*

**Dr. Nasser I. AL-RASHID**
*Attaché (Administrative)*

**Mr. Saleh Abdul-Aziz AL-SAID;** Mrs. Amel Ibrahim Algadhi
*Attaché (Administrative)*

**His Highness Prince Faisal Bin Turki Bin Naser Al SAUD**
*Attaché*

**His Highness Prince Turki Bin Khalid Bin
Bin Saad AL-SAUD;**
Her Royal Highness Princess Arib Bint Fahd A.M.B.Al-Saud
*Attaché (Administrative)*

**Mr. Talaat Y. AL-SHUBAIKI;** Mrs. Soha Z. Karkadan
*Attaché*

**Mr. Khaled I. AL SOWAILEM;** Mrs. Bushra I. Al Khamais
*Attaché*

**Colonel Abdulrahman I. AL SUWAILEM;**
Mrs. Gomasha I. Al-Metawaa
*Attaché (Administrative)*

**Major Saeed Ali ALGHAMDI;** Mrs. Najah S.I. Alghamdi
*Attaché (Administrative)*

**Lieutenant Colonel Saud K. ALOMARI;**
Mrs. Joza S.S. Al-Mohamedi
*Attaché (Administrative)*

**Mr. Khalid M. A. ALSAIF**
*Attaché*

**Colonel Mohammad ALTHOMALI**
*Attaché (Administrative)*

**Brigadier General Abdulaziz Saleh M. ASEEL;**
Mrs. Thoria Ali Etaiwi
*Attaché (Administrative)*

**Mr. Mahmoud M. FOSTOUK**
*Attaché*

**Major Abdulhafiz A. HORAIB;** Mrs. Fatin M. S. Alhamad
*Attaché (Administrative)*

**Major Abdulla H. KABLY;**
Mrs. Fatma Hasan Mohammed Bakkala
*Attaché (Administrative)*



**Dr. Abdullah M. Z. KHOUJ**
*Attaché (Administrative)*

**Colonel Yahya Ahmed A. MASFUH**
*Attaché (Administrative)*

**Mr. Abdullah Abdul-Jabar MAWYAH;**
Mrs.Hayat Mohammed Rayes
*Attaché (Administrative)*

**Colonel Saeed Abdulaziz M. MUSHAYT;**
Mrs. Johara Abdullaiziz Saeed Mushayt
*Attaché (Administrative)*

**Mr. Abdulaziz A. NAZIR**
*Attaché (Administrative and Executive Assistant to the Ambassador)*

**Mr. Saleh Mohammad OBAID;** Mrs. Samiah A. Hamdan
*Attaché (Administrative)*

**Major General Mosleh A. OMAIR;** Mrs. Najat A. Ahmad
*Attaché (Administrative)*

**Mr. Mohammed J. RADWAN;** Mrs. Fatema M. Al Al-Ayesh
*Attaché (Administrative)*

---

**Mr. Hamad H. ALABDALI;** Mrs. Nadia M. H. Alabdali
*Assistant Attaché (Cultural)*

**Mr. Abdulrahman Abdulaziz ALHOSAIN;** Mrs. Naima Alhamdan
*Assistant Attaché (Cultural)*

**Mr. Fahad AL BAWARDY** Mrs. Sarah Al Shohaib
*Assistant Attaché (Cultural)*

**Mr. Abdulrahman A. AL-DYEL;** Mrs. Sarah A. Al-Olaiwy
*Assistant Attaché (Cultural)*

**Mr. Mohammed Jayez AL ENEZI;** Mrs. Tahani Al Enezi
*Assistant Attaché (Cultural)*

**Mr. Abdullah J. AL-JAMMAZ;** Mrs. Salwa A. Al-Suwailem
*Assistant Attaché (Cultural)*

**Mr. Mohammed A. AL-KHALAF;** Mrs. Nora Al-Dawod
*Assistant Attaché (Cultural)*

**Mr. Abdullah Kh. AL-KHODAIR;** Mrs. Sarah M. Al-Robia
*Assistant Attaché (Administrative)*

**Mr. Abdulrahman AL OMIRAH;** Mrs. Sarah Alabbas
*Assistant Attaché (Cultural)*

**Mr. Naif AL OTAIBI**
*Assistant Attaché (Cultural)*

**Mr. Ahmed A. M. AL RASHEED**
*Assistant Attaché (Cultural)*

**Mr. Ahmad Abdullah AL-ASWAD**
*Assistant Attaché (Cultural)*

**Mr. Saleh O. AL RAZGAN;**Mrs. Nora A.M. Alfallaj
*Assistant Attaché (Administrative)*

**Mr. Abdul Muhsin AL SHAIKH**
*Assistant Attaché (Cultural)*

**Dr. Feher S. AL SHARIF;** Mrs. Lamya F. Al Ghalib
*Assistant Attaché (Medical)*

**Mr. Muhammed A. AL-TURBAK**
*Assistant Attaché (Cultural)*

**Mr. Sameer F. AL-TURKI**
*Assistant Attaché (Administrative)*

**Mr. Abdullah I. ALMATROUDI;** Mrs, Hessah A. Almatroudi
*Assistant Attaché (Cultural)*

**Mr. Nayef A. ALMIZAINY;** Mrs. Laila Yousef Alewaimer
*Assistant Attaché (Administrative)*

**Mr. Abdulmuhsin F. M. ALSUWAILIM;** Mrs. Bushra N. Al-Tuwaijri
*Assistant Attaché (Cultural)*

**Mr. Mutasim ASSIDMI;** Mrs. Abutheyab
*Assistant Attaché (Cultural)*

**Mr. Mohammed M. Y. FALL**
*Assistant Attaché*

**Mr. Mahmoud M. SAAD**
*Assistant Attaché (Administrative)*

**Dr. Suliman B. SINDI;** Mrs. Faygah Sindi
*Assistant Attaché (Cultural)*

**Mr. Abdul Mannan TURJOMAN**
*Assistant Attaché (Cultural)*

———————

**Major General Abdulaziz S. A. AL-SAIF;**
Mrs. Haya Dh. H. Al-Hamdan
*Defense Attaché*

**Colonel Abdullah S. ALHUMAIDAN;** Mrs. Fekriah A. Al-Eisa
*Military Attaché*

**Commodore Mogbel Hamad AL-MOGBEL;**
Mrs. Mazawi Momahed Al-Hamdan
*Naval Attaché*

**Brigadier General Saleh H. A. ALROWAITEE;**
Mrs. Huda Alrowaitee
*Air Attaché*

**Captain Abdullah A. I. AL-KHWYTER;** Mrs. Bdria S. A. Al-Fraikh
*Assistant Naval Attaché*

Citizen Services
601 New Hampshire Avenue, NW 20037..Tel. 342-7393

Commercial Office
601 New Hampshire Avenue, NW 20037..Tel. 337-4088

Defense and Armed Forces Attaché
1001 30th Street, NW 20007..Tel. 857-0122

Information Office
601 New Hampshire Avenue, NW 20037..Tel. 342-3800

Saudi Arabian Cultural Mission
601 New Hampshire Avenue, NW 20037..Tel. 342-3800

http://www.state.gov/www/about_state/contacts/diplist/1998/98winter_2.html#s
Retrieved on August 8, 2007, 10:56 AM.

...of Foreign Status of Beneficial Owner for United States Tax Withholding

▶ Section references are to the Internal Revenue Code.   ▶ See separate instructions.   ▶ Give this form to the withholding agent or payer. Do not send to the I

## Part I   Identification of Beneficial Owner (See instructions)

OMB No
1545-16...

BANK OF AMERICA, N.A.
PO BOX 830040 (TX1-945-03-12)
DALLAS, TX 75283-0040

REC02DC
HX000001462+ 0102

U.S Taxpayer Identification Number (if required)

☐ SSN or ITIN   ☐ E

DR ABDULLAH M KHOJ
SPECIAL FOR ISLAMIC CTR
C/O ISLAMIC CTR
2551 MASSACHUSETTS AVE NW
WASHINGTON DC 20008

Permanent Address, We must have a non-U.S. address, please provide if different from mailing address. Give complete non-U.S. address: street, city, province or state, postal code and country.

ABDULLAH M. KHOUJ

NO. 3 AL-AZIZAH STREET

MAKKAH, SAUDI ARABIA

ACCOUNT NUMBER(S)
013570000000002010722726

Type of beneficial owner: --   ☒ Individual   ☐ Corporation   ☐ Disregarded entity   ☐ Partnership   ☐ Simple trust
☐ Grantor trust   ☐ Complex trust   ☐ Estate   ☐ Government   ☐ International organization
☐ Central bank of issue   ☐ Tax-exempt organization   ☐ Private foundation

Country of incorporation or organization

Foreign tax identifying number, if any (optional)

Do not use this form for:

Instead, use Form

- A U.S. Citizen or other U.S. person, including a resident alien individual ............................................ W-9
- A person claiming an exemption from U.S. withholding on income effectively connected with the conduct
  of a trade or business in the United States ...................................................................... W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) ........ W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895 or 1443(b) (see instructions) .................... W-8ECI or W-8EXF

Note: *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

- A person acting as an intermediary ............................................................................ W-8IMY

Note: *See instructions for additional exceptions.*

## Part II   Claim of Tax Treaty Benefits (if applicable)

I certify that (check all that apply):

a ☒ The beneficial owner is a resident of SAUDI ARABIA within the meaning of the income tax treaty between the United States and that country.

b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions)

c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

d ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article ................... of the treaty identified on line 9a above to claim a ................ % rate of withholding on (specify type of income): ...........................
Explain the reasons the beneficial owner meets the terms of the treaty article: ....................................................
............................................................................................................

