UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Crim. No. 07-149 (RCL) |
| : | |
| FARZAD DARUI : | |
| : | |
| **Defendant** : | |
| : | |

**GOVERNMENT'S MOTION IN *LIMINE* TO PRECLUDE THE
PRESENTATION OF EVIDENCE THAT IS IRRELEVANT, IMMATERIAL,
AND SIGNIFICANTLY LIKELY TO CAUSE UNFAIR PREJUDICE OR CONFUSION
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

The United States of America, through its attorney, the United States Attorney for the District of Columbia, respectfully requests, pursuant to Federal Rules of Evidence, that the Court take appropriate steps to ensure that the purported evidence discussed herein is not presented by the defense at trial. Specifically, the defense, in its motions and representations to the Court, has made numerous unsubstantiated claims or referred to "evidence" that is utterly irrelevant to this case. The government believes the defendant is attempting to present prejudicial, confusing, and emotionally-charged issues before the jury to distract them from a straightforward criminal fraud case.

**I.      Introduction**

In its motions before the court, the defense has referenced (with scant proof) a laundry list of perceived historical wrongs, sinister ideological allegations, and a multinational conspiracy. While these speculative claims may have been targeted more for the media than the Court, they also share the distinction of being confusing and irrelevant to the fraud at issue in this case. The government has organized the defendant's claims into three categories: (1)

historical and political issues relating to the Islamic Center and the Middle East; (2) irrelevant and unduly prejudicial defense arguments related to specific witnesses; and (3) the alleged international conspiracy. The government files this motion to advise the Court about these issues before trial so as to streamline the trial, and minimize delay and in-court objections. As discussed below, each of these categories of "evidence" should be excluded from this trial.

## II.     Legal Framework

It is well established that this Court has complete discretion to decide what matters are material, relevant, and collateral to any case or witness examination, even if those issues fall in the realm of cross-examination or impeachment. See FRE 401-403; United States v. Walker, 930 F.2d 789, 791 (10th Cir. 1991) ("it is well settled that it is not improper for the trial judge to limit impeachment on matters that are deemed collateral or irrelevant"); U.S. v. Sampol, 636 F.2d 621, 664 (D.C. Cir. 1980) (trial court has discretion to limit cross-examination and require that affirmative defense be first presented before witness can be questioned).

### A.     FRE 401, 402 and 403

As this Court is well aware, relevant evidence is admissible and irrelevant evidence is inadmissible. See FRE 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FRE 401. Relevancy "exists only as a relation between an item of evidence and a matter properly provable in the case." *Advisory Committee Notes, Rule 401*. As such, matters which are collateral to the main issues at trial are generally considered irrelevant: it is for this reason that parties are forbidden from presenting extrinsic evidence to impeach a witness on collateral matters. See United States v. Tarantino,

846 F.2d 1384, 1409 (D.C. Cir.), cert. denied, 488 U.S. 867 (1988).

Equally importantly, even if evidence is relevant, it may be excluded by the Court if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FRE 403. The rule also encompasses evidence that is certainly relevant, but may elicit excessive emotional reactions from the jury. See *Advisory Committee Notes, Rule 403* (includes evidence which calls for "inducing decision on a purely emotional basis"). In this context, "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. FRE 403 similarly seeks to prohibit "delay and a 'mini-trial' on a collateral matter." United States v. Fonseca, 435 F.3d 369, 376 (D.C. Cir. 2006), cert. denied, 128 S.Ct. 49 (2007) (quoting United States v. Baylor, 97 F.3d 542, 545 (D.C.Cir.1996)).

### B.   Limits on Speculative Cross Examination and the Requirement of Affirmative Evidence

While the right to cross-examination is broad, and a defendant may impeach a government witness "by contradiction," that is by offering evidence that contradicts the witness's testimony on a material issue, see Fonseca, 435 F.3d at 375; United States v. Halperin, 441 F.2d 612, 617 (5th Cir. 1971), there are significant limits the Court can and must impose on speculative cross-examination into irrelevant, prejudicial, and collateral matters. See e.g., FRE 403; United States v. Stamp, 458 F.2d 759, 773 (D.C. Cir. 1971), cert. denied sub. nom, 406 U.S. 975 (1972) ("undue inquiry into collateral matters to test credibility, and the like, on cross examination is within the discretion of trial judge and there can be no reversal except for abuse" (quoting Lindsey v. United States, 133 F.2d 368, 369 (D.C. Cir. 1942)). For example, specific

