UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No. 1:07-cr-00149-RCL |
| | ) | |
| FARZAD DARUI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FARZAD DARUI'S BRIEF IN
<u>OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE*</u>**

<u>PRELIMINARY STATEMENT</u>

A defendant in a criminal case has a constitutional right to present a complete defense.

Farzad Darui's defense is simple:  Dr. Abdullah M. Khouj authorized all the transactions at issue.

To the extent he states otherwise, he is being untruthful.  In more detail, Darui states his defense

as follows:

The government claims two categories of checks authorized by Khouj were altered

without Khouj's knowledge:

1.    <u>Payments to Darui and/or his companies,</u> which were, in fact, repayment for debts
incurred by Khouj for Darui providing housing and food, and other expenses, for Khouj's
"wives"; and

2.    <u>Extra checks made out to employees,</u> which were, in fact, payments to informants
and Mid-East journalists who reported on whether the plans of radical Islamists included taking
over The Islamic Center to use as their platform for promoting their particular brand of Islam.

Darui's defense explains both categories.  Regarding the first: From April 1992 until

December 2004 (almost 13 years) Darui housed in four different apartments owned by him a

"wife" or mistress of Khouj, Debbi Estrada.  He also housed for approximately 18 months (Fall

1995 - March 1997) another "wife" or mistress, Noufissa Zhouri.  Darui was rarely paid by

Khouj for housing these two women and never in an amount to cover the entire rent.[1]  Moreover, Estrada caused considerable monetary damage to Darui's apartments; for example, she pulled appliances and wiring out of the walls.  Khouj also asked Darui regularly to leave Estrada money, usually in amounts of $50 to $150, or to take her food.

Although Khouj intermittently made small payments to Darui, he repeatedly promised to repay him in full.  For a long while, Darui assumed Khouj was making a minimal salary and, therefore, did not press him for repayment.

In late 1999, when Darui accidentally learned that Khouj had amassed hundreds of thousands of dollars, he insisted on repayment in full.  Khouj agreed to do so from his Special Account, which Darui knew was in Khouj's name and social security number.  Darui also knew Khouj had used this account for personal expenditures.  Khouj told Darui he did not want the Saudis to know about this use of the Special Account funds.  So Khouj agreed to "authorize" extra payments to vendors, which would go toward paying down the ever-increasing debt for Estrada.  Khouj had used this same technique to conceal other payments from the Saudis.

The second category of checks is payments to informants and, at times, paying expenses of journalists to cover radical Islamic events in the United States and Europe.  Throughout the over two-decade history of The Islamic Center (post-1984) both Darui and Khouj had serious concerns about Islamic dissidents threatening The Center.  Khouj, a Saudi citizen whose salary was paid by the Saudi government, was concerned with keeping the dissidents out so The Center

---

[1] Because checks were discovered during the investigation, Khouj eventually had to admit to the FBI he had made some rental payments to Darui.  At first he claimed payments of $600 were made and showed the checks to the interviewing agent, but the defense has never received copies of those checks.  Although these checks were specifically described in an FBI 302 dated January 16, 2007, the government now claims it does not even have copies.  Later, Khouj admitted paying $550 at various times.  The monthly rents for the furnished apartments ranged from $950 to $1500.

remained under Saudi control.  Darui's concern was keeping Islamic radicals out of The Center, even if they were Saudi.  The two overlapping but somewhat different concerns could be addressed by the same tactic: paying persons to mingle with potential dissidents and to provide "intelligence" to Khouj and Darui.  This information consisted of oral reports and photographs.  The informants needed to be paid - in cash, with no identifiable record of their names.  When asked, Darui also provided the information he collected to local and federal law enforcement.  Khouj was well aware of these "intelligence" payments as they were usually made via an extra paycheck to certain employees and the cash given to the information provider.

The government now attempts to protect Khouj, and its case, by excluding Darui's defense, claiming such evidence is "prejudicial, confusing, and emotionally-charged."[2]

Khouj's credibility is critical to this prosecution.  Why? Because the government does not have one original "altered" check in its case against Darui.[3]  Viewing two copies of the same check is a confounding experience.  The two copies have the same number, same amount, same date, same signature, but different payees.  There is no visible sign of alteration.  [App. A].  Thus, Khouj's testimony is crucial to present the jury any evidence — beyond mere copies of two checks, identical except for the payees — that the cashed check was indeed the altered check.