## Part III   Notional Principal Contracts

☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

## Part IV   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

- I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
- The beneficial owner is not a U.S. person,
- The income to which this form relates is not effectively connected with the conduct of a trade or business in the United States or is effectively connected but is not subject to tax under an income tax treaty, and
- For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

Sign Here ▶  DR. ABDULLAH M. KHOUJ                    2/25/02              SELF
Signature of beneficial owner (or individual authorized to sign for beneficial owner)   Date (MM-DD-YYYY)   Capacity in which actin

# Bank of America.

BANK OF AMERICA, N.A. (THE "BANK")

**Personal Signature Card with Substitute Form W-9**

| | |
|---|---|
| **Account Number** | 0020 1072 2726 |
| Account Type | INTEREST CHECKING |
| Account Title | DR ABDULLAH M KHOJ |
| | SPECIAL FOR ISLAMIC CTR |

☐ Temporary Signature Card (deposit accounts only)

By signing below, I/we acknowledge and agree that this account is and shall be governed by the terms and conditions set forth in the following documents, as amended from time to time: (1) if this account is a deposit account, the Deposit Agreement and Disclosures, the Personal Schedule of Fees, and the Miscellaneous Fees for Personal Accounts, (2) if this account is a Line of Credit, the Line of Credit Agreement and Disclosures. Furthermore, I/we acknowledge the receipt of these documents. By signing below, I/we also acknowledge and agree that the signature(s) will serve as verification for any transaction in connection with this account, any Line of Credit checks which I/we may sign, and as the certification (set forth below) of the taxpayer identification number to which I/we want interest reported. A joint account is owned by each owner in trust for the other joint owner(s), at the death of an owner, the balance in the account shall belong to the surviving owner(s). **Substitute Form W-9.** (Required only for Deposit Accounts) Certification: Under penalties of perjury, I certify that: **(1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). Certification Instructions:** You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. (See also IRS instructions for Form W-9.)

> The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| Tax Identification Number | Report Interest On | Signature | ATM/Check Card Requested ? * (Deposit Accounts Only) |
|---|---|---|---|
| 1. 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 | ☒ | _signature_ | ☐ |
| 2. | ☐ | | ☐ |
| 3. | ☐ | | ☐ |
| 4. | ☐ | | ☐ |
| 5. | ☐ | | ☐ |

* By checking the box marked "ATM/Check Card Requested?", I/we hereby request an Automatic Teller Machine Card and/or a Check Card.

**Bank Information**

**Customer 1**

Name _____

Review Information _____

**Customer 2**

Name _____

Review Information _____

**Customer 3**

Name _____

Review Information _____

**Customer 4**

Name _____

Review Information _____

**Customer 5**

Name _____

Review Information _____

Date 07/30/2003    Banking Center Name ARLINGTON COURT HOUSE

Associate's Phone Number 703-807-2871    Associate's Name JERRY A MAY

NDC
87-14-5000M 08-2001

Confidential Pursuant to Fed.R.Crim.P.6(e)

BOA-00002

App. 19, p. 1

# Minutes of The annual meeting of The Board of Governor's of The Islamic Center. July 9, 1999

Official Board Members of The Islamic Center for the year 1999-2000 are The Ambassadors of the following countries to The United States (who had representation in the board meeting) .
His Royal Highness Prince Bandar Bin Sultan Bin Abdul Aziz, Chairman.
Azarbaijan, , Bahrain, Bangladesh, Chad, Egypt, Gambia, Indonesia, Kuwait, Kyrgyz Republic, Lebanon, league of Arab State, Malaysia, Morocco, Mauritania, Oman, Pakistan, Qatar, Saudi Arabia, Senegal, Syria, Tunisia, United Arab Emirates and Yemen members.

Executive committee members of The Islamic Center for the year 1999-2000 are Ambassadors of the following countries:
Saudi Arabia, His Royal Highness Prince Bandar Bin Sultan Bin Abdul Aziz, Chairman.
Azarbaijan, Egypt, Indonesia, Morocco, Pakistan,  Senegal,

Next regular meeting of the Board of Governor's will be announced by the Chairman of the Board of Governor's after the executive committee meeting.

Next annual meeting of The Board of governor's of The Islamic Center will be around next Hijrah new year ( 1421), April 2000.

Enclosed minutes of the meeting remain un-official until  pproved by the Board of Governor's of The Islamic Center at the next annual meeting of the Boar . If there are any questions or comments regarding the minutes ple  e contact the  oard secretary at (202)-332-8343.

The annual meeting of the Board of Governors of The Islamic Center was convened on July 9, 1999, by the invitation of His Royal Highness Prince Bandar Bin Sultan Bin Abdul Aziz chairman of the Board of Governors of The Islamic Center and chaired by His Excellency Ahmed Maher Al-sayed Ambassador of the Republic of Egypt in the absence of HRH Prince Bandar Bin Sultan.

The annual meeting was opened by Dr. Abdullah M. Khouj director of The Islamic Center recognizing HE Ambassador Ahmed Maher Al-Sayed as Chairman of the meeting on behalf of HRH Prince Bandar Bin Sultan Bin Abdul Aziz.

HE Ambassador Al-Sayed as chairman of the meeting welcomed all the members and congratulated Saudi Arabian government, HRH Prince Bandar Bin Su  n and Dr. Khouj for restoring the center to its original function and all the impro  ements that has been done.

<u>Mr. Farzad Darui manager of the center was nominated as boards secret  ry and the nomination was approved with no objections.</u>

Dr. Abdullah M. Khouj gave a "state of The Islamic Center" Address an  riefly described the centers troubles with the dissident group praying out side o  he Center, the reason that there has not been an earlier meeting, Saudi Ara  i's financial contributions, Renovation of the basement of the center with th  inancial help from HRH Prince Bandar and restoring the center to bring back m  y Muslims who have left the center because of the dissident groups intimid  ion. Dr. Khouj went through programs he implemented with the help of HRH Pr  ce Bandar and the Saudi government such as Friday food program to prov  free food to prayer participants, Ramadan Iftar Program to serve Food ever  ay of the month of Ramadan, Zakat distribution on regular basis, Publications of  merous books and Islamic Informational Materials, Al-Nur Quarterly magazine  rinting and distribution of thousands of Qurans on yearly bases, a very successf  D'awa program with thousands of non Muslims embracing Islam, weekend Qu  nic and Arabic classes for adults and children with over one hundred students in  ttendance and The Center's visitors program of providing Islamic information an  guidance to groups and individuals visiting the center.

There were many questions and discussions by the following board men  ers,

HE Ambassador Mamadou Seck asked about the demonstrators out side of the center.
Dr. Khouj replied that they are objecting to the ownership of The Center by The Board of Governors.
HE Ambassador Seck, asked if the US administrations helped in dealing with the demonstrators. Dr. Khouj replied yes during President Reagan's administration.

It was asked how many employees the center has.

III.   *Serve as sources of guidance for Muslims.*
IV.   *Providing Quran and Islamic literature and distribution of such publications that would create awareness and knowledge of Islamic truth.*
V.   *Extending assistance (Zakat) whenever required, specially to families in distress.*
VI.   *Conducting marriages to marrying couples.*
VII.   *Organize language and religious classes both for adults and children.*
VIII.   *Offering counsel whenever needed.*
IX.   *Welcoming tourists and visitors, and meeting their anticipation of gaining knowledge about Islam.*
X.   *Providing a research center equipped with an adequate library.*
XI.   *Cooperate with American Organizations, Muslims and non-Muslims who share The Islamic Center's ideals.*

Ambassador Al-Sayed thanked all the participants of the meeting and The Administration of The Islamic Center for all the work they have done.

Dr. Khouj thanked His Royal Highness Prince Bandar and Saudi Government for their unfailing support of the Center during troubled times and expressed hope and gratitude for the Boards participation in the future of The Center specially now that center is heading toward a stable future with almost no problems of the past.
Dr. Khouj and all the participants thanked His Excellency Ambassador Al-Sayed for chairing the meeting in a very well manner.

Meeting was adjourned.


list of attendees;

Dr. Khalid Abdullah
Chief Representative, League of Arab States,

HE Dr. Farid Abboud
Ambassador, Lebanon

HE Ahmed Maher Al-Sayed
Ambassador, Arab Republic of Egypt

HE Saad Mohamed Al-Kubaisi
Ambassador, Qatar

HE Ahmad Soubiane Hassaballah
Ambassador, Republic of Chad

HE Ahmad Kattan
Ambassador, Saudi Arabia

HE Noureddin Mejdoub
Ambassador, Tunisia

HE Hafiz Mir Jalal Oglu Pashayev
Ambassador, Republic of Azarbaijan

HE Mamadou Seck
Ambassador, Republic of Senegal


Mr. Marat Asankulov
Cousul, Kyrgyz Republic

Mr. Mustapha Cheraoui
Deputy Chief of Mission, Morocco

Mr. Badar Mohammed Al-Hinai
Charge D'Affair, Sultanate of Oman

Mr. Malamin K. jawara
Charge D'Affair, Gambia

Mr. Abdul Malick Aleryani
Deputy Chief of Mission, Republic of Yemen

Mr. Umardin Mutalib
Counselor, Malaysia

Mr. Mohammad Naeem Khan
Political Counselor, Pakistan

Nazaruddin Nasution
Deputy Chief of Mission, Indonesia

Mr. Azzam Mansour
Third Secretary, Syria


Mr. Ahmad Al-Wehid
Second Secretary, State of Kuwait

Mr. Hamad Hared Al-Habsi
Charge D'Affair, UAE

**Dr. Ahmad Quazi Mesbahuddin**
**Minister of Economic Affairs, Bangladesh**

**Mr. Abdul Hakim Buhiji**
**First Secretary, State of Bahrain**

**Mr. Abdullahi Ould Keba**
**Charge D'Affair, Republic of Mauritania**

TELEGRAM #0094071A

His Eminence Dr. Abdullah Nassef
Secretary General
Muslim World LEague
Makkah, Saudi Arabia

Your Eminence:



<u>Reference to my letter of which you had approved regarding
my termination of contract with the Muslim World League as
3/9/86,</u> and since I also deserve my vacation which
suppose to start on Rajab 22, 1406, would you please inform
the person in charge of the accounts to please send me the
remaining of my salary according to my contract and everything
which was related to it.