conduct by a witness, outside of a conviction, that is probative of the truthfulness of a witness cannot be impeached by extrinsic evidence.[1]  See FRE 608(b).  A party also cannot present extrinsic evidence to impeach a witness by contradiction on a collateral or irrelevant issue in their testimony.  See Tarantino, 846 F.2d at 1409; United States v. Mulinell-Navas, 111 F.3d 983, 988 (1st Cir. 1997) (trial court has discretion to decide what are collateral matters); see also FRE 611(a) (Court obligated to control "mode and order" of interrogation, "protect witnesses from harassment or undue embarrassment" and the scope of cross-examination).  Nor can they elicit a witness's religious beliefs or opinions.  See FRE 610.

     A defendant's cross-examination can also be limited where the defendant cannot establish a foundation for the relevance of the questioning from information that has actually been accepted into evidence.  See United States v. Lin, 101 F.3d 760 (D.C. Cir. 1996) (court properly limited cross-examination on prejudicial matter where defense failed to make proper foundation); Baker v. United States, 401 F.2d 958, 987 (D.C. Cir. 1968) (court can limit cross examination where defendant did not first present evidence of an affirmative defense).  For example, in Lin, the trial court refused to permit defense's cross examination of government witnesses' potential bias where the subject of the cross examination was "highly prejudicial" and defense counsel's proffer was based solely upon his client's representation.  Lin, 101 F.3d at 768.  The D.C. Circuit affirmed the decision and concluded that the proffer, standing alone and without the defendant's testimony under oath, did not "support a genuine belief that the witness

---

[1] Evidence is "extrinsic if offered through documents or other witnesses, rather than through cross-examination of the witness himself or herself."  United States v. Boulerice, 325 F.3d 75, 82 n.5 (1st Cir. 2003) (quoting Weinstein's Federal Evidence, § 608.20[1] (2d ed. 2003)).

committed the offense or the degrading act to which the questioning relates." Id. at 768 (citation and internal quotations marks omitted).[2]

### III.    Argument

If left unchallenged, the defense's spurious arguments here could threaten the legitimacy of a fair and unbiased verdict. The defense's strategy, as laid out in its various pleadings, is to present the specter of a global conspiracy involving Saudi Arabia and attack government witnesses with irrelevant and offensive claims and innuendos which are solely designed to play upon juror emotions.   This defense is also baseless, and should be rejected by this Court.

#### A.    Historical and Political Issues Relating to the Middle East

The defense, particularly in its Motion to Dismiss Counts 1-5 of the Indictment (hereinafter, "DMTD"), has referenced a large number of controversial historical and politically charged events that are irrelevant to this case. The persons and events at issue include the following:

- Akbar Tabatabai- a murder victim in 1980;
- David Belfield- alleged Tabatabai murderer;

---

[2] In Bui v. DiPalol, 170 F.3d 232 (1st Cir. 1999), cert. denied, 529 U.S. 1086 (2000), the court acknowledged the rule in Lin:
> First and foremost, Lin, like so many of the precedents we have culled, holds that cross-examination presupposes the existence of a proper foundation. Offers of proof that do not carry the promise of demonstrating bias do not satisfy this requirement; indeed, such offers may be considered irrelevant.  Furthermore, in Lin as in this case, the trial court left open the possibility that witnesses could be recalled and the line of inquiry reopened if the defense subsequently made a better proffer.  Like Lin, [defendant] never returned with a beefed-up presentation.  Finally, as Lin suggests, questions that implicate a witness's involvement in elaborate conspiracies to commit illegal acts have the potential to be prejudicial and misleading.  And when the potential for this kind of prejudice exists, the need to insist that cross-examination be based on a solid foundation is heightened.

Id. at 245.

- Iranian revolution of 1980 and Ayatollah Komeneini;
- the Iran Freedom Foundation (IFF) and similar movements;
- various civil disturbances, protests, and removal of said protestors at or involving the D.C Islamic Center or the IFF, including, but not limited to, subsequent prosecutions for unlawful entry;
- Robert Levinson;
- Said Ramadan;
- Hani Ramadan;
- Ali Al-Timimi;
- Amar al-Bayoumi;
- Osama Basnan;
- Osama bin-Landen, and the attacks of September 11, 2001;
- requests from the U.S. State Department to the Islamic Center for information about its activities made after September 11, 2001;
- Muslim World League; and
- the emergence and spread of Wahhabist theology.