Clearly, if Khouj is lying, it prejudices the government's case.  But Darui's reason for exposing this witness's lies is not for mere impeachment, as claimed by the government and the cases it cites.  Khouj is lying to conceal the *reasons* he authorized the transactions at issue, facts that go to the core of Darui's defense.

---

[2]  Motion *in Limine*, 1.
[3]  One original cancelled check was found in the search of The Islamic Center.  When the government did not know of its existence, this check was listed as altered.  After it was found and there was no alteration, the government removed it from the "checks-at-issue" list.

Without question, if the Special Account is a personal account of Khouj and he authorized the payments to Darui, there is no intent to defraud by Darui. Thus the *reasons* and manner Khouj authorized those payments are directly and critically relevant to Darui's defense. By focusing only on impeachment, where a defendant has broad latitude in any event, the government attempts to avoid the main point, which is not solely to attack Khouj's credibility. Instead, the point is if the truth is presented about these matters, Darui does not have the *mens rea* necessary for a guilty verdict.

Nor is Darui's defense without factual basis, as is the situation with most cases cited by the government. For example, the government is well aware that Darui has evidence (including Khouj's inconsistent statements to government agents) to contradict Khouj's numerous denials that he had relationships with women whom he asked Darui to house and feed. To wit:

Although Khouj repeatedly has denied to the government he ever had any marriage other than his first wife,[4] who has been in Saudi Arabia for over two decades, defense counsel has located a witness to the marriage ceremony between Khouj and another woman, and informed the government of this fact <u>prior</u> to its filing its Motion *in Limine*.

Second is an example of Khouj attempting to conceal from the government the extent of his involvement with Estrada. In his first interview with the FBI (September 14, 2006), Khouj stated he "did not know" what a letter (from Darui's business lawyer) was referring to by asking about Estrada. Khouj explained that Estrada "did some work on the Center's newsletter" and was "paid about $500" monthly <u>by Darui</u>. This interview occurred at a time when Khouj erroneously thought Darui had left the United States to live in Mexico and would not return to contest these allegations.

---

[4] Motion *in Limine*, 8 n.6.

In January 2007 (presumably after the FBI had found numerous checks to Estrada signed by Khouj),[5] he told the FBI that he "tried to help by paying her rent for several years." He claimed that "Darui offered to rent her one of his apartments," and that he "gave Darui a check once a month for $600 to help with her rent." Khouj also stated he "hired [Estrada] to be a typist for the Center's magazine, where she was paid $500 a month." "Khouj denied she was his girlfriend . . ." but admitted that "on occasion . . . he would stop by her apartment and deliver food to her," and "he may have written checks to help her from 1994 to 2003." (Emphasis added).

After one Estrada neighbor (coincidentally, an FBI employee who had worked with the Darui case agent) was interviewed and stated a Saudi male had visited Estrada one to two times per week, Khouj was interviewed for the sixth time. On June 6, 2007, almost nine months after his first interview with the FBI, when he claimed he did not know why he was being questioned about Estrada, Khouj admitted that his visits to bring her food were "often" and lasted "approximately one hour." He also admitted for the first time that in the late 1980's, Estrada had "lived with [him] for a few months . . . at a townhouse owned by the Center at 2550 Massachusetts Avenue . . . ." He then changed the amount he had claimed he paid Darui saying it was "$550 per month to rent a small apartment Darui owned." Khouj denied living with Estrada for more than a few months.

## SUMMARY OF THE ARGUMENT

The government's Motion *in Limine* should be denied because it asks this Court to exclude cross-examination of Khouj on the very facts at the core of Darui's defense, which is his constitutionally guaranteed right to present. This right also includes rigorous cross-examination

---

[5] Darui has never signed a check to Estrada.

so that the jury can assess the witness's credibility. Darui is provided broad discretion under

Federal Rule of Evidence 401, which permits a minimal threshold to refute *mens rea*.

LEGAL ARGUMENT

**1.    *The government's attempt to gut Darui's ability to present his defense violates Due Process and the Sixth Amendment.***

Whether rooted directly in Due Process or "in the Compulsory Process or Confrontation

Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful

opportunity to present a complete defense.'"  *Holmes v. South Carolina,* 126 S. Ct. 1727, 1731

(2006) (quoting *Crane v. Kentucky,* 476 U.S. 683, 690 (1986)).  In general, a defendant must be

permitted to introduce evidence directly relating to the actual elements of the charged offense

and "evidence pertaining to collateral matters that, through a reasonable chain of inferences,

could make the existence of one or more elements of the charged offense . . . more or less

certain."  *United States v. Hurn*, 368 F.3d 1359, 1363 (11th Cir. 2004).