I will be very grateful for your prompt attention to this
matter.

May Allah bless you and reward you.

<u>Dr. Abdullah Khouj</u>
<u>Director Islamic Center, Washington,D.C.</u>

Sent on March 30, 1986 at 15:51 EST

```
EASYLINK
ID?EID561922 ISLAMIC.HAM

INSTANT FORMS PLUS - SOFTWARE FOR IBM PC COMPATIBLES:  CREATE FORMS
FOR SENDING/PRINTING PLUS MUCH MORE. CALL 1-800-247-1373 DEPT. 285.
0094002A 30MAR86 15:44 EST
PTS
/NTF
HIS EMINENCE DR ABDULLAH OMAR NASSEF
DSECRETARY GENERAL
THE MUSLIMWORLD LEAGUE
MAKKAH SAUDI ARABIA+

GA
YOUR EMINENCE:
THIS IS REFER TO MYY RECENT LETTER THAT YYOUOU HAVE APPROVED TO RELEASE
MY CONTRCACT WITH MUSLI M WORLD LEAGUE BY 3/03/09/86.  SINCE MY VACTATION
IS START FROM RAJABSTARTS ON RAJAB 22, 1406 (3/31/86) I WOULDLIKE LIKE TO REQUEST
TOCONTINUE TEXT OR ENTER LLLL OR MMMM IF FINISHED
```

```
EASYLINK
ID?EID561922 ISLAMIC.HAM

INSTANT FORMS PLUS - SOFTWARE FOR IBM PC COMPATIBLES:  CREATE FORMS
FOR SENDING/PRINTING PLUS MUCH MORE. CALL 1-800-247-1373 DEPT. 285.
0094071A 30MAR86 15:51 EST
PTS
/NTF
HIS EMINENCE DR ABDULLAH NASSEF
SECRETRYTARY GENERAL
MUSLIM WORLD LEAGUE
MAKKAH,  SAUDI ARABIA+

GA
YOUR EMINENCE:
INREFERENCE TO MY LETTER OF WHICH YOU HAD APPROVED REGARDING MYY TE TERMINATI
OF CONTRACT WITH THE MUSLIM WORLD LEAGUE AS OF 3/9/86, AND SINCE I ALSO
DESERVE MY VACATION WHICH SUPPOSE TO START ON RAJAB 22,1406, WOULD YOU
PLEASE INFORM THE PERSON IN CHARGE OF THE ACCOUNTS TO LEAPLEASE SEND ME
THE REST OF MY REMAINING OF MY SLASALARIY ACCORDING TO MY CONTRACT AND EVERYT
WAS RELATED TO IT.
I WILL BE VERY GRATEFUL FOR YUR OUR PROMPT ATTENTION TO THIS MATTER.
MAY ALLAH BLESS YOU AND REWARD YOU.
DR. ABDULLAH KHOUJ
DIRECTOR ISLAMIC CENTER, WASHINGTON,D.C.
LLLL
MMMM
```

◄Return to Full

Copyright 2005 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

July 26, 2005 Tuesday
Final Edition

**SECTION:** Metro; B05

**LENGTH:** 375 words

**HEADLINE: Raid Targets Islamic Charity in Falls Church**

**BYLINE:** Mary Beth Sheridan, Washington Post Staff Writer

**BODY:**

FBI and Homeland Security agents raided the Northern Virginia office of a Saudi-based charity that has been under scrutiny for possible terrorist ties and detained one of its employees on immigration charges, officials said yesterday.

 The Muslim World League office in Falls Church had also been searched in 2002 in a dramatic series of raids of Muslim organizations in Northern Virginia. The charity has not been charged. 

Abdullah Alnoshan, 44, a Saudi citizen who worked at the charity, was arrested at 6 a.m. Friday at his house in Alexandria, according to officials of Immigration and Customs Enforcement, part of the Department of Homeland Security.

Agents working through a joint terrorism task force searched his home and then his office at 360 S. Washington St. in Falls Church, officials said. They removed computers, photographs and immigration documents, said Allan Doody, special agent in charge of the ICE office.

Alnoshan was charged with immigration fraud. According to an affidavit in U.S. District Court in Alexandria, Alnoshan had been sponsored by the Muslim World League for a work visa to do public relations and religious work. Instead, he served as director of the charity, the document said.

Also charged in the case was Khalid Fadlalla, a Sudanese citizen who works at the Muslim World League office in New York. Fadlalla, who also was arrested Friday, had signed the forms petitioning for a work visa for his Saudi colleague, according to court documents and officials.

Ashraf Nubani, an attorney involved in the case, said Alnoshan plans to plead not guilty.

In recent years, U.S. officials have filed immigration charges against hundreds of people whose names have emerged in the course of terrorism investigations.

U.S. agencies have been investigating the Muslim World League for years because of suspicions that it knowingly or unknowingly provided funds to Osama bin Laden. A senior Treasury Department official, Stuart Levey, told a Senate hearing on terror financing this month that the Muslim World League and a few other Saudi charities "continue to cause us concern."

The Muslim World League has strongly denied providing any support to terrorism.

Staff writer Jerry Markon contributed to this report.

**LOAD-DATE:** July 26, 2005

# Faith - To pray like a 'full citizen'

## 5May'05

**By Andrea Useem**
**Special to The Examiner**
**Published: Thursday, May 5, 2005 1:19 AM EDT**

When Asra Nomani entered the main hall of the Islamic Center mosque in Northwest on a recent Friday afternoon, she sat against the back wall and slowly looked around at the painted ceramic tiles, the carved calligraphy and decorated dome that held an enormous chandelier.

"It's beautiful," she breathed.

"I feel very inspired here," said Rahat Khan, a tax accountant from Gaithersburg who accompanied Nomani.

Their moment of reflection was interrupted when an older man pointed his finger at them and said gruffly: "No ladies here. [This place is] only for men." He instructed Nomani, Khan and this reporter to go downstairs, to the women's section.

Nomani had already seen the downstairs area - a multipurpose room with stained carpet remnants, broken fluorescent lights and a small TV for women to follow the prayer leader upstairs. "We are just going to pray here," she answered quietly.

Nomani was staging a "sit-in" as part of a campaign for Muslim women's rights that she began two years ago when she entered her own mosque in Morgantown, W.Va., through the main door reserved for men and refused to leave. Since then, she has published a book about her experiences as a Muslim woman and organized other sit-ins and several female-led prayer services.

"We are going to pray as full citizens," announced Nomani before she entered the mosque, which she described as "a symbol of Islam in America." Situated along a row of embassies on Massachusetts Avenue, the mosque has been a spiritual home for both local Muslims and diplomats from Muslim nations since it opened in 1957. President Bush made a nationally televised visit to the mosque in the week after Sept. 11, 2001.

Nomani and Khan said they feared physical confrontation and possible arrest when they entered the main hall and were both relieved and surprised when the mosque manager, Farzad Darui, allowed them to remain for the ritual Friday sermon and prayer.

"They have the right to pray in the mosque, as [women] did in the time of the Prophet [Muhammad]," Darui told one male congregant who objected to their presence. "We don't want them to feel segregated."

**No barrier**

Historians say that when the Prophet Muhammad led prayers in his 7th-century community, men prayed at the front and women prayed at the back, with no curtain or barrier between them.

Yet in two-thirds of American mosques, women pray behind a curtain or in another room, according to a study by the Council on American-Islamic Relations in 2000, the most recent year for which data is available. That number represented an increase from 1994, when only half the mosques made such a separation.

While many American Muslim women have spoken quietly about substandard spaces for women's prayer, Nomani's activism represents a new trend, according to Yvonne Haddad, a professor of history at Georgetown University who has written about Islam in America.

Nomani's confrontational tactics stirred mixed reactions at the D.C. center.

Some men were clearly supportive. As one congregant filed past Nomani after the prayer, he told her: "May Allah bless you, this is your place."

Others said women's presence in the main hall was acceptable, within limits. "It's OK for them to pray [with the men] as long as they are behind us," said Ahmed Jallow, a Gambian who works for an intellectual property firm.

But for others, a woman's presence in a traditionally male space represented unsettling sexual temptation.

**'The devil is behind us'**

One congregant, who would identify himself only by his first name, Muhammad, said the issue was one of ritual purity. Before prayer, both men and women wash their face, arms and feet, thus entering a state of cleanliness known in Arabic as "wudhu."

"If a man sees a woman and has any kind of sexual reaction, the wudhu breaks," said Muhammad, who is originally from Bangladesh.

Most Islamic scholars agree that ejaculation breaks a man's state of purity. "The devil is behind us 24/7, waiting to tempt us," said Muhammad, who came to the mosque with his wife and teenage son.

Saleemah Abdul-Ghafur, a women's rights activist who works with Nomani, ridiculed this reasoning.

"The whole concept that Muslim women should be limited because they might incite men to have impure thoughts is just absurd. How about teaching [men] self-control instead?" said Abdul-Ghafur, whose forthcoming book, "Living Islam Out Loud," profiles American Muslim women who have wrestled with conflicting messages to succeed at their careers while keeping quiet at the mosque.

'Sister-friendly'

Even though Abdul-Ghafur and Nomani have been branded as radical because they support women-led prayers - a far more controversial step than simply praying at the back of the mosque - an increasing number of moderate Muslims have been

saying that the common excuses for shunting women into smaller spaces are no longer valid.

"Even if you have a small space, what about the decoration? What about the ventilation?" said Shahina Siddiqui, head of the Islamic Social Services Association in Canada, who has written a set of guidelines to make mosques more "sister-friendly." Siddiqui said that praying in the main hall should be a "natural expectation" for all Muslim women.

But downstairs at the Massachusetts Avenue mosque on a recent Friday, no one was complaining. As the sermon was piped in through speakers overhead, about 50 women gathered in the basement room. Some chatted, while a young child played with a noisy Teletubbies toy. Men filtered behind wooden screens to the bathrooms located at the back of the room.