Obviously, the question of whether the defendant embezzled funds from the Islamic Center has nothing to do with any of these emotionally tinged historic events or persons: none of these events or persons are relevant to how or why he took the money, his receipt of the funds, or his scheme to defraud. It also has not been suggested that any of the above is related to a witness's veracity or any legitimate affirmative defense that justify the defendant's taking of the money. In addition to being irrelevant, the presentation of such evidence will inflame or confuse the jury, and create a great risk of undue prejudice. See, e.g., United States v. Fulmer, 108 F.3d 1486, 1498 (1st Cir. 1997) (error under FRE 403 to allow reference to Oklahoma City bombing in unrelated threats case). The defense should therefore be barred from raising any of these events or persons in this case.

### B.  Irrelevant and Unduly Prejudicial Defense Arguments Related to Specific Witnesses

The defense also appears poised to introduce additional opinion and "other acts" evidence that should also be restricted by the Court at the outset of this case. As discussed

below, this evidence is wholly immaterial to the charges in the indictment and contains a high risk of undue prejudice.

### 1.     *Religion and religious opinions*

The defense has raised in its motions the religious opinions of various persons who may have visited or worked at the Islamic Center, including their views on: (a) a women's right to pray with men, (b) the role of women in society, (c) polygamy and (d) Wahhabism and radical Islam.  No person's religious belief about these issues is relevant to the issues in this case or any elements of the criminal fraud charged in the Indictment.  Thus, it appears that the defendant's primary aim in introducing this evidence would be to evoke an emotional reaction from the jury to prejudice witnesses by suggesting that they may support terrorism or have religious opinions that may be outside the American mainstream.$^3$  This should not be tolerated.

A number of the government witnesses are Muslim (as is the defendant), and permitting examination of these controversial issues at trial is to invite error and prejudice against persons holding unpopular religious views.  FRE 610 clearly mandates that "[e]vidence of the beliefs or opinions of a witness on religion is not admissible" to show "the witness's credibility is impaired or enhanced."  See also Sampol, 636 F.2d at 666 ("The purpose of the rule is to guard against the prejudice which may result from disclosure of a witness's faith"); United States v. Kalaydjin, 784 F.2d 53, 57 (2nd Cir. 1986) (FRE 610 prohibits cross-examination "regarding an act that is

---

$^3$ In particular, the government believes that the defense will attempt to question a government fact witness, Dr. Abdullah H. Khouj, about his opinion on these subjects.  Dr. Khouj is the Director and Imam (religious leader) of the Islamic Center of Washington, D.C.  As discussed below in section B.2, cross examination of Dr. Khouj's religious opinions about polygamy is subject to a different analysis than whether defendants can question Dr. Khouj about whether he has or had multiple "wives" or mistresses.

meaningful only when considered in relation to the firmness of the witness's religious beliefs"). In addition, no witness should be forced to endure questions in a court of law which are designed solely to insult them or curry to a juror's potential bigotry.[4]  Recognizing this Court's role to "protect witnesses from harassment or undue embarrassment," FRE 611, the government requests that the defendant be precluded from improperly prejudicing the jury or intimidating witnesses through such examination.[5]  Importantly, because the prejudice at issue here can be caused by merely raising this subject matter, the government requests the Court to specifically bar the defense from raising these issues without seeking permission of the Court outside the presence of the jury.

       2.      *Marital infidelity, and multiple "wives" or mistresses*

The government also anticipates that the defense will attempt to present evidence, or raise questions during cross-examination, relating to Dr. Khouj's marital fidelity.[6]  In its

---

[4] See generally James C. Woods, The Third Tower: The Effect of the September 11th Terrorist Attacks on the American Jury System, 55 Ala. L. Rev. 209 (Fall 2003) ("Muslims or Middle Easterners testifying in any capacity may face more intense skepticism and scrutiny by jurors suffering fear and anger over the attacks [of 9/11]").