This fundamental right to our system of ordered liberty, *Chambers v. Mississippi*, 410

U.S. 284, 302 (1973), includes the right to have an impartial jury serve as the trier of all facts

necessary for conviction, with the prosecution bearing the burden of proving guilt beyond a

reasonable doubt.  *E.g., Apprendi v. New Jersey*, 530 U.S. 466, 477-78 (2000).  And it includes

the right to subject the prosecution's case to "the crucible of meaningful adversarial testing" by

confronting and cross-examining its witnesses at trial.  *Crane*, 476 U.S. at 690-91.  These

constitutional guarantees reflect the "conviction . . . that the truth is more likely to be arrived at

by hearing the testimony of all persons of competent understanding who may seem to have

knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be

determined" by the trier of fact.  *Washington v. Texas*, 388 U.S. 14, 22 (1967).

An essential element of the jury's responsibility for assessing the truth of every accusation is "[d]etermining the weight and credibility of witness testimony . . . ," *United States v. Scheffer*, 523 U.S. 303, 313 (1998), by subjecting those witnesses to cross-examination before the jury. *See Crawford v. Washington*, 541 U.S. 36, 48-49 (2004). In *Crawford*, the Court emphasized that, pursuant to the Confrontation Clause, the reliability of the government's witnesses against the defendant must be assessed by a jury (not a judge) "in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence . . . , but about how reliability can best be determined." *Id.* at 61.

In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Court rejected the State's argument that defendant must "show 'outcome determination' prejudice" for the Confrontation Clause to be violated. *Id.* at 679-80. Rather, the focus of the Clause is on "individual witnesses." *Id.* at 680. Holding that such a trial decision is subject to harmless error, *Van Arsdall* set out factors for the reviewing court's consideration:

- Importance of the witness's testimony in the prosecution's case;

- Whether the testimony was cumulative;

- Presence or absence of evidence corroborating or contradicting the witness's testimony on material points;

- Extent of cross-examination otherwise permitted; and

- Overall strength of the prosecution's case.

*Id.* at 684.

The right to confront and cross-examine witnesses, when not abused, is constitutionally guaranteed by the Confrontation Clause of the Sixth Amendment. *Davis v. Alaska*, 415 U.S. 308 (1974).

For example, in *Olden v. Kentucky*, 488 U.S. 227 (1988), the trial court barred a black defendant in a rape case from cross-examining the white complainant about her extramarital affair with defendant's half brother, a witness for the State. Defendant argued complainant had a motive to tell the man with whom she was having a relationship that she had been raped to conceal from him that she had consensual sex with the defendant. *Id*. at 229-30. The Supreme Court summarily reversed, characterizing the restriction on cross-examination as "beyond reason," and stating that "[s]peculation as to the effect of the jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [complainant's] testimony." *Id.* at 232. And in *Davis*, 415 U.S. 308, the trial court's failure to allow cross-examination regarding the witness's bias provided the basis for reversal. The Court observed: "[T]he jurors were entitled to have the benefit of the defense theory before them so that they could make an informal judgment as to the weight" to give the witness's testimony, which "provided 'a crucial link in the proof . . . of petitioner's act.'" *Id.* at 317.

Under the *Van Arsdall* factors, the cross-examination of Khouj should not be limited.

- Khouj's testimony is essential to the government's case. Other than Darui, Khouj is the only witness with personal, first-hand knowledge of the circumstances of writing the checks.

- Khouj's testimony is not cumulative of any other witness. Without the ability to cross-examine Khouj fully, relevant and exculpatory evidence will be excluded from the jury's consideration.

- As described in this and previous defense motions, Khouj has contradicted his own statements on a variety of issues during the investigation of this case. (*See e.g.*, *supra* pp. 4-6.)

- Regardless of the extent of cross-examination otherwise permitted, if Khouj cannot be questioned regarding his multiple wives and endorsement of The Center's informant program, evidence directly related to Darui's defense – namely, that there was a debt owed him and that Khouj authorized all the checks – will be kept from the jury.

- If the government is able to prevent Khouj's cross-examination as requested, its case against Darui is significantly bolstered. However, if cross-examination is permitted on these topics, the government's case weakens appreciably.

On these authorities alone, the government's motion should be denied.