"I am quite happy with the way everything is," said Hannan Muhammad Abdallah, an ESL teacher at a D.C. public school who converted to Islam 23 years ago. "We don't feel like we are second-class citizens. We came here to pray and worship."

**Move it forward**

*Abdullah Khouj, the center's director and prayer leader, or imam, said that male congregants, who number about 3,000 on a given Friday, require the entire upstairs area because their attendance at the Friday prayer is religiously mandated, while women are allowed to pray at home. The difference in roles, he explained, "is out of respect for women's activities at home," such as cooking and caring for small children.*  

*"If women don't have anything to do at home, they are welcome, and their husbands should not prohibit them," said Khouj, who hails from Saudi Arabia, during an interview after the prayer.*

*Khouj blamed Nomani's discontent on materialism and a lack of faith: "If you come to worship, you will accept [the current arrangements]. If you are closer to God, you wouldn't be concerned with these worldly matters."*

But Nomani objects. "It's not about getting better carpets. It's about making our communities more inclusive," said Nomani, who described her friendship with Daniel Pearl, the journalist murdered by extremists in Pakistan in 2002, as an inspiration to fight against "ugliness" perpetuated in the name of Islam.

"As long as you exclude women, you are embracing the most conservative brand of Islam, and that takes you down a slippery slope toward intolerance."

*faith@dcexaminer.com*

Copyright 1984 The Washington Post
The Washington Post

January 31, 1984, Tuesday, Final Edition

**SECTION:** Metro; B7

**LENGTH:** 599 words

**HEADLINE: Jury Finds 32 Guilty Of Unlawful Entry in Mosque Disturbance**

**BYLINE:** By Ed Bruske and Caryle Murphy, Washington Post Staff Writers

**BODY:**
A D.C. Superior Court jury yesterday convicted 32 persons on charges of unlawful entry stemming from a disturbance last July at the Islamic Center on Massachusetts Avenue NW, in which members of a dissident group disrupted religious services there.

Among those convicted was the group's leader, Mohammed Asi, 32, who has had a running dispute with the center's board of directors over the center's religious and political direction. Also convicted was Bahram Nahidian, a Georgetown rug merchant who is an outspoken supporter of Iran's Islamic revolution.

Those convicted face sentences of up to six months in prison. Judge W. Byron Sorrell dismissed charges of disrupting a religious service--punishable by a $100 fine--that had been brought against the defendants earlier in the trial.

Lawyers for the defendents said they will ask Sorrell during post-trial motions tomorrow to dismiss the convictions on grounds of prosecutorial misconduct. Sorrell set sentencing for Feb. 15.

"It's a defeat for democracy," Asi said of the convictions. His dissident group has quarreled bitterly with the center's governing board over the method of choosing the mosque's religious leader, or imam, with Asi and his followers claiming that a new imam was unfairly forced upon those who worship at the mosque.

Asi's group wants to elect the mosque's imam, and the board, made up of the 29 ambassadors to the United States from Islamic nations, maintains that it has the right to appoint the imam because it owns the center.

"The totalitarian spirit occupying the Islamic Center has managed to defeat the democratic process that is represented by the Muslim congregation, and because of that we've been praying on the sidewalk for ll months," Asi said.

Ever since last March, members of the dissident group have been holding their weekly Friday noon

services on the sidewalk near the mosque. However, the center remains firmly under the control of the board.

The center's director, Sam Hamod, who was appointed by the board, declined to comment on the convictions.

Assistant U.S. Attorney Thomas Motley argued at the trial that during the incident last July, members of the group were warned by the center's chief of security, and by D.C. police, to leave the mosque or face arrest.

Defense attorney Mark Lane argued that group members could not hear the warning and that even if they had, they still had a right to remain in the mosque under Islamic law.

Of 52 persons originally arrested during the incident, charges were brought against 45. One person, Omar Omar, did not appear for trial and a bench warrant has been issued for his arrest.

The U.S. Attorney's office dropped charges against six defendants during the trial when it was learned that they had not been present in the mosque when the warnings were given.

Sorrell dismissed charges against six others on grounds that evidence identifying them as participants was insufficient.

The jury, which at one point during the two-month trial was taken to view the mosque, deliberated nearly a week before reaching its verdict.

The incident occurred last July 11, during services observing Eid, one of the most holy days of the Moslem calendar. The dissidents, who are both Iranian and American, entered the prayer room of the center with the rest of the congregation and began shouting during the services.

Police in riot gear entered the mosque after Hamod claimed he was assaulted.

Before the incident, the mosque had been closed for four months in an attempt to lessen tension between the board and the dissident faction.

GRAPHIC: Picture, District police remove members of dissident faction from mosque last July 11. By Dudley Brooks -- The Washington Post

# U.S. District Court
## Eastern District of Virginia (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:04-cr-00385-LMB All Defendants

Case title: USA v. Al-Timimi

Date Filed: 09/23/2004
Date Terminated: 07/13/2005

---

Assigned to: District Judge Leonie M. Brinkema

Appeals court case number: '05-4761'

**Defendant**

**Ali Al-Timimi** (1)
*TERMINATED: 07/13/2005*

represented by **Alan H. Yamamoto**
643 S Washington St
Alexandria, VA 22314
(703) 684-4700
Fax: (703) 684-6643
Email: yamamoto.law@verizon.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Edward B. MacMahon**
107 East Washington St
Middleburg, VA 20118
(703) 589-1124
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**James Patrick Vann**
Martin F McMahan & Associates
1150 Connecticut Ave Nw
Suite 900
Washington, DC 20036
(202) 862-4343
*TERMINATED: 10/22/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Katherine Joanne Seikaly**
Bryan Cave LLP

700 13th St NW
Suite 700
Washington, DC 20005
(202) 508-6000
Fax: (202) 508-6200
*LEAD ATTORNEY*
*Designation: Pro Bono*

**William Edward Olson**
Bryan Cave LLP
700 13th St NW
Suite 700
Washington, DC 20005
(202) 508-6000
Email: weolson@bryancave.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*



| **Pending Counts** | **Disposition** |
|---|---|
| [18:924A.F] 18:2 & 924(n) Inducing Others to Conspire to Use Firearms (May 2003) (1s) | BOP for 121 months concurrent as to each of Counts 1,2, and 3; 3 years Supervised Release with conditions, S/A $100.00 |
| [18:373-0101.F] 18:373 Solicitation to Levy War Against the United States (10.21.01) (2s) | BOP for 121 months concurrent as to each of Counts 1, 2 and 3; 3 years Supervised Release with conditions, S/A $100.00 |
| [18:2384.F] 18:2 & 2384 Counseling and Inducing a Conspiracy to Levy War Against the United States (May 2003) (3s) | BOP for 121 months concurrent as to each of Counts 1, 2, and 3; 3 years Supervised Release with conditions, S/A $100.00 |
| [50:1705.F] 50:1705(b), 18:2, 31 CFR 545.204 & 545.206, Executive Order No. 13224, 66 Fed. Reg. 49079 (2001); 65 Fed. Reg. 41549 (2000); Executive Order No. 13129, 64 Fed. Reg. 36759 (1999) Attempt to Contribute Services to the Taliban (10.21.01) (4s) | BOP for 120 months concurrent as to each of Counts 4 and 5, to be served concurrently with the terms of imprisonment imposed in Counts 1, 2 and 3; 3 years Supervised Release with conditions, S/A $100.00 |
| [50:1705.F] 50:1705(b), 18:2, 31 CFR 545.204 & 545.206, Executive Order No. 13224, 66 Fed. Reg. 49079 (2001); 65 Fed. Reg. 41549 (2000), Executive | BOP for 120 months concurrent as to each of Counts 4 and 5, to be served concurrently with the terms of imprisonment imposed in Counts 1, 2 |

Order No. 13129, 64 Fed. Reg. 36759 (1999) Counseling and Inducing an Attempt to Aid the Taliban (10.21.01) (5s)

[18:371.F] 18:2 & 371 Counseling and Inducing a Conspiracy to Violate the Neutrality Act (May 2003) (6s)

[18:924C.F] 18:924(c) & 2(a) Use of Firearms in Connection with a Crime of Violence (9.18.01) (7s)



[18:924C.F] 18:924(c) & 2(a) Use of Firearms in Connection with a Crime of Violence (9.18.01) (8s)

[18:844H.F] 18:844(h)(2) & 2(a) Carrying an Explosive During Commission of a Felony (9.18.01) (9s)

[18:844H.F] 18:844(h)(2) & 2(a) Carrying an Explosive During Commission of a Felony (9.18.01) (10s)

and 3; 3 years Supervised Release with conditions, S/A $100.00

BOP for 60 months, to be served concurrently with the terms of imprisonment imposed in Counts 1, 2, 3, 4, and 5; 3 years Supervised Release with conditions, S/A $100.00

BOP for 360 months, to be served consecutively to the terms of imprisonment imposed in Counts 1, 2, 3, 4, 5, and 6; 3 years Supervised Release with conditions, S/A $100.00

Life Imprisonment; 3 years Supervised Release with conditions, S/A $100.00

BOP for 120 months, to be served consecutively to the terms of imprisonment imposed in Counts 1, 2, 3, 4, 5, 6, 7, and 8; 3 years Supervised Release with conditions, S/A $100.00

BOP for 240 months, to served consecutively to the terms of imprisonment imposed in Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9; 3 years Supervised Release with conditions, S/A $100.00

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

[18:371.F] 18:371, 924(n), 2384 & 2, 50:1705(b), 31 CFR 545.204, 545.206(b), Executive Order No. 13224, 66 Fed.Reg. 49079 (2001), Executive Order 13129, 64 Fed.Reg. 36759 (1999) Conspiracy (May 2003) (1)

[50:1705.F] 50:1705(b), 18:2 & 31 CFR 545.204, Executive Order No. 13224, 66 Fed.Reg. 49079 (2001); 65