[5] It is possible that if this Court compelled a reluctant witness to testify about their religious beliefs in response to an irrelevant question by defense counsel, it could raise Free Exercise and Free Speech concerns.  See Employment Div. v. Smith, 494 U.S. 872, 877 (1990) ("the First Amendment obviously excludes all 'governmental regulation of religious beliefs as such.' . . . The government may not compel affirmation of religious belief, []punish the expression of religious doctrines it believes to be false, [] impose special disabilities on the basis of religious views or religious status, [] or lend its power to one or the other side in controversies over religious authority or dogma") (citations omitted)).

[6] The government has interviewed Dr. Khouj at length, and he has denied having a polygamous or adulterous affair.  To date, the defendant has identified two persons whom Dr. Khouj may have had a relationship with or to whom he may have been married.  The government has only been able to locate one of these women, and that woman has denied marrying Dr. Khouj or having an intimate relationship with him.

pleadings, the defense (without any supporting affidavits) has stated that it plans to portray Dr. Khouj as an adulterer and polygamist in order to suggest that the money that the defendant received was from Dr. Khouj – not the Islamic Center – for the purpose of paying back the defendant for money he had provided to Dr. Khouj's wives or mistresses. DMTD at 11-13. There are numerous problems with this defense that should cause this Court to restrict its presentation at trial.

    First, Dr. Khouj's marital fidelity is irrelevant and immaterial to the defendant's fraud. Whether or not Dr. Khouj, an employee of the victim in this case, is a polygamist or philanderer does not make it any more or less likely that the defendant took almost $500,000 from the Islamic Center without permission for more than a five and a half year period and deposited it directly into his own accounts. In the same vein, the fact that a person may or may not have engaged in marital infidelity should have no bearing on whether or not the witness is telling the truth on the witness stand. See United States v. Marchesani, 457 F.2d 1291, 1297 (6th Cir. 1972) (trial court properly disallowed cross examination that witness "was cohabitating with a man who was not her husband"); see also United States v. Scroggins, 939 F.2d 416, 421 (7th Cir. 1991) (sexual orientation and change in sexual identity are irrelevant to credibility). Nor does any evidence suggesting Dr. Khouj's infidelity necessarily make the defendant's affirmative defense more believable. For example, if the defense could show that Dr. Khouj committed a single act of adultery 20 years ago of which the defendant was unaware, or was married to another woman whom the defendant does not know (and the defendant did not provide her with money), neither of these facts would make it demonstrably more (or less) likely that the defendant was being repaid by Dr. Khouj for the defendant's costs in housing and feeding a

9

harem of wives or mistresses.[7] See Tarantino, 846 F.2d at 1410 (defendant cannot introduce evidence that "bears no relevance to any elements of the crimes charged or to any affirmative defenses to those crimes"); United States v. Secord, 726 F. Supp. 845, 849 (D.D.C. 1989) (what a defendant did not know cannot be relevant to his state of mind); see also United States v. Morgan, 581 F.2d 933 , 936 (D.C. Cir. 1978) ("The district court has wide discretion to admit or exclude evidence where the question is one of relevancy or materiality").

Second, the defendant's mere allegations of infidelity and polygamy should be seen for what they truly are: attempts to embarrass Dr. Khouj on the witness stand and attack his truthfulness through specific acts of uncharged conduct (i.e., adultery and criminal polygamy). As such, FRE 608(b) applies. This means that even if the defense were permitted to question Dr. Khouj about mistresses or otherwise – which the government believes it should not – the defense would be limited solely to the response he provides on cross examination, as his response cannot be questioned by "extrinsic evidence." United States v. Whitmore, 359 F.3d 609, 618 (D.C. Cir. 2004) (quoting and discussing FRE 608(b)).[8] FRE 608(b) also prohibits the defendant asking about any speculative consequences that Dr. Khouj might have faced if the allegations were proven true. See *Advisory Committee Notes, FRE 608(b), 2003 Amendments* (rule bars

---

[7] Under the same logic, evidence of the defendant's infidelity, standing alone, is also irrelevant on cross-examination.

[8] Even if FRE 608(b) did not apply, this Court would be justified in prohibiting extrinsic evidence to impeach Dr. Khouj because his marital fidelity is a collateral matter in this case. See Tarantino, 846 F.2d at 1409 (trial court can limit collateral impeachment). The matter is collateral because the fact which could be proven (infidelity) would have no relevance in rebutting the government's case of fraud because it would not make it less likely that the money at issue belonged to the Islamic Center, or that the defendant permissibly altered checks to commit the fraud. Id. at 1410 (matter is collateral if the fact could not be shown in evidence purposes independent of the contradiction by the witness).

questioning "to the consequences that a witness might have suffered as a result of an alleged bad act").