### 2. *Federal Rules of Evidence 401and 404(b) provide a liberal standard of admissibility for Darui's cross-examination of the government's main witness.*

Addressing the pertinent evidentiary rules, evidence is relevant if it has "*any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). Rule 401 is a "liberal standard" that "establishes only a minimal level of probability." *United States v. Leonard,* 439 F.3d 648, 651 (10th Cir. 2006). Relevance is a particularly low hurdle when a defendant seeks to negate evidence of *mens rea*: "[T]he accused as part of his defense is entitled to wide latitude in the introduction of evidence [that] tends to show lack of specific intent." *United States v. Brown,* 411 F.2d 1134, 1137 (10th Cir. 1969).

Furthermore, defendant has the same right as the government to use Federal Rule of Evidence 404(b) to prove his theory of the case or bolster an element of his defense. *See United States v. Stephans*, 365 F.3d 967, 975 (11th Cir. 2004) (reversing the district court decision to exclude testimony supporting the theory of the defense under Rule 404(b)); In the context of challenged evidence, 404(b) requires the court to admit evidence of a witness's "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Fed. R. Evid. 404(b).

Although it is frequently said that good faith is a complete defense to charges of fraud, it is more accurate to say that as part of its proof of intent to defraud, the government must negate the possibility that a defendant acted in good faith:

> Since an essential element of the crime charged is intent to defraud, it follows
> that good faith on the part of the defendant is a complete defense to a charge of
> mail (or wire) fraud.  A defendant, however, has no burden to establish a defense
> of good faith.  The burden is on the government to prove fraudulent intent and
> the consequent lack of good faith beyond a reasonable doubt.

2 L. Sand *et al.*, Modern Federal Jury Instructions—Criminal ¶ 44-5.  The issue of good faith must thus be squarely raised (and its absence proved) by the government in its case-in-chief. Accordingly, Darui has the *evidentiary* right to inquire on matters relating to his good faith and lack of intent to defraud, and the *constitutional* right to confront and cross-examine the government's witnesses on this very issue.

Particularly in fraud cases, where the "difficult issue of the defendant's subjective intent" is at issue, defendant should be "permitted to develop fully and fairly all of the evidence that would tend to exonerate him."  *United States v. Thomas*, 32 F.3d 418, 421 (9th Cir. 1994) and cases cited therein.

The government requests this Court to limit Darui's ability to present his complete defense and impeachment in three areas:

- Religion and religious opinions;

- Marital infidelity and multiple "wives" or mistresses; and

- Operation of The Islamic Center in areas "unrelated" to the fraud.

Darui responds in limited detail to the issues raised by the government.  It would be folly to provide all Darui's factual bases at this time, because each time Darui has done so the government has changed its explanation for the evidence.

- **Any questioning of Khouj's religious beliefs will be related to Darui's defense and have a basis for such questioning.**

Darui is clearly entitled to inquire of Khouj's relationships with two women:  Estrada and Zhouri.  Witnesses and documents establish that both these women resided in Darui's apartment

buildings.  Khouj has admitted making partial payments toward Estrada's rent.  Zhouri has admitted residing in Darui's apartment building:  "ZOUHRI only officially met Darui once at the IC, but rented an apartment from him from sometime in 1995 to sometime in 1996."  FBI interview with Noufissa Zhouri, February 6, 2007.

It is relevant that Islam allows multiple "marriages" and that Khouj approves of this tenet.  If the jury is not told these facts, it may not believe there was a religious marriage ceremony when Khouj was already married to another woman because polygamy is against U.S. law and contrary to most American religions.

Moreover, Khouj does not keep his religious views on polygamy private but has written extensively of his acceptance of polygamy.  Abdullah M. Khouj, *A False Picture of Islam*, The Washington Post, February 27, 1998 at A21; Abdullah Muhammad Khouj, Handbook of Marriage in Islam 54-59 (The Islamic Center 1987).[6]

Finally, the fact that Islam has a radical fringe that Darui opposed is crucial to his defense that he was paying informants to provide him such information.

- **Darui is entitled to inquire of Khouj's marital infidelity or multiple "wives" or mistresses because Khouj's relationships with two if them are bases for Khouj's debt to him.**

Darui does not care nor will he inquire whether Khouj had a <u>sexual</u> relationship with Estrada or Zhouri.  The fact that there was some type of <u>serious</u> relationship with these women is material to Darui's defense.  If Darui cannot establish there were relationships, why would the

---

[6] In his handbook, Khouj addresses the "widely misunderstood" issue of polygamy.  He laments how those with a "rudimentary understanding [of the practice] are not willing to try to understand the Islamic view of polygamy," and how "[t]hey refuse to see its value *even* as an emergency solution to specific human problems."  (Emphasis added).  Khouj describes polygamy as "a legal bond connecting a husband to more than one wife, the maximum being four wives."  He points out that "Islam places certain demands on polygamists," which include "equal treatment in support, housing, sexual relations, and personal relations."  *Id.* at 58.

jury ever believe Khouj was financially responsible for Darui's housing and feeding these two women?