**Disposition**

DISMISSED per filing of Superseding Indictment

DISMISSED per filing of Superseding Indictment

Fed.Reg. 41549 (2000); Executive
Order 13129, 64 Fed.Reg. 36759
(1999) Attempt to Contribute Services
to the Taliban (9.18.01)
(2)

[18:924C.F] 18:924(c) & 2(a) Aiding
& Abetting the Use of Firearms in                    DISMISSED per filing of Superseding
Connection with a Crime of Violence                  Indictment
(9.18.01)
(3-4)

[18:844H.F] 18:844(h)(2) & 2(a)
Aiding & Abetting the Carrying of                    DISMISSED per filing of Superseding
Explosives During Commission of a                    Indictment
Felony (9.18.01)
(5-6)


**Highest Offense Level (Terminated)**

Felony


**Complaints**                                       **Disposition**

None


**Plaintiff**

USA                                 represented by  **Gordon D. Kromberg**
                                                    United States Attorney's Office
                                                    2100 Jamieson Ave
                                                    Alexandria, VA 22314
                                                    (703)299-3700
                                                    Email: gordon.kromberg@usdoj.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/02/2004 | 3 | NOTICE of Appearance for Ali Al-Timimi by Attorney James Patrick Vann (nbla) (Entered: 09/27/2004) |
| 09/23/2004 | 1 | INDICTMENT as to Ali Al-Timimi (1) count(s) 1, 2, 3-4, 5-6 (ctat) (Entered: 09/23/2004) |
| 09/23/2004 |  | Arraignment before Judge Leonie M. Brinkema set for 9:00 a.m. on 10/1/04 for Ali Al-Timimi (ctat) (Entered: 09/23/2004) |

◀Return to Full

Copyright 2005 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

July 14, 2005 Thursday
Final Edition

**SECTION:** Metro; B01

**LENGTH:** 861 words

**HEADLINE: Va. Muslim Lecturer Sentenced To Life**;
Followers Trained For Armed Jihad

**BYLINE:** Jerry Markon, Washington Post Staff Writer

**BODY:**

A man convicted for what he said -- words that prosecutors said incited his followers to train for violent jihad against the United States -- had a few more things to say yesterday in a federal courtroom in Alexandria before he was sentenced to life in prison.

Ali Al-Timimi, a prominent Muslim spiritual leader, delivered an impassioned statement in which he asserted his innocence, read the preamble to the U.S. Constitution and said his religious beliefs do not recognize "secular law." He then compared himself to the Greek philosopher Socrates, who was sentenced to death for corrupting the young and dishonoring the gods of Athens.

"I will not admit guilt nor seek the court's mercy," Timimi told a courtroom crowded with his supporters and prosecutors. "Socrates was mercifully given a cup of hemlock. I was handed a life sentence."

As U.S. District Judge Leonie M. Brinkema pronounced the life sentence, Timimi nodded slightly. The judge then revoked his bond, and Timimi walked slowly away in the custody of U.S. marshals, smiling and waving at supporters in the emotionally charged courtroom.

Although Brinkema called the punishment "very draconian," she said she had no choice under congressionally mandated minimum sentencing requirements. And she criticized Timimi, 41, for his role in inspiring his followers to attend terrorist training camps abroad.

"I don't think any well-read person can doubt the truth that terrorist camps are an essential part of the

new terrorism that is perpetrated in the world today," she said. "People of good will need to do whatever they can to stop that."

The contentious hearing reflected the passions surrounding the prosecution of Timimi. The Fairfax County resident was convicted in April, primarily for his pronouncements to his followers in a case that some experts said raised First Amendment issues but prosecutors called a major victory in the war on terrorism.

Assistant U.S. Attorney Gordon Kromberg said Timimi "deserves every day of the time he will serve. . . . Timimi hates the United States and calls for its destruction. He is allowed to do that in this country. He is not allowed to solicit treason."

Defense lawyer Edward B. MacMahon Jr. said prosecutors have targeted Muslims since the Sept. 11, 2001, terrorist attacks. "The local Muslim community is not a group of terrorists who need to be watched every moment by the FBI," said MacMahon, who accused Kromberg of using Timimi's religion to convince jurors that he is "the most dangerous man in the United States."

The Timimi case culminated an investigation in which 11 Muslim men, all but one from the Washington area, were charged with participating in paramilitary training -- including playing paintball -- to prepare for "holy war" abroad. Timimi was named as an unindicted co-conspirator in the earlier case, in which nine men were convicted in 2003 and 2004.

Federal prosecutors have said the investigation secured more successful prosecutions than any other domestic terrorism case since Sept. 11, 2001.

Timimi, who was born and raised in the Washington area and has lectured on Islam around the world, was charged last year with 10 counts, including soliciting others to levy war against the United States and contributing services to Afghanistan's former Taliban rulers. After seven days of deliberation, a federal jury convicted him on all 10 counts.

Prosecutors said Timimi -- the former primary lecturer at the Center for Islamic Information and Education, also known as Dar Al-Arqam, in Falls Church -- was a revered figure to the Muslim men convicted in the earlier case.

The heart of the government's evidence against Timimi was a meeting he attended in Fairfax on Sept. 16, 2001, five days after the attacks on the Pentagon and World Trade Center. Timimi told his followers that "the time had come for them to go abroad and join the mujaheddin engaged in violent jihad in Afghanistan," according to court papers.

Many who attended that meeting practiced for jihad by playing paintball in the Virginia countryside, and some left the United States for terrorist training camps, though none went to Afghanistan and fought against U.S. troops.

Defense lawyers portrayed Timimi as a scholar whose often-incendiary rhetoric merely reflected his right to free speech. Some legal experts agreed that the case raised troubling First Amendment concerns, while others said that his words crossed the line because they could have incited violence.

But Brinkema, in rejecting defense motions for acquittal and a new trial, said she was satisfied that the

case did not "violate any of Timimi's First Amendment rights. This is not a case about speech. This is a case about intent."

The judge said that the mandatory sentences, including a life term for a gun charge -- made because Timimi incited some followers to fire weapons at terrorist training camps -- were "very draconian."

Defense lawyers, who vowed to appeal the verdict and sentence, said they understood that Brinkema had no choice. "I'm very saddened today that this has come to this," MacMahon said as he concluded his courtroom remarks.

**LOAD-DATE:** July 14, 2005



# Saudi Links to Sept. 11 Not Probed Enough, Congress Says

**Saturday , November 23, 2002**

**FOX NEWS**

WASHINGTON —

ADVERTISEMENT

Lawmakers investigating the Sept. 11 attacks believe the FBI has not aggressively pursued the possibility that the Saudi government provided money to students who helped two of the hijackers, aides said Saturday.

The White House denied the assertion as well as claims that the FBI has not done enough to examine fully the financing of the 19 hijackers, 15 of whom came from Saudi Arabia.

"The FBI has been investigating this and I'm not going to prejudge the conclusion of that investigation," said Bush administration spokesman Dan Bartlett.

The debate over a possible Saudi link raises a sensitive political issue for the Bush administration, since Saudi Arabia is one of the United States' closest and most important allies in the Persian Gulf at a time when the administration is considering war with Iraq.

A draft report by a joint congressional committee probing the terrorist attacks says the CIA and FBI ignored the possibility that two of the hijackers, Khalid Almidhar and Nawaf Alhazmi, both Saudis, were given Saudi money from two Saudi men they met in California in the year before the attacks, *The New York Times* reported in its Saturday editions. Almidhar and Alhazmi were on the plane that crashed into the Pentagon.

The committee, whose final classified report will be finished in December, also accused the Saudi government of not fully cooperating with American investigators.

Bartlett disputed congressional critics of the probe.

"As anyone who knows this issue will tell you, it's very difficult to track financing of terrorist networks because most of it is done in cash," he said. "I don't agree with the assessment it's not been aggressively pursued."

The two hijackers met with Omar al-Bayoumi and Osama Basnan, who were receiving financial support from the Saudi government, the *Times* said. Officials were not sure what kind of stipends they were receiving, the newspaper said.

*Newsweek* said, however, the FBI uncovered financial records showing payments to the family of al-Bayoumi from a Washington bank account held in the name of Princess Haifa Al-Faisal, wife of the Saudi ambassador to the United States and daughter of the late King Faisal.

Sources said the payments amounted to about $3,500 a month. The money filtered into the al-Bayoumi family's bank account in early 2000, just a few months after Almidhar and Alhazmi arrived in Los Angeles from an Al Qaeda planning summit, *Newsweek* said in a report posted on its Web site Friday night.

Payments for roughly the same amount began flowing every month to Basnan.

Administration officials told *Newsweek* they didn't know the purpose of the payments from Princess Haifa's account. They also were uncertain whether the money was given to the hijackers by al-Bayoumi or Basnan.

A spokesman for the Saudi embassy said the allegations that the wife of the Saudi ambassador supported terrorists are "untrue and irresponsible."

Nail al-Jubeir, the spokesman, said the princess hasn't given money to al-Bayoumi at all, and that she is fully cooperating with the FBI.

"She wants her name cleared," al-Jubeir said.

The princess did help the Basnan family with a check for $15,000 in April 1998 and regular payments from Dec. 4, 1999 through May, and Saudi officials are trying to find out why they needed assistance, al-Jubeir said.

In a statement, the FBI refused to give details of its investigation but said: "Since the terrorist attacks of 9-11, the FBI has aggressively pursued investigative leads regarding terrorist support and activity."

It said al-Bayoumi and Basnan face visa fraud charges. Al-Bayoumi was detained on that charge in Britain, but it was not an extraditable offense and he was released. It is not known whether Basnan is in custody.

Basnan was deported to Saudi Arabia on Nov. 17 and they believe his wife was deported to Jordan two weeks earlier, al-Jubeir said.

"There was no linkage found between them and the terrorists," he said. "The only reason he became a person of interest to the FBI was his relation to al-Bayoumi."