Third, the defendant's efforts to inject highly controversial issues such as polygamy and adultery into this case threaten to cause undue prejudice and significant jury confusion by creating a separate mini-trial within the trial. See FRE 403. As the court can imagine, if the defense is permitted to attempt to follow this line of questioning the trial may devolve into a hearsay battle with both sides calling witnesses on the issue of whether Dr. Khouj, a victim in this case whose is aged 56, was or was not faithful to his wife at any point in his life. Such a "mini-trial" would confuse the jury and turn its attention from its most important task: deciding whether the defendant improperly took money from the Islamic Center.[9] In order to "protect witnesses from harassment or undue embarrassment," FRE 611(a)(3), and avoid the significant danger that the defendant's defense will unfairly cause prejudice and a "mini-trial" on marital fidelity, this Court should restrict the defendant's inquiry into these matters. See Fonseca, 435 F.3d at 375.

---

[9] When defendants are permitted to put on irrelevant and prejudicial defenses other problems can arise. In Untied States v. Rosado, 728 F.2d 89 (2nd Cir. 1984), the trial court permitted the defendant to engage in "a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial" and then permitted the government to present limited rebuttal. Id. at 93. The court affirmed, but emphasized that the better course would have been to preclude the defendant's case:
> This appeal illustrates the hazards of permitting defendants in a criminal case to present evidence beyond what is relevant to disputing the elements of the offense charged or to establishing a lawful defense. Because the trial judge, in an effort to be solicitous of defense contentions, permitted evidence on issues inappropriate for jury consideration, we are now faced on appeal with the defendants' argument, among others, that their convictions should be reversed because of evidence introduced by the prosecution to rebut their own inadmissible evidence.

Rosado, 728 F.2d at 89.

Alternatively, this Court should limit defense cross-examination on Dr. Khouj's marital fidelity until the defense actually submits evidence of relevant infidelity (i.e., that Dr. Khouj's had relationship with a woman presently - not 20 years ago- that the defendant had actually supported) in its case in chief. As discussed above in section II.B, courts in this District have consistently controlled speculative and potentially prejudicial cross examination by the defense until the defendant or some other defense witness actually testifies under oath through competent evidence. See Lin, 101 F.3d at 768 (court limited cross-examination on prejudicial matter – that the witness was involved in illegal activities – unless defendant or defense witness testified, and recognizing proffer based upon defendant's representation to his attorney was insufficient); United States v. Smith, 1992 WL 42270 (D.C. Cir. March 4, 1992) (unpublished opinion) ("We have repeatedly held in this Circuit that trial judges are necessarily entrusted with a large measure of discretion to control the introduction of evidence and that they may therefore curtail examination when it strays into matters relevant only to an affirmative defense not brought out in direct testimony" (quotations omitted)); Sampol, 636 F.2d at 664 (court properly limited cross examination on prejudicial matter – that CIA planned a murder – unless defense put forth sufficient evidence of affirmative defense in its case in chief); Stamp, 458 F.2d at 773 (cross-limited on potential affirmative defense until defense put forth evidence in its case in chief); Baker, 401 F.2d at 987 (same); see also Searcy v. Jaimet, 332 F.2d 1081, 1090 (7th Cir. 2003) (courts may limit cross "into subjects for which there is no proper foundation, or into matters that are unduly speculative" (citations and quotations omitted)). The government therefore requests that if the Court does not exclude the defendant's arguments *in toto*, it limit the defense from cross-examining witnesses on the issue of Dr. Khouj's marital fidelity until the defense

actually presents relevant evidence of the issue in its case in chief. If the defendant can meets its burden at that point, the government can then make its witnesses available for recall by the defense.