Darui has a witness to one of the marriage ceremonies.  Khouj finally admitted Estrada lived with him, but falsely limited the length of time.  There are witnesses, including a federal government employee, who have stated Khouj visited Estrada at Darui's apartment building (after he kicked her out of his Massachusetts Avenue townhouse).  Only on the sixth FBI interview did Khouj admit he visited her one to two times a week but claims he only stayed for about "an hour" to "deliver groceries."

- **Operation of The Islamic Center is material to Darui's defense that Khouj's directing of the finances was unconventional and that he regularly paid bills and employees "off the books."**

Khouj fired other persons who were in charge of finances so he could control how The Center's money was spent.  Khouj directed the finances in a slip-shod manner so he could conceal certain expenses from the Saudis by claiming they were for matters that, in fact, had no basis.  One example: for nine years Khouj paid Estrada $250 twice a month.  The documents to the Saudis falsely claimed the payments were for typing a newsletter.  At first Khouj told the FBI Darui paid her.  When such checks were found with only Khouj's signature as payor he repeated his claim to the Saudis - that it was for typing a newsletter.  Although Darui has requested The Center's newsletters for that time period, Khouj and The Center successfully quashed that subpoena request.

Below is a specific, but limited response to the government's five examples of evidence regarding The Center's operations that should be excluded:[7]

(a)    The hiring and removal of Islamic Center employees prior to 2000, <u>see</u> DMTD at 6 and 9.

---

[7] Motion *In Limine*, 13.

<u>Removal of a Center employee prior to 2000 is relevant if Khouj removed all persons dealing in finances so he and the Saudis could control the money The Center spent.  That fact is relevant to Darui's defense.</u>

(b)     The legitimacy, timing and intent of the Islamic Center's Board of Directors meetings, including diplomatic representation at those meetings (including those prior to 2000), <u>see id.</u> at 6, fn.4; 8, and 13.

<u>It depends on the facts to be proved whether legitimacy of The Center's Board of Governors is important prior to 2000.  For example, the Board voted Darui Secretary in 1999; therefore, the Saudis could not unilaterally remove him as they had done to other employees.</u>

(c)     The proper interpretation of the Islamic Center's bylaws as it relates to the selection and election of officers by the Board of directors, <u>see id.</u> at 7-10, and 13-14.

<u>This example has the same response as (b).</u>

(d)     Whether the Center properly paid sales tax on books it sold, <u>see</u> Defendant's Opp. Brief to Mot. to quash Subp. To the Islamic Center at 8 (Rule 17 (c) request ¶ 19).

<u>The reason Khouj did not get an audit on the Special Account, which was in his name and social security number, is because Darui told him he would have to pay U.S. taxes on the funds.  Khouj concealed this and other income to limit his U.S. taxes; it its relevant Khouj also ignored D.C. taxes owed by The Center as that fact makes it more likely that he did not pay his own taxes.</u>

<u>Also relevant is Khouj's financial status reflecting much more wealth than what would be accumulated by an annual salary of $45,000, which he falsely claims in his March 16, 2007 FBI interview he donated sometimes to The Islamic Center.</u>

(e)     Payments from The Islamic Center to keep tabs on suspected radical Islamists, <u>see id.</u> at 9; DMTD at 10.

The government cannot charge Darui with endorsing checks for certain employees and then argue he cannot tell why he did so.

The Court should reject the relief requested by the government, which offends Darui's constitutional rights. The request also ignores the clear evidentiary relevance of facts that challenge the elements of the government's case-in-chief.

When deciding the government's motion this Court must also take into consideration that Khouj disobeyed this Court's order to provide documents reflecting use of a Post Office Box and falsely told this Court he had no other bank accounts except for one at Bank of America. These violations are the subject of defense motion entitled Defendant's Response in Opposition to Government's Motion to "Scrutinize," filed January 29, 2008 (Dkt. No. 43).

The government's motion is nothing more than an attempt to do what defendants are frequently accused of attempting: "sanitizing" the evidence. But here, sanitizing the evidence would also violate the constitutional trial rights afforded a criminal defendant, rights that were seen by the Founders as central to the jury trial guarantee.