In other terrorism news, there has been a preliminary decision in the immigration case of a Lebanese national arrested in Detroit, Mich., in December 2001 for overstaying his visa.

Rabih Haddad was the proprietor of the Global Relief Foundation, and Islamic charity that the U.S. government said provided funds and support to terrorist organizations, including Al Qaeda. Haddad was detained under "special circumstances" following Sept. 11, 2001, but the immigration court proceedings were closed to the press. An appeals court recently said the case be open to the public.

Although there has been no final resolution to open the hearing portion of Haddad's case, the Executive Office of Immigration Review's Immigration Court in Detroit late Friday denied Haddad's recent request for asylum -- he had claimed he would subject to religious and political persecution if returned to Lebanon -- and ordered him removed to Lebanon. The court also ordered members of his family out.

But the immigration portion of his case could drag out a bit longer, and Haddad will continue to be a guest of the United States government until it's over.

The Justice Department released a statement saying it's "pleased" with the decision to deny Haddad asylum, citing the court's opinion that he presents "a substantial risk to the national security of the United States.'

"The safety and security of the American people are the highest priority of the Justice Department," Justice spokeswoman Barbara Comstock said in the statement. "We will continue to dedicate all efforts to using every constitutional tool available to protect our citizens."

*The Associated Press contributed to this report.*

SEARCH                                                    GO

**Click here for FOX News RSS Feeds**

**Advertise on FOX News Channel, FOXNews.com and FOX News Radio**
Jobs at FOX News Channel.
Internships At Fox News (Summer Application Deadline is March 15, 2007)
Terms of use.  Privacy Statement.  For FOXNews.com comments write to
foxnewsonline@foxnews.com;  For FOX News Channel comments write to
comments@foxnews.com
© Associated Press. All rights reserved.
This material may not be published, broadcast, rewritten, or redistributed.

Copyright 2007 FOX News Network, LLC. All rights reserved.
All market data delayed 20 minutes.

◄Return to Full

Copyright 2002 Newsweek
Newsweek

December 2, 2002, U.S. Edition

**SECTION:** NATIONAL AFFAIRS; Pg. 28

**LENGTH:** 1899 words

**HEADLINE:** The **Saudi Money Trail**

**BYLINE:** By Michael Isikoff And Evan Thomas; With Jamie Reno in San Diego, Dan Klaidman and Mark Hosenball in Washington and Christopher Dickey in Paris

**HIGHLIGHT:**
Rent payments for 9-11 hijackers and mysterious checks from a princess's account. Is there a Saudi tie to terror? Inside the probe the Bush administration doesn't want you to know about.

**BODY:**
When the two Qaeda operatives arrived at Los Angeles International Airport around New Year's 2000, they were warmly welcomed. Nawaf Alhazmi and Khalid Almihdhar would help hijack American Airlines Flight 77 and crash it into the Pentagon a year and a half later, but that January in Los Angeles, they were just a couple of young Saudi men who barely spoke English and needed a place to stay. At the airport, they were swept up by a gregarious fellow Saudi, Omar al-Bayoumi, who had been living in the United States for several years. Al-Bayoumi drove the two men to San Diego, threw a welcoming party and arranged for the visitors to get an apartment next to his. He guaranteed the lease, and plunked down $1,550 in cash to cover the first two months' rent. His hospitality did not end there.

Al-Bayoumi also aided Alhazmi and Almihdhar as they opened a bank account, and recruited a friend to help them obtain Social Security cards and call flight schools in Florida to arrange flying lessons, according to law-enforcement officials. Two months before 9-11, al-Bayoumi moved to England; several months later, he disappeared. He is believed to be somewhere in Saudi Arabia.

Who is al-Bayoumi? At various times, the affable father of four told people that he was getting his doctorate at San Diego State, though the school has no record he ever attended. He told others that he was a pilot for the Saudi national airline. He apparently did work for Dallah Avco, an aviation-services company with extensive contracts with the Saudi Ministry of Defense and Aviation, headed by Prince Sultan, the father of the Saudi ambassador to the United States, Prince Bandar. According to informed sources, some federal investigators suspect that al-Bayoumi could have been an advance man for the 9-11 hijackers, sent by Al Qaeda to assist the plot that ultimately claimed 3,000 lives.

The Feds' interest in al-Bayoumi has been heightened by a money trail that could be perfectly innocent, but is nonetheless intriguing--and could ultimately expose the Saudi government to some of the blame for 9-11 and seriously strain U.S.-Saudi ties. It is too soon to say where the trail will wind up, but it

begins with a very surprising name on a Washington bank account.

About two months after al-Bayoumi began aiding Alhazmi and Almihdhar, NEWSWEEK has learned, al-Bayoumi's wife began receiving regular stipends, often monthly and usually around $2,000, totaling tens of thousands of dollars. The money came in the form of cashier's checks, purchased from Washington's Riggs Bank by Princess Haifa bint Faisal, the daughter of the late King Faisal and wife of Prince Bandar, the Saudi envoy who is a prominent Washington figure and personal friend of the Bush family. The checks were sent to a woman named Majeda Ibrahin Dweikat, who in turn signed over many of them to al-Bayoumi's wife (and her friend), Manal Ahmed Bagader. The Feds want to know: Was this well-meaning charity gone awry? Or some elaborate money-laundering scheme? A scam? Or just a coincidence?

A spokesperson for Princess Haifa told NEWSWEEK that she had no idea the money was going to the al-Bayoumi family or that it might in any way be used for some nefarious purpose. Saudi officials and members of the royal family routinely give money to supplicants who need medical or financial help and write the embassy. Dwei-kat's husband, Osama Basnan, had first pleaded to the Saudi Embassy for help in 1998, saying that he needed money to treat his wife's thyroid condition. At the time, Prince Bandar wrote Basnan a $15,000 check. The monthly payments to his wife, Majeda, began in January 1999 and ended only last summer. Until she was contacted late last week by NEWSWEEK, Princess Haifa was unaware that the payments are being investigated by U.S. authorities, according to the spokesperson.

Questions over the money trail have enflamed a fierce, behind-the-scenes struggle between two congressional committees looking into 9-11 and the Bush administration. Senate Intelligence Committee co-chairman Robert Graham of Florida, a Democrat, and Richard Shelby of Alabama, a Republican, believe that the FBI failed to fully investigate 9-11. The lawmakers suspect that the administration does not want to look too closely at Saudi connections to the hijackers. The White House clearly fears jeopardizing U.S.-Saudi relations. In addition to Saudi oil, the United States needs Saudi bases to stage a possible invasion of Iraq. Administration officials reluctantly confirmed to NEWSWEEK that money had moved from Princess Haifa's account to al-Bayoumi, but they stressed that they do not know the purpose of the payments or whether any Saudi officials were even aware of them. "The facts are unclear, and there's no need to rush to judgment," said one administration official. In meetings with intelligence committee leaders, Vice President Dick Cheney, Attorney General John Ashcroft and others have adamantly rejected attempts to declassify the information, citing national-security concerns.

There have long been persistent suspicions of Saudi financial involvement with Al Qaeda. Of the 9-11 hijackers themselves, 15 of 19 came from Saudi Arabia. Some American intelligence officials say the Saudis have been less than fully cooperative in the war on terror. Some wealthy Saudis have long been known to fund charities that are used as fronts to support terrorists. It would be shocking indeed if the Saudi government or members of the royal family were supporting Al Qaeda. Saudi officials insist that any such suggestion is preposterous. After all, Osama bin Laden's stated aim is to overthrow the House of Saud as lackeys for the Americans. But many investigators suspect that the Saudi royals wish to hold their enemies close, to learn what they are up to and, possibly, to buy insurance. The Saudi government, as well as many wealthy Saudi businessmen with close ties to the government, generously support radical imams who preach Wahhabism, a very conservative form of Islam, not just in Saudi Arabia but all over the world, including in the United States. The potential for mischief is great. Rogue elements could be secretly funding terrorists, perhaps by scamming unwitting members of the royal family. There

is a thin line between militant Islam and terrorism, and the Saudis have not always been mindful of the difference. --Saudi intelligence officials scoff, however, at the suggestion that Prince Bandar's wife is being used to provide a slush fund for black ops. "To think that my government uses the bank account of the ambassadress to pay informants is both ludicrous and insulting," said Turki Al Faisal, former chief of Saudi intelligence.

The FBI is still trying to figure out if al-Bayoumi played a role in the 9-11 plot. Within a few days of the attacks last fall, New Scotland Yard, working with the FBI, had found him enrolled in a business graduate program at Birmingham, England's Aston University. The British investigators arrested al-Bayoumi, and tore up the floorboards in his house. They discovered records of phone calls to two diplomats in the Saudi Embassy in Washington. The officials, who worked in the Islamic section of the embassy, which supports mosques and Islamic charities, apparently offered innocent explanations to FBI investigators. Al-Bayoumi, who adamantly denied any connection to the attacks or knowledge of the hijackers' links to Al Qaeda, was released after a week without charge, and is believed to have disappeared to Saudi Arabia. Now the gumshoes "are desperate to find out whatever they can about this guy," says Kerry Steigerwalt, a lawyer for a young Yemeni student recently grilled by the FBI about al-Bayoumi.

Before he vanished, al-Bayoumi offered a benign explanation of how he met with Almihdhar and Alhazmi. He told investigators that he just happened to be in a restaurant at the Los Angeles airport and overheard the two men talking in Arabic. He introduced himself and offered to help the two newcomers get settled and adjust to life in southern California. It was a chance meeting, he insisted to the skeptical agents. His offer of help was nothing more than the usual charity extended by one Muslim "brother" to another.

Al-Bayoumi was a familiar figure in San Diego's burgeoning Islamic community. He was often seen at the mosque or at social functions, chatting amiably, almost always holding a video camera. Al-Bayoumi seemed to pay so much attention to the comings and goings of young Saudi college students that some were convinced that he was a Saudi government spy. "He was always watching them, always checking up on them, literally following them around and then apparently reporting their activities back to Saudi Arabia," said Henry Bagadan, a Pakistani businessman who worships at the San Diego Islamic Center.