### 3.    *Operation of the Islamic Center in Areas Unrelated to the Fraud*

Among the other issues that the defense has suggested it may raise at trial are issues related solely to the internal politics, governance, and operation of the Islamic Center. While the government concedes that some inquiry into the operation and employment of certain employees of the Islamic Center during the time of the fraud (2000 to 2006) will be relevant in this case, the topics that the defense appears to take issue are clearly irrelevant. For example, the defense has suggested it will raise at trial:

- (a) the hiring and removal of Islamic Center employees prior to 2000, see DMTD at 6 and 9;
- (b) the legitimacy, timing and intent of the Islamic Center's Board of Directors meetings, including diplomatic representation at those meetings (including those prior to 2000), see id. at 6, fn.4; 8, and 13;
- (c) the proper interpretation of the Islamic Center's bylaws as it relates to the selection and election of officers by the Board of Directors, see id. at 7-10, and 13-14;
- (d) whether the Center properly paid sales tax on books it sold, see Defendant's Opp. Brief to Mot. to Quash Subp. to the Islamic Center at 8 (Rule 17(c) request ¶ 19); and
- (e) payments from the Islamic Center to keep tabs on suspected radical Islamists, see id. at 9; DMTD at 10.

Putting aside the validity of any of these actions, none of them has anything to do with the defendant's fraud. The fraud at issue here did not begin until 2000, and the defense has conceded that the Board of the Islamic Center did not know that the defendant had deposited the money at issue into his account. As a result, the Board's actions, whether lawful, improper, or political, is immaterial and means nothing to this case. Similarly, whether or not the Islamic

13

Center paid informants to keep tabs on radicals, or paid the proper amount of sales tax on books, is totally irrelevant to the facts in dispute here. More importantly, it is quite clear that the defense is intending to present this evidence in a ruse to confuse the jury and obfuscate real issues in dispute. This Court should prevent the defendant from presenting such irrelevant and potentially prejudicial evidence at trial.

### C.     International Conspiracies Aligned Against the Defendant

Among the defendant's more creative allegations (again with no proof) is that there is an international conspiracy, spearheaded by Saudi Arabia and Dr. Khouj, which is fixated on creating false evidence of fraud against him in order to remove him from his $40,000 a year job at the Islamic Center of Washington, D.C. According to the defendant, the Kingdom of Saudi Arabia has been financially supporting the Islamic Center since 1984 (and helping to pay defendant's salary), and the defendant had personally worked with Dr. Khouj and the Saudi Arabian Embassy continuously from 1984 to August, 2006. See DMTD at 6, 13. Despite this amicable history, the defendant claims that the situation changed in December 2004, when he opposed the Saudi Arabian Embassy's effort to appoint Dr. Khouj's successor. See id. at 14. The defense provides no proof of this opposition or conspiracy (or explanation as to why Dr. Khouj or the Saudi's did not just fire him), but claims that, at some point after that, Dr. Khouj and/or the Saudi Arabian Embassy were not just angry at him, but decided to frame him for fraud of the Islamic Center by manipulating copies of the checks at issue here. As the defense has stated:

> Darui contends any check he cashed was originally made out to Blue Line or Zaal and that any other check with the same amount, number and date – but different payee – is the result of alteration by Khouj or the Saudi Embassy. It appears that copies of these bogus altered checks were provided by the Saudi Embassy in a form different from how

14

Darui prepared finance information for Khouj to provide the Embassy. Def. Reply Brief in Sup. of Mot. For Bill of Particulars at 2, n.1.[10]

As with the defense's other claims, this claim of conspiracy and (criminal) alteration is so speculative, wanting of proof, and potentially prejudicial, that this Court should strike the defense in its entirety. This Court is empowered to bar any defense that "bears no relevance to any elements of the crimes charged or to any affirmative defenses to those crimes," Tarantino, 846 F.2d at 1410, and this "conspiracy" defense is really no defense at all. There is simply no evidence to support the conspiracy, and even if the defendant could show any proof of a manipulation of the evidence in this case that is the direct result of a Saudi conspiracy, this defense would still not protect him from criminal liability. Specifically, the government's proof of the fraud at issue includes more than 60 fraudulent checks that were not altered (i.e. the payee on the copies of these checks provided by the Islamic Center and the Saudi Arabian Embassy are the same as the payee in the deposited checks). Given this circumstance, it is obvious that the defense is ignoring the facts and is attempting to play directly on the emotion of jurors who may be predisposed to believe in illogical conspiracies involving the Kingdom of Saudi Arabia. This is precisely the type of prejudicial and misleading evidence that is objectionable under FRE 403.