CONCLUSION

For all these reasons, the government's unconstitutional attempt to foreclose Darui's defense must be denied.

FARZAD DARUI

By: /s/ Victoria Toensing
Victoria Toensing (DC Bar #304980)
Joseph diGenova
Brady Toensing
diGENOVA & TOENSING, LLP
1776 K Street, N.W., Suite 737
Washington, D.C. 20006
(202) 289-7701
(202) 289-7706 (fax)
Counsel for Defendant

By: /s/ Aaron S. Book
Aaron S. Book (DC Bar # 490815)
Steven T. Webster (admitted *pro hac vice*)
WEBSTER BOOK LLP
1 North King Street
Leesburg, Virginia 20176
703-779-8229
703-991-9178 (fax)
Counsel for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 3, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Ronald Sharpe, Esq.
Assistant United States Attorney
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530

<u>/s/ Victoria Toensing</u>
Victoria Toensing

# APPENDIX A



DIRECT BILL ACCOUNT STATEMENT

| Billing Date | Account Number | Page |
|---|---|---|
| 03-12-04 | 0115396935 | 1 of 2 |

For up-to-date information call: 1-800-262-5148

P.O. BOX 946220
Maitland FL 32794-6220

Your Agent/Broker: 420017819
HOWARD & HOFFMAN INC
3201 NEW MEXICO ST. NW STE 205
WASHINGTON DC 20016-2723

PHONE: 202-966-0700
Please call your agent regarding policy and address changes.

THE ISLAMIC CENTER
ATTN: MR. DARUI
2551 MASSACHUSETTS AVE. N.W.
WASHINGTON DC 20008-2826

| Due Date | Minimum Due | Account Balance |
|---|---|---|
| 04-01-04 | $5,331.97 | $15,989.87 |

| ACCOUNT ACTIVITY | $ MIN DUE | $ ACCT BAL |
|---|---|---|
| BALANCE FORWARD | 7,874.13 | 23,861.00 |
| PAYMENTS - THANK YOU $7,874.13 | 7,874.13CR | 7,874.13CR |
| INSTALLMENT PREMIUM DUE | 5,328.97 | |
| INSTALLMENT CHARGE (Included in Minimum Due Amount) | 3.00 | 3.00 |
| NEW BALANCE | 5,331.97 | 15,989.87 |

79002

SPECIAL ACCOUNT
2551, MASS. AVE. N.W.
WASHINGTON, DC 20008

15-120/540 DC
8021

DATE APRIL 15, 2004

PAY TO THE
ORDER OF            CNA            $ 4600.00

FOUR THOUSAND SIX HUNDRED AND NO/100 DOLLARS.            DOLLARS

IF HELD TO LIGHT, IF CIRCULAR WATERMARKS ARE NOT PRESENT DO NOT CASH. SEE BACK FOR ADDITIONAL SECURITY FEATURES.

Bank of America

ACH R/T 054001204

FOR 0115396935   PARTIAL PAYMENT

⑈079002⑈ ⑆054001204⑆ 00204072272⑈

| 04-01-04 | $15,989.87 | $15,989.87 |
|---|---|---|

THE ISLAMIC CENTER

Account Number: 0115396935

Return this portion with your payment in the enclosed envelope.
Please write your account number on your check.

Payable to:

CNA INSURANCE
PO BOX 382033
PITTSBURGH PA 15250-8033

10 0115396935 000005331970 000015989874

79002

79-INV1APR04-008

79002

SPECIAL ACCOUNT
2551 MASS. AVE. N.W.
WASHINGTON, DC 20008

15-128/548 DC
8021

DATE APRIL 15, 2004

PAY TO THE
ORDER OF     *B.I.T INCORPORATED*                          $   4600.00

FOUR THOUSAND SIX HUNDRED AND NO/100 DOLLARS.                    DOLLARS

WHEN HELD TO LIGHT, IF CIRCULAR WATERMARKS ARE NOT PRESENT, DO NOT CASH. SEE BACK FOR ADDITIONAL SECURITY FEATURES.

Bank of America

ACH R/T 054001204

FOR 0115396935  PARTIAL PAYMENT

⑈079002⑈ ⑆054001204⑆ 002010722726⑈          ⑆0000460000⑈

REQUEST 00002028043000000 4600.00
ROLL ECIA   20040419 000000916012653+
JOB ECIA P  ACCT 0000002010722726
REQUESTOR Margaret Rich
give to peggy

Margaret Rich
PA4292

WB-11294

79002, WB-2004