After al-Bayoumi left San Diego in July 2001, the cashier's checks purchased by Princess Haifa continued to flow to Majeda Dweikat, who in turn signed many of them over to her husband, Osama. Basnan also befriended the two hijackers, Almihdhar and Alhazmi. After the terrorist attacks, Basnan, who was known as a vocal Qaeda sympathizer, "celebrated the heroes of September 11" and talked about "what a wonderful, glorious day it had been," according to a law-enforcement official. Wife Dweikat appears to have been at least a minor scamster. She was convicted of marriage fraud to obtain immigration papers and pleaded guilty--along with al-Bayoumi's wife, Manal--to shoplifting in April 2001. The checks from Princess Haifa stopped when Basnan was arrested for visa fraud last August. (He told a judge, "I love this country," but was ordered deported to Saudi Arabia.) Interestingly, Osama Basnan showed up in Houston last April when Saudi Crown Prince Abdullah came to town with a vast entourage en route to President George W. Bush's ranch. According to informed sources, Basnan met with a high Saudi prince who has responsibilities for intelligence matters and is known to bring suitcases full of cash into the United States--a practice not unheard-of among the Saudi elite. A Houston police report obtained by NEWSWEEK shows that Basnan complained he had been robbed of his Saudi passport and $400. It is dated April 25, the same week the crown prince was in town.

The congressional investigators looking into 9-11 argue that the Feds aren't doing enough to stop another attack. The FBI's failure to thoroughly investigate the Saudi connection reveals the bureau's inherent weakness as a counterterror organization, these investigators tell NEWSWEEK. Senator Graham has been pushing for a new domestic-intelligence service, modeled on Britain's M.I.5, to track terror cells in this country. Graham says he fears that a concealed terrorist "infrastructure" set up to support the 19 hijackers is still in place--waiting for a new call to action.

The Bush administration has been reluctant to give the congressional committee investigating 9-11 everything it asks for. Cheney and others believe that Congress is intruding on the executive branch's intelligence-gathering and foreign-policy-making powers and that a "witch hunt" will distract and hobble the CIA and FBI. But the administration may also worry that if investigators keep digging, the U.S.-Saudi relationship will wind up in a deep hole.

/DOCUMENT

**GRAPHIC:** PHOTO: Tug of war: Intel-committee members, led by Reps. Pelosi and Goss and Sens. Graham and Shelby (above, from left), have pushed for disclosure of possible Saudi ties to terror. Cheney, Ashcroft and Mueller (left) have resisted, citing national security.; GRAPHIC: Graphic: (text) A Royal Connection to 9-11?: Investigators are probing whether the Saudi government gave money to two Saudi students who were helping 9-11 hikackers: (graphic omitted)

**LOAD-DATE:** November 27, 2002



From left to right: NATO Deputy Secretary General Alessandro Minuto Rizzo with
Director of Department of European Union and Member States at the Ministry of Foreign
Affairs of Saudi Arabi Prince Mohamed Bin Faisal Bin Turki
(Photo ~300Kb)

Retrieved from http://www.nato.int/multi/photos/2007/m070121a.html
Retrieved on August 8, 2007, 1:52 pm.



**THE ISLAMIC CENTER**
T ELEPHONE 332/3461

332-8343

المركز الاسلامي بواشنطن

2551 MASSACHUSETTS AVENUE N
WASHINGTON, D.C. 20008,  U. S.

September 18, 1984

The Travelers Insurance Company
7617 Little River Turn Pike
Annandale, VA   22003

Attention:  Ms. Pam King

Dear Ms. King:

    Please find enclosed a New Enrollment Form of one of our
new employee , Dr. Abdullah M. Khoj.

    Dr. Abdullah M. khoj is the Director of the Center.  The
date of Employment was August 21, 1984.  He is married with
2 children.  Dr. Khoj was sent here by the Saudi Arabian
Government, therefore, the social security number does not
apply to his case.

    We would like his policy to be effective in our Group
starting September 1, 1984.  If there is any further question
concerning this enrollment, please contact me at the above
number from Monday – Friday  between 10 a.m. to 5:00 p.m.

    Thank you very much for your assistance and consideration.

                                Sincerely yours,

                                Samira P. Osman
                                Administrative Secretary



     c.c.  Mrs. Fay Vaziri, Agent

SOC-00094                                                    App. 31, p. 1

# A False Picture of Islam

I take exception to Jim Hoagland's "Sexual Politics, Islamic Style" [Feb. 13] on several grounds. Not only is the headline offensive and misleading, but it does not relate to the article itself.

Hoagland does not define what an "Islamic style" of sexual politics is. How can there be such a thing as an "Islamic style" when Islam is a way of life that God gave to all humankind? What sources does Hoagland use to examine this topic? If Hoagland wishes to discuss Islam, then he should limit himself to valid sources on Islam. If he wants to examine current trends in any Islamic society, he must distinguish between what is Islamic and what is cultural.

Contrary to Hoagland's claim, the veil is not a "sign of intimidation," nor is it a sign of misogynistic tendencies in Islam. Islam does not promote misogyny. Furthermore, Hoagland's apparent displeasure at no longer seeing "smartly dressed young Tunisian women" in the French-style sidewalk cafés shows his own ethnocentricity.

Moslem women have had full rights for more than 1,400 years. They own and control their own property, conduct their own businesses and participate in community affairs. They also have the right to inherit, to choose a marriage partner, to petition for divorce, to be educated and, for themselves and their children, to be supported and protected. Moslem women are spiritually equal to men. Although Western women have gained

some of these rights since the 19th century, they are still made to feel that they must be sexually attractive to get ahead and to become successful.

As devout Moslems, we have never argued whether women possess souls, nor have we ever viewed them as the source of evil in the world. Hoagland should not juxtapose the Judeo-Christian concept of original sin on the Islamic concept of women, which portrays women as honored and protected members of the society. The concept of original sin does not exist in Islam.

Hoagland states that while there is no prohibition, it has gradually become uncomfortable for "smartly dressed women" to frequent street cafés. He implies that this is because, in Arab cities, the streets belong to the men. This is not true. Female/male interaction in Islam is based on dignity, respect and honor, not on shame and fear. Hoagland is unclear as to how a discussion of women's role in society will "produce only losers." Open discussions on social issues are important in any society. Tunisians who are discussing these issues are not wasting their time and energy. Why does Hoagland believe that a moratorium on these issues is beneficial? Who benefits from this moratorium?

From what great fount did Hoagland gain the wisdom to determine—as Western society has done throughout history—that his way of thinking is the right way? Look at what Western society has gained: the disintegration of the family, homelessness, rising crime, teen-age

pregnancy, rampant drug and alcohol abuse, AIDS, suicide and contamination of the air, water and land. This is hardly a glowing vision of the perfect life. Perhaps Hoagland could learn a great deal from what Islam has to say about such problems.

In what way is adultery, as practiced in the West, superior to a legal married state of polygamy? Where did Hoagland get the information that adoption is prohibited in Islam? We have adoption, but it is not the Western style, which severs a child from his roots and heritage so that he will spend a lifetime wondering who he really is.

How do Hoagland and others conclude that the Moslem woman's dress does not protect and honor her? On what authority does Hoagland refute the high status Islam gives to women? Did Hoagland study the original Islamic sources to determine what is the actual position of women in Islam? When examining another religion, one must go directly to the main sources of that faith, not only to those individuals claiming to be members of that faith. Unfortunately, some people who claim to be Moslems do not have the proper knowledge of Islam. This leads to many misunderstandings. I encourage anyone who is interested to come and find out what Islam really is.

—*Abdullah M. Khouj*

*The writer is director of The Islamic Center.*

**ABDULLAH M. KHOUJ**
2550 MASSACHUSETTS AVE. NW.
WASHINGTON, DC 20008

15-122/540
00215

1481

8 - 28 2001

PAY TO THE
ORDER OF _Blue line Travel_____ | $ 207.00

only Two hundred seven And 00/100 _____ DOLLARS

First Union National Bank
of Washington, D.C.
Washington, DC

**FIRST UNION**

Performance Banking

FOR _____

⑈054001220⑈ 10000540.2552⑈ 1481 ⑉00000020700⑈

Blue Line Travel, Inc.
5613 Leesburg Pike, Suite 21
Falls Church, VA 22041

►Q31000011◄
FIRST UNION NATL SVC-671
PHILADELPHIA PA 08302001
0814419209

App. 33, p. 1

ABDULLAH M. KHOUJ
2550 MASSACHUSETTS AVE. NW.
WASHINGTON, DC 20008

15-122/540
00215

1486

9 - 4 2001

PAY TO THE
ORDER OF *The Blue line Travel* — | $224.00

*only two hundred twenty four* 00/100 DOLLARS

First Union National Bank
of Washington, D.C.
Washington, DC

FIRST
UNION

*Performance Banking*

FOR _____

⑆054001220⑆ 1000054082552⑈ 1486  ⑇000022400⑈

Blue Line Travel Inc.
5613 Leesburge Pike, Suite 21
Falls Church, VA 22041

▶031000114◀
FIRST UNION NATL SVC-871
PHILADELPHIA PA 00002001
0816097100

SOC-00097

App. 33, p. 2

**Form** [ ▶ Section references are to the Internal Revenue Code.  ▶ See separate instructions.  ▶ Give this form to the withholding agent or payer. Do not send to the ]

... of Foreign Status of Beneficial Owner for United States Tax Withholding

OMB No. 1545-16...

## Part I   Identification of Beneficial Owner (See instructions)

BANK OF AMERICA, N.A.
PO BOX 830040 (TX1-945-03-12)
DALLAS, TX 75283-0040

REC02DC
HX000001462+ 0102

U.S Taxpayer Identification Number (if required)

☐ SSN or ITIN   ☐ E...

Permanent Address, We must have a non-U.S. address, please provide if different from mailing address. Give complete non-U.S. address: street, city, province or state, postal code and country.

DR ABDULLAH M KHOJ
SPECIAL FOR ISLAMIC CTR
C/O ISLAMIC CTR
2551 MASSACHUSETTS AVE NW
WASHINGTON  DC  20008

ABDULLAH M. KHOUJ

NO. 3 AL-AZIZAH STREET

MAKKAH, SAUDI ARABIA

ACCOUNT NUMBER(S)
01357000000000002010722726

Type of beneficial owner: --  ☒ Individual   ☐ Corporation   ☐ Disregarded entity   ☐ Partnership   ☐ Simple trust
☐ Grantor trust   ☐ Complex trust   ☐ Estate   ☐ Government   ☐ International organization
☐ Central bank of issue   ☐ Tax-exempt organization   ☐ Private foundation

Country of incorporation or organization

Foreign tax identifying number, if any (optional)

Do not use this form for:                                                                                            Instead, use Form
• A U.S. Citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   W-9
• A person claiming an exemption from U.S. withholding on income effectively connected with the conduct
  of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   W-8ECI
• A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . . . . . . . . . . . W-8ECI or W-8IMY
• A foreign government, international organization, foreign central bank of issue,  foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895 or 1443(b) (see instructions) . . . . . . . . . . . . . . . . . . . . W-8ECI or W-8EXP
Note: *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to
claim they are a foreign person exempt from backup withholding.*
• A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   W-8IMY
Note: *See instructions for additional exceptions.*

## Part II   Claim of Tax Treaty Benefits (if applicable)

I certify that (check all that apply):

a  ☒ The beneficial owner is a resident of  SAUDI ARABIA within the meaning of the income tax treaty between the United States and that country.
b  ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).
c  ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the
     requirements of the treaty provision dealing with limitation on benefits (see instructions).
d  ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business
     of a foreign corporation, and meets qualified resident status (see instructions).
e  ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount
     subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.
   Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article . . . . . . . . . . . . . . . . . . . . . . of the
   treaty identified on line 9a above to claim a . . . . . . . . . . . . . . . . . . % rate of withholding on (specify type of income): . . . . . . . . . . . . . . . . . . . . . . . . . .
   Explain the reasons the beneficial owner meets the terms of the treaty article: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Part III   Notional Principal Contracts

☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively connected with the
  conduct of a trade or business in the United States. I agree to update this statement as required. . . . . . . . . . . . . . . . . . . . . . .

## Part IV   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I
further certify under penalties of perjury that:
• I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
• The beneficial owner is not a U.S. person,
• The income to which this form relates is not effectively connected with the conduct of a trade or business in the United States or is effectively connected but is not
  subject to tax under an income tax treaty, and
• For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.
Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any
withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

Sign Here ▶    DR. ABDULLAH M. KHOUJ                              2/25/02              SELF
               Signature of beneficial owner (or individual authorized to sign for beneficial owner)    Date (MM-DD-YYYY)    Capacity in ...

# Bank Accounts Chart

| Special Account in the name of Dr. Abdullah M. Khouj | Five Accounts in the name of The Islamic Center |
|---|---|
| **Account #:**<br>• #XXXXXXXX2726 | • Administrative Account #XXXXXXXX5929<br>• Bookstore Account #XXXXXXXX7589<br>• Charity Account #XXXXXXXX4037<br>• Construction Fund Account #XXXXXXXX7548<br>• Food Account #XXXXXXXX6121 |
| **Ownership:**<br>• 9/84 – 7/03: In Khouj's diplomatic tax ID # as Attaché of Saudi Embassy, Washington, D.C.<br><br>• 7/03- 2006: In Khouj's name and social security number | • In the Center's tax identification number |
| **Signator:**<br>• Only Khouj had signatory authority | • In order to retain its 501(C)(3) status, the Center had to have two signatories. |
| **Signature:**<br>• Darui never signed a check | • Darui never signed a check |
| **Mailing:**<br>• In February 2002, Khouj requested Bank of America to mail the monthly statements to a Post Office Box | • All monthly statements were mailed to the Center |
| **Funding Source:**<br>• Khouj deposited approximately $600,000 annually from the Saudi Embassy into this personal account | • Administrative: $10,000 to $20,000 annually for performing religious services<br>• Bookstore: $30,000 to $60,000 annual gross sales receipts<br>• Charity: $40,000 to $50,000 annual donations<br>• Construction: Dormant since 1990<br>• Food Account $20,000 to $40,000 annual donations |



**THE ISLAMIC CENTER**
Telephone: 332-8343
Telex: 517395

2551 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20008   U.S.A.

June 8, 1988

Ms. Sylvia A. Habib
Assistant Vice President
International Private Banking
2300 Calvert Street, N.W.
Washington, D.C. 20008

Dear Ms. Habib:

Please find enclosed signature cards for a new account
to be opened in the name of "The Islamic Center, Charity
Account". Per my letter of April 26, 1988, Mr. Shaker
Ahmed El-Sayed is currently out of the country and is
expected to return middle of June, 1988, therefore,
Mrs. Mushk A. Ahmed, Bookkeeper is temporarily an
authorized signer on the account.

New signatures cards will be provided upon Mr. El-Sayed's
return accompanied by my letter.

Sincerely yours,

Dr. Abdullah M. Khouj
Director

RESOLVED. That this organization establish in its name a deposit account with AMERICAN SECURITY BANK, N A , Washington, D.C., upon such items and conditions as may be agreed upon with said bank and that

the __**Director, Shaikh**__ and __**Bookkeeper**__ of this
           Title                                    Title

organization be, and they are hereby authorized to establish such account.

RESOLVED: That

__**Dr. Abdullah M. Khouj**__          __**Director**__ (Title)
           (Print or Type)

and/X __**Mr. Fathy M. Mady**__         __**Shaikh**__ (Title)
           (Print or Type)

X and/or __**Mrs. Mushk A. Ahmed**__    __**Bookkeeper**__ (Title)
           (Print or Type)

and/or _____         _____ (Title)
           (Print or Type)

and/or _____         _____ (Title)
           (Print or Type)

of this organization be, and they are hereby authorized to withdraw funds of this organization from the said account upon checks of this organization, signed as provided herein with signatures duly certified to said bank by the Secretary of this organization and said bank is hereby authorized to honor and pay any and all checks so signed, including those drawn to the individual order of any officer or other person authorized to sign the same.

I hereby certify that the foregoing is a full, true and correct copy of the resolution adopted by the Board of the _____

at a meeting of said Board duly held on the _____ day of _____, 19____ and that the signatures appearing on the reverse side of this card are the signatures of the persons duly certified to said bank by said organization and said bank in accordance with the above resolution until such authority is revoked by giving written notice thereof to said bank signed by the officers of said organization thereunto duly authorized by its Governing Body

WITNESS My hand and seal of the organization.

(SEAL)          _____          _____
                     (Signature)                        Secretary

We hereby certify the foregoing to be correct: (FOR LODGE, ASSOCIATION)

1. _____          2. _____
     Retiring Officer (Title)             Retiring Officer (Title)

**FOR BANK USE ONLY**

Previous Bank or Branch _____

Opened By _____ Date _____ Amount _____

Solicited By _____ Date Closed _____

Telecheck· Code _____ Opr. _____ Control No _____

---

AGREEMENT:     ☐ CORPORATION          ☐ LODGE, ASSOCIATION

The organization named below, as depositor, enters this bank-depositor agreement with AMERICAN SECURITY BANK, N.A., Washington, D. C., and agrees that this account shall be carried by said Bank as a

☒ CHECKING          ☐ SAVINGS

account and that all funds on deposit in said account shall be governed by said Bank s by-laws, all future amendments thereof, all regulations passed or hereafter to be passed by its Board of Directors pursuant to said by-laws, all rules and practices as to interest and service charges of said Bank relating to said account, the Code of Laws of the District of Columbia, and applicable banking laws of the United States. Depositor authorizes said Bank to endorse checks, when presented unendorsed for deposit to said account. Depositor further agrees that checks may be paid when signed and countersigned with the signature(s) indicated.

Name of Account __CHARITY ACCOUNT, THE ISLAMIC CENTER__

By _____ and _____
     (Authorized Signature and Title)        (Authorized Signature and Title)
STREET __2551 MASS. AVE., NW__ City & State __WASH., DC 20008__
ADDRESS
BUSINESS __NON-PROFIT RELIGIOUS ORGANIZATION__ Telephone __332-8343__
Said Bank is hereby authorized to:
☒ MAIL  all statements, vouchers and notices to the address indicated above.
☐ HOLD  all statements, vouchers and notices until called for and if not called for after 30 days said Bank may mail statements, etc., to the address indicated above. If the above mailed statements, vouchers and notices are returned undelivered, said Bank is hereby authorized to destroy same two (2) years thereafter.
Bank is relieved of all liability for items lost in the U.S. Mail, or otherwise, or not called for by the depositor.

AUTHORIZED SIGNATURES.          Office - Account Number

1. __Dr. Abdullah M. Khouj__          Director (Title)

2. __Mr. Fathy M. Mady__              Shaikh (Title)

3. __Mrs. Mushk A. Ahmed__            Bookkeeper (Title)

4. _____          _____ (Title)

5. _____          _____ (Title)

SOC-00101

## THE ISLAMIC CENTER PAYMENT AUTHORIZATION FORM

DATE: FEBRUARY 23, 2001

ACCOUNT: SPECIAL ACCOUNT

PAYABLE TO: ABDUL AZIZ DIALLO

FOR: ADMINISTRATIVE EXPENDITURES

AMOUNT: $996.49

CHECK NUMBER: 76846

APPROVED BY THE DIRECTOR OF THE ISLAMIC CENTER.

_____

DR. ABDULLAH M. KHOUJ

PREPARED BY THE ACCOUNTING DEPARTMENT.

NOT VALID WITHOUT THE DIRECTOR'S SIGNATURE.

App. 37, p. 1