Again, alternatively, even if this Court were to permit this conspiracy defense, it should bar the defense from cross-examining government witnesses about this speculative conspiracy until affirmative evidence establishing the conspiracy and alleged alteration is put forth in the defendant's case in chief. The defendant's conspiracy theory is highly prejudicial and likely will

---

[10] The defendant has intimated (but not yet speculated) that Dr. Khouj or the Saudi Embassy was also behind the disappearance of the original fraudulent checks. The government contends that it is most likely the defendant himself destroyed or moved the original checks.

evoke emotional responses, particularly in light of public perception of the Kingdom of Saudi Arabia; as such this Court should be even more skeptical of permitting cross-examination by the defense on this subject in the absence of any proof.  See Bui, 170 F.3d at 245 ("questions that implicate a witness's involvement in elaborate conspiracies to commit illegal acts have the potential to be prejudicial and misleading" and therefore " the need to insist that cross-examination be based on a solid foundation is heightened").  As discussed above in Section III.B.2, trial courts in this Circuit have long insisted that the defense first present affirmative proof of a defense theory before allowing potentially prejudicial cross-examination. See, e.g., Sampol, 636 F.2d at 664;  Stamp, 458 F.2d at 773;  Baker, 401 F.2d at 987.

In many ways, this case is similar to the situation faced by the court in Sampol.  In that case the defendants, on trial for the murder of the former Chilean ambassador to the United States, claimed that Central Intelligence Agency was involved in a conspiracy to commit murder, and the trial court permitted the defendants to present this defense in its opening statement despite limited evidence of the conspiracy.  636 F.2d at 662-663.  The trial court then restricted cross examination of government witnesses of the CIA theory until the defense could prove up its claims in its case in chief, at which point it could recall any government witnesses.  Id. at 664. Thereafter, the defendants attempted to put forth evidence in their case in chief by calling CIA operatives with limited direct knowledge, but the trial court ruled that the defendants had not met their burden to present the defense.  Id. at 665.  The Circuit, which first recognized that the trial court "properly refused to allow appellants to put the CIA on trial" and probably could have restricted the entire defense, affirmed the trial court's approach.  Id. at 663, n.31, 664 (quotation omitted).  As to the limits the trial court placed on cross examination, the Circuit concluded:

16

> Here the record establishes that any questions as to the general activities in the CIA in Chile would have exceeded the scope of the direct examination . . . . Since the stated purpose of such testimony was to establish what counsel considered to be an affirmative defense, the trial judge was free to demand that appellants call their own witnesses to present it.

Id. at 664. See also Casey v. United States, 413 F.2d 1303, 1305 (5th Cir.), cert. denied, 397 U.S. 1029 (1969) (holding trial court properly limited defense's speculative examination of witnesses regarding CIA involvement in the offense until defense presented evidence under oath supporting its conspiracy theory). The court then upheld the trial court's limitation on the defendant's case in chief, as it concluded that the defendant had not met its burden of proving a CIA linkage that would permit the recall of government witnesses. Id. at 666.

Here, the defense has similarly suggested a wide-ranging international conspiracy, that has significant potential for prejudice, but has no evidence to support it. Should this Court even permit defendant to raise this claim, the government requests the Court follow the procedure used in Sandol and restrict the defense from raising this issue on cross-examination until it can establish a sufficient foundation for its theory in its case in chief.

**IV.     Conclusion**

For the reasons stated here, and any that may be raised in a reply brief or orally before the Court, the government requests that the defense be precluded from making the arguments and defenses referenced in this Motion.

               Respectfully submitted,

               UNITED STATES ATTORNEY

By:     **/s/**    
    Tejpal S. Chawla, D.C. Bar No. 464012
    Ronald W. Sharpe, D.C. Bar. No. 434575
    Assistant United States Attorneys
    555 4th Street, NW
    Room 5233
    Washington, D.C. 20530
    (202) 353-2442 (Chawla)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | **Crim. No. 07-149 (RCL)** |
| : | |
| **FARZAD DARUI** : | |
| : | |
| **Defendant** : | |
| _____ : | |

## ORDER

After having considered the Government's Motion in *Limine* to Preclude the Presentation of Evidence that is Irrelevant Immaterial and Significantly Likely to Cause Unfair Prejudice or Confusion, and Memorandum of Points and Authorities in Support Thereof, any opposition and Reply thereto, oral argument, and the entire record in this matter, it is hereby:

ORDERED that the government's motion is GRANTED.

**SO ORDERED** this _____ day of _____, 2007.

_____
ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE