## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 07-149 (RCL) |
| FARZAD DARUI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FILED**

**MAY - 7 2009**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### MEMORANDUM OPINION

The government's prosecution of defendant in May 2008 resulted in a hung jury. Before

the Court are four motions by defendant: Motion [107] for a Judgment of Acquittal; Motion

[114] to Dismiss Superseding Indictment as Violative of the Double Jeopardy Clause; Motion

[128] to Dismiss the Indictment or Preclude at Retrial the Testimony of the Government's

Principal Witness Who Obstructed Justice, Made False Statements, and Committed Perjury; and

Motion [142] to Dismiss Indictment with Prejudice and for Sanction of Government for

Manipulating Evidence, Submitting a False Affidavit, and Using False Testimony to Support

Admission of a Material Exhibit. On February 26, 2009, the Court heard oral argument on

Motion [128]. As described below, the Court finds no grounds for judgment of acquittal,

dismissal of the indictment, or sanction of the government, and all four motions shall be denied.

### BACKGROUND

Defendant was prosecuted and tried for five counts of mail fraud, two counts of interstate

1

transportation of stolen property, one count of money laundering, and one count of theft.  The

charges were all related to defendant's alleged misappropriation of funds from the Islamic Center

of Washington while he served as the Center's business manager.  The government's main

witness at trial was Dr. Abdullah Khouj, the Center's director and religious leader.  After eleven

trial days, jury deliberations began on the afternoon of Wednesday, May 21, 2008.  On that

Friday afternoon, the Court determined that the jury was hung and declared a mistrial.


## DISCUSSION

### A.      Motion [107] for a Judgment of Acquittal

There are two parts to defendant's Motion [107].  The first part, which seeks acquittal on

the mail fraud charges (Counts One through Five), can be disposed of quickly.  Defendant

contends that "[f]or the reasons asserted orally at trial, . . . there was no adequate proof of mail

fraud because the mails were not used in furtherance of the alleged scheme to defraud."  (Def.'s

Mot. [107] at 1.)  As defendant seems to recognize, during trial defendant made two oral motions

for dismissal based on insufficiency of the evidence, one after the government's case and one

after all evidence had been submitted.  The Court denied both motions.  Defendant does not

explain how this motion, also claiming insufficiency of the evidence, differs from the ones made

during trial, nor why it should be granted while the trial motions were denied.  Accordingly, the

Court cannot grant defendant's motion for acquittal based on insufficiency of the evidence.

The second part of defendant's Motion [107] is more substantial.  Defendant claims that

the recent Supreme Court decision *United States v. Santos*, 128 S. Ct. 2020 (June 2, 2008),

"precludes prosecution of money laundering when there is no evidence the funds are profits."

(Def.'s Mot. [107] at 2.)  The federal money laundering statute under which defendant is

charged, 18 U.S.C. § 1957, targets

> [w]hoever, in any of the circumstances set forth in subsection (d), knowingly
> engages or attempts to engage in a monetary transaction in criminally derived
> property of a value greater than $10,000 and is derived from specified unlawful
> activity . . . ."

18 U.S.C. § 1957(a).  "'Criminally derived property' means any property constituting, or derived

from, *proceeds* obtained from a criminal offense."  18 U.S.C. § 1957(f)(2) (emphasis added).

Defendant contends that *Santos* defines "proceeds" as "profits" rather than gross receipts.

Therefore, defendant continues, because the government has not presented evidence that

defendant's financial transactions involved "profits" from his mail fraud—as opposed to mere

reimbursements—*Santos* mandates that the money laundering count of the superseding

indictment (Count Eight) be dismissed.  The Court does not reach the same conclusion as to

*Santos*'s holding.

In *Santos*, Justice Scalia wrote for a four-Justice plurality that the term "proceeds" in a

related federal money laundering statute, 18 U.S.C. § 1956(a)(1), could be fairly interpreted as

either "profits" or "gross receipts."[1]  Therefore, Justice Scalia continued, the "rule of lenity,"

which requires that ambiguous criminal laws be interpreted with lenience toward the defendant,

mandates that "proceeds" be interpreted as "profits."  *Santos*, 128 S. Ct. at 2025 (Scalia, J.).  The

fifth vote in favor of the "profits" interpretation came from Justice Stevens, writing separately

and concurring with the judgment.  But Justice Stevens suggested that the term could be defined

---

[1]Although defendant is not charged under § 1956, but rather under § 1957, the term
"proceeds" is undefined in either statute.  Defendant contends that *Santos* is thus relevant to
defendant's case.  The government does not contest defendant's position, nor does the Court.

as "profits" in the context of some money laundering operations but as "gross receipts" in others. *Id.* at 2032 (Stevens, J., concurring) ("[T]his Court need not pick a single definition of 'proceeds' applicable to every unlawful activity, no matter how incongruous some applications may be."). For example, Justice Stevens wrote, "the legislative history . . . makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales. But that history sheds no light on how to identify the proceeds of many other types of specified unlawful activities." *Id.* (footnote omitted).[2] Because Justice Stevens concluded that a "gross receipts" definition would be "perverse" in the context of *Santos*—involving an illegal gambling operation—he concurred with the judgment and interpreted the statutory term "proceeds" as "profits." *Id.* The dissent, authored by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, concluded that "proceeds" should be defined as gross receipts (in the opinion's words, "the total amount brought in"). *Id.* at 2035–2045 (Alito, J., dissenting).

Justice Scalia, joined by Justices Souter and Ginsburg, took issue with Justice Stevens' position, stating that the Court had "never once" "giving the same word, *in the same statutory provision*, different meanings *in different factual contexts*." *Id.* at 2030 (Scalia, J.). He also disagreed with Justice Stevens' legislative history assessment. *Id.* at 2030 n.8. Justice Scalia then, after noting that the holding of the case is necessarily limited by Justice Stevens' opinion, *id.* at 2031 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)), offered his own interpretation of the opinion's stare decisis effect:

---

[2]Justice Alito, in dissent, noted that five Justices (Justice Stevens, and Justice Alito writing for Chief Justice Roberts and Justices Kennedy and Breyer) agreed with this statement. *Santos*, 128 S. Ct. at 2035 and n.1 (Alito, J., dissenting).

[T]he narrowness of [Justice Stevens'] ground consists of finding that "proceeds" means "profits" when there is no legislative history to the contrary. That is all that our judgment holds. It does not hold that the outcome is different when contrary legislative history does exist. Justice STEVENS' speculations on that point address a case that is not before him, are the purest of dicta, and form no part of today's holding.

*Id.* at 2031.

The D.C. Circuit has not yet interpreted *Santos*'s enduring holding, and its sister Circuits are split on the issue.[3] In this situation, all that a District Court can do is read *Santos* and come to its own conclusion. This Court, having done that, does not reach the same conclusion Justice Scalia did as to *Santos*'s holding. To this Court, it appears that when Justices Scalia's and Stevens' opinions are read together, *Santos* defines "proceeds" as "profits" only in the context of an illegal gambling operation. It does not mandate a definition in the context of defendant's alleged unlawful activity (mail fraud). Accordingly, *Santos* does not suggest that the Court must

---

[3]Some take Justice Scalia's view. *See, e.g., United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("In June 2008, the Supreme Court [in *Santos*] . . . held that the term 'proceeds' as used in 18 U.S.C. § 1956 refers to 'profits,' not 'receipts' of an illegal enterprise."); *United States v. Yusuf*, 536 F.3d 178, 185 (3rd Cir. 2008) ("[T]he Supreme Court, in *United States v. Santos*, recently clarified that the term 'proceeds,' as that term is used in the federal money laundering statute, applies to criminal profits, not criminal receipts, derived from a specified unlawful activity."); *United States v. Lazarenko*, 546 F.3d 593, 605 (9th Cir. 2008) ("[*Santos*] concluded that the term ['proceeds'], left undefined in the statute, was ambiguous as to whether it meant 'profits' or 'receipts,' and so defined it in the more defendant-friendly terms of 'profits,' based on the rule of lenity."). Others are less certain. *See, e.g., United States v. Levesque*, 546 F.3d 78, 82 (1st Cir. 2008) ("In Santos, the Court ruled, under the rule of lenity, that the term 'proceeds' in the federal money-laundering statute . . . should be interpreted as 'profits' rather than 'receipts,' *at least when the predicate offense is an illegal lottery operation*.") (emphasis added); *United States v. Brown*, 553 F.3d 768, 785 (5th Cir. 2008) ("[N]ot even after *Santos* is the law 'clear' on what the prosecution should be required to prove as 'proceeds' in this case . . . ."); *United States v. Howard*, 2009 WL 205649 at *10 (4th Cir. Jan. 29, 2009) (unpublished opinion) ("Because *Santos* does not establish a binding precedent that the term 'proceeds' means 'profits,' except regarding an illegal gambling charge, we are bound by this Court's precedent establishing that 'proceeds' means 'receipts.'").

dismiss Count Eight of the superseding indictment.

The Court cannot grant defendant's motion [107] for acquittal on either of its theories, and the motion shall therefore be denied.

**B.      Motion [114] to Dismiss Superseding Indictment as Violative of the Double Jeopardy Clause**

If a judge declares a mistrial without being compelled to do so by "manifest necessity," then retrying the defendant on the same charges would violate the Double Jeopardy Clause of the Fifth Amendment. *See, e.g.*, *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824). Defendant claims that his is such a case. Defendant argues that before declaring a mistrial, the Court should have provided additional guidance on the legal issue of "consent." Defendant also argues that the Court erred by declining to poll the foreperson or the jurors individually as to the extent to which the jury was deadlocked. The question presented by the motion, again, is whether the Court's declaration of a mistrial was supported by manifest necessity. The Court concludes that it was and will therefore deny defendant's motion to dismiss.

*1.*      United States v. Wecht *Informs the Court's Consideration of This Motion.*

Since the parties briefed this issue, the Third Circuit decided *United States v. Wecht*, 541 F.3d 493 (3d Cir. Sept. 5, 2008), *cert. denied*, 129 S. Ct. 658 (Dec. 1, 2008), a factually similar case which sheds some light on the issue of manifest necessity and the breadth of the trial court's discretion. Because of its applicability, it is discussed here at length before analysis of defendant's motion. *Wecht* was more complex than defendant's case; it involved forty-one counts of theft, wire fraud, and mail fraud and consumed twenty-three trial days before closing

6

arguments concluded. *Id.* at 495. After almost one-and-a-half weeks of jury deliberation, the

jury sent a note asking:

> Out of the 41 counts if any one or more count the jury cannot come to unanimous
> agreement on, does that constitute a hung jury?

*Id.* at 496. After consulting with counsel, the court sent a written response to the jury:

> The answer to your question is "no." It is your duty, as jurors, to consult with one
> another, and to deliberate with a view to reaching an agreement if you can do so
> without violence to your individual judgment. Each of you must decide the case
> for yourself, but do so only after an impartial consideration of the evidence in the
> case with your fellow jurors. In the course of your deliberations, do not hesitate to
> re-examine your own views, and change your opinion, if convinced it is
> erroneous. But do not surrender your honest conviction as to the weight or effect
> of evidence solely because of the opinion of your fellow jurors, or for the mere
> purpose of returning a verdict.

*Id.* Except for the first sentence, that text tracked verbatim the Third Circuit's Model Criminal

Jury Instruction 9.05 ("Deadlocked Jury – Return for Deliberations"). One week later, the jury

sent another note:

> After considering all counts in a variety of ways and in reconsideration of all
> individual opinions according to the court instructions—we have unanimously
> agree [sic] we have reached an impasse & respectfully request direction from the
> court. We agree additional deliberation would not be helpful.

*Id.* Upon reading this note, the court informed counsel that it "was inclined to poll the jurors

individually to ask whether they were 'hopelessly deadlocked' and whether further deliberations

would lead to a unanimous verdict . . . ." *Id.* The government requested an instruction clarifying

that partial verdict on any of the counts was a possibility. *Id.* Defendant Wecht supported an

individual poll. *Id.* The court proceeded with the individual poll, and each juror agreed that (1)

they were hopelessly deadlocked and (2) further deliberations would not lead to a unanimous

verdict. The court then gave the full Model Criminal Jury Instruction 9.05 and sent them back to

continue deliberations.

After the jury left, the government renewed its request that the court clarify for the jury

the possibility of a partial verdict. *Id.* at 497. Wecht objected and cross-moved for a mistrial on

the basis of the individual poll. *Id.* The court denied the government's motion that day and

denied Wecht's motion on the next day of deliberations. *Id.* The following day the court, having

received another note from the jury announcing deadlock,[4] declared a mistrial. *Id.* at 497–99.

Immediately after doing so he asked the government whether it planned to retry the case; the

government indicated that it did, and the court set a trial date. *Id.* at 498.

After the ruling, Wecht appealed to the Third Circuit seeking dismissal of the indictment.

*Id.* at 499. The court of appeals found that the trial judge "did not follow the ideal set of

procedures." *Id.* at 501. The panel found that the trial judge did not follow Comment 9.06 to the

Model Instructions, which recommended that if the jury was still deadlocked after Instruction

9.05 was given in full, the judge should (1) question the foreperson as to the extent of the

deadlock, (2) question each juror individually on the same issue, and then (3) consult with the

parties outside the jury's presence as to whether a mistrial should be declared. (The judge polled

the jurors and consulted with the parties *before* giving Instruction 9.05.) The judge also failed to

make an explicit finding of "manifest necessity" before declaring a mistrial, as recommended in

---

[4]The text of the note was revealed after the declaration:

Pursuant to court instructions the jury contends we have exhausted all further
deliberation efforts. We agree unanimously that we are unable to reach a
unanimous verdict—on all 41 counts and are essentially deadlocked in the case of
United States of America vs. Cyril H. Wecht.

*Id.* at 499.

step (3) of the Comment.  Nonetheless, the panel concluded that because Comment 9.06 was

only a "recommendation" rather than a "mandate," it could not be said that the trial judge

"violated" the Comment.  *Id.* at 502.  But the panel found that the judge *did* violate Federal Rule

of Criminal Procedure 26.3, which states that "[b]efore ordering a mistrial, the court must give

each defendant and the government an opportunity to comment on the propriety of the order, to

state whether that party consents or objects, and to suggest alternatives."  The trial judge

consulted with the parties *before* giving the full Instruction 9.05—but not afterward.  The Third

Circuit held that to comply with Rule 26.3 the consultation must occur after the "Deadlocked

Jury" instruction but before the declaration of a mistrial.

However, the panel still concluded that dismissal of the indictment on double jeopardy

grounds would be improper.  The main issue remained "whether, under the substantive law

governing mistrials, the indictment against Wecht must be dismissed because the District Court

improperly declared a mistrial."  *Id.* at 504.  The panel quoted the Supreme Court:

> [T]he trial judge's belief that the jury is unable to reach a verdict [has] long [been]
> considered the classic basis for a proper mistrial. . . .
>
>         . . . [T]here are especially compelling reasons for allowing the trial judge
> to exercise broad discretion in deciding whether or not "manifest necessity"
> justifies a discharge of the jury.  On the one hand, if he discharges the jury when
> further deliberations may produce a fair verdict, the defendant is deprived of his
> "valued right to have his trial completed by a particular tribunal."  But if he fails
> to discharge a jury which is unable to reach a verdict after protracted and
> exhausting deliberations, there exists a significant risk that a verdict may result
> from pressures inherent in the situation rather than the considered judgment of all
> the jurors.  If retrial of the defendant were barred whenever an appellate court
> views the "necessity" for a mistrial differently from the trial judge, there would be
> a danger that the latter, cognizant of the serious societal consequences of an
> erroneous ruling, would employ  coercive means to break the apparent deadlock.
> Such a rule would frustrate the public interest in just judgments.

*Id.* at 505–06 (quoting *Arizona v. Washington*, 434 U.S. 497, 509–10 (1978)).[5]  With this

discretion in mind—lessened somewhat by the trial judge's violation of Rule 26.3—the panel

considered ten factors in turn:

> "1. a timely objection by the defendant;
>
> 2. the jury's collective opinion that it cannot agree;
>
> 3. the length of jury deliberations;
>
> 4. the length of the trial;
>
> 5. the complexity of the issues presented to the jury;
>
> 6. any proper communications between the judge and jury;
>
> 7. the effects of exhaustion and the impact of coercion of further deliberations on the jury[;]
>
> 8. whether the court provided counsel an opportunity to be heard;
>
> 9. whether the court considered alternatives to a mistrial; and
>
> 10. whether the court's decision was made after adequate reflection."

*Id.* at 506 (quoting Comment 9.06 and various decisions from other Circuits).  The *Wecht* panel

concluded that Factors (8), (9), and (10) further decreased the deference to the trial judge in that

case, that Factors (1) and (7) did not weigh in that case, and that the remaining factors (2)–(6)

(especially (2)) weighed in favor of the trial judge.  Upon this analysis—with five factors

weighing in favor of deferring to the trial court's decision and three against—the panel concluded

that manifest necessity did compel the mistrial and denied Wecht's motion to dismiss the

indictment.

---

[5]Much of this language has also been quoted by the D.C. Circuit in this context.  *See*
*United States v. Glover*, 731 F.2d 41, 46–47 (D.C. Cir. 1984).

2.      Wecht-*Style Analysis Does Not Reveal Error in This Case.*

Although *Wecht* is not binding precedent in this Circuit, it does represent a recent detailed

and factually similar assessment of the issues at play in this case (and one for which the Supreme

Court has denied certiorari).   And although this Circuit may not pick the exact same ten factors

against which the Third Circuit measured the *Wecht* trial judge, they remain a fair approximation

of the factors that might reasonably be considered.   *See, e.g.*, *United States v. Ligon*, 781 F. Supp.

1, 6 (D.D.C. 1991, as am. 1992) (Gasch, J.) (citing *Arnold v. McCarthy*, 566 F.2d 1377, 1387

(9th Cir. 1978)) (listing the same factors (1)–(7) as *Wecht*).   Comparing this Court's record to

that of the trial judge in *Wecht*, there can be no doubt that the *Wecht* panel—and an analogous

panel within this Circuit—would likely conclude that this Court's mistrial declaration was

supported by manifest necessity and thus not in error.   In fact, as described below, it is not

unlikely that a court of appeals would view nine of the ten *Wecht* factors as supporting this

Court's decision to declare a mistrial.

At the outset, it should be noted that this Court complied with Federal Rule of Criminal

Procedure 26.3, which the *Wecht* panel chided its trial court for neglecting.   After giving the

*Thomas* anti-deadlock instruction—roughly analogous to the Third Circuit's Instruction

9.05—this Court consulted the parties regarding whether a mistrial should be declared (allowing

the defendant to make a timely objection).   A spirited debate ensued, only after which did the

Court declare a mistrial.   (*See* Def.'s Mot. [114] Ex. A (trial transcript from May 23, 2008).)

Accordingly, a court of appeals would not only grant this Court more deference than did the

panel in *Wecht*, but here factors (1), (8), (9), and (10) would favor this Court's conclusion of

11

manifest necessity (as was not the case in *Wecht*).

Factors (3), (4), and (5) favor this Court no more—but no less—than they did the *Wecht* judge. The *Wecht* panel concluded that for a forty-one-count indictment and twenty-three trial days, one and a half weeks was sufficient time for jury deliberation before a mistrial might be declared. Defendant's case here was less complex, but the relative time-frames were roughly commensurate. In defendant's case, there was a nine-count superseding indictment and trial argument took eleven days. A mistrial was declared on the third day of jury deliberations. These metrics are not out of line from those in *Wecht*. Accordingly, as the *Wecht* panel considered factors (3), (4), and (5) to favor the trial judge's decision to declare a mistrial, it is likely that this Circuit would view those factors as supporting this Court's decision.[6]

Factor (2)—which weighed so heavily in the *Wecht* decision—favors this Court as well. Again, factor (2) considers "the jury's collective opinion that it cannot agree." Here, defendant's jury unambiguously declared that it was hung on the second day of deliberations. As the District of Columbia's model jury instructions recommend, the Court delivered the *Thomas* anti-deadlock instruction and sent the jury back to continue deliberating. The jury returned its second deadlock note the next day. Defendant complains that the Court did not poll the foreperson or the jury as to the extent to which the jury was hung. But unlike the Third Circuit's instructions in *Wecht*, the District of Columbia's Model Criminal Jury Instructions do not have supplemental anti-deadlock instructions analogous to the Third Circuit's Comment 9.06 (which suggested such

---

[6]With regard to factor (5), the Court realizes that a comparison of the numbers of indicted counts, trial days, and deliberation days are at best a rough and imprecise way to gauge "the relative complexity of the issues presented to the jury." However, there is no perfect way to do so, and this is the most economical comparative technique the Court has at its disposal.

polling).[7] And even though the *Wecht* panel said that the trial court's failure to poll was "less than ideal," it concluded that such a failure did not militate for reversal. *Wecht*, 541 F.3d at 501–02. The Court here opted against such polling (as well as against supplemental legal instruction) because of the inherent risk of coercion. Not only do the D.C. model instructions indicate that that decision was defensible, but the decision would also likely garner the support of *Wecht* factor (7) (considering "the effects of exhaustion and the impact of coercion of further deliberations on the jury").

The only factor that went in the *Wecht* judge's favor but would likely not benefit this Court is factor (6) (evaluating "any proper communications between the judge and jury"). The *Wecht* panel cited the judge's pre–deadlock-instruction jury polling in concluding that this factor supported the judge's mistrial declaration. Although this Court did communicate with the jury extensively through notes, it did not poll jurors. As a result, the Court cannot conclude from *Wecht* that a court of appeals would view factor (6) as weighing in this Court's favor.

When the ten factors are viewed together, however, it becomes clear that an appellate panel would likely deny a challenge to the Court's mistrial declaration. Based on *Wecht*, nine of

---

[7]In fact, the D.C. instructions are particularly attuned to the risk of coercion posed by such supplemental communications:

> Because of the potential for coercion inherent in any anti-deadlock instruction, the [D.C.] Court of Appeals has cautioned that an anti-deadlock charge generally should only be delivered to a hung jury once. . . . Notwithstanding [that], a jury can repeatedly be instructed on points of law and repeatedly be given non-coercive instructions to resume its deliberations *before* an anti-deadlock instruction is given.

Criminal Jury Instructions for the District of Columbia, 4th ed. rev. (Barbara Bergman, ed.), p. 187 (Instr. 2.91 cmt.) (citing *Epperson v. United States*, 495 A.2d 1170 (D.C. 1985)) (emphasis added).

the ten factors appear to favor the Court. *Wecht* endorsed the trial judge with only five of ten

possible supporting factors, and there the panel's deference to the trial judge was eroded by

procedural missteps not present in this case. This Court therefore concludes that *Wecht* strongly

suggests that defendant's motion for acquittal should be denied.


### 3. *Nor Do Cases Cited By Defendant Reveal Error.*

None of the cases cited by defendant convince the Court that, *Wecht* notwithstanding, its

declaration of a mistrial was in error. To the contrary, the cases defendant cites are all quite

distinguishable from his situation.

Defendant's primary argument is that the Court erred in not providing supplemental

clarifying instruction on the issue of consent. Defendants cites several cases in which

convictions were overturned for lack of clarifying instructions. (Def.'s Mot. [114] at 7 (citing

*Wright v. United States*, 250 F.2d 4, 11–13 (D.C. Cir. 1957) (en banc) (insufficient instruction on

the issue of insanity) ("Where . . . the need for more [instruction] appears, it is the duty of the

judge to fill in the sketch, as may be appropriate on the basis of the evidence, to provide the jury

with light and guidance in the performance of its difficult task."); *United States v. Bolden*, 514

F.2d 1301, 1308 (D.C. Cir. 1975) (insufficient instruction on intent) ("When the court refused to

do anything more than reread the statute and the standard instruction, despite cogent requests

from the jury and both government and defense counsel, it could well have left the jury with the

incorrect impression that coincidence was sufficient to convict.")).). These cases are

unconvincing for two related reasons. First, they deal with reversals of convictions, not with

reversible error in the declaration of a mistrial. It is well established that the trial court has

14

significant discretion in determining whether manifest necessity compels a mistrial,[8] and

defendant has provided no rationale for why these conviction reversals should compel dismissal

of an indictment following a mistrial.[9] Second, and moreover, even these cases recognize the

discretion granted to the trial court in instructing the jury (as reflected in the quoted excerpts).

They stand for the principle that such discretion has its limits, *not* that failure to give a requested

instruction or clarification is *always* reversible error. In short, defendant has not established that

the Court lacked discretion to decline supplementary instruction on the issue of consent.

Defendant also cites case law for the principle that a juror's refusal to follow the law

constitutes good cause to dismiss that juror. (Def.'s Mot. at 8.) The Court accepts that

premise—but in defendant's case there was no clear refusal to follow the law. Defendant treats

the written statement of one juror complaining that "[w]e [the jury] are not doing anything in

accordance with evidence, testimony, instructions or otherwise" (Notes From Jury [101] at 6) as

clear evidence that jurors were not following the law. It is not as clear to the Court. In the

Court's view that note was more an expression of frustration with the process, and as such it did

not necessitate additional instruction to the jury on its duty to follow the law. Faced with such

weak and ambiguous evidence of jury misconduct, the Court decided against providing

supplementary instruction and thereby risking coercive effect.

---

[8]*See, e.g.*, *United States v. Glover*, 731 F.2d 41, 47 (D.C. Cir. 1984) (quoting *Arizona v. Washington*, 434 U.S. 497, 510 n.28 (1978)) ("The reason for the great deference accorded a trial court's declaration of mistrial in the deadlocked jury situation 'is that the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate.'").

[9]At oral argument on February 25, 2009, defendant argued to the effect that "the standard of reversal is the standard for dismissal." However, as defendant cited no legal support for this position, the Court declines to adopt it.

Because the Court did not exceed the bounds of its discretion in declining to give the supplementary jury instructions requested by defendant, and because there was no convincing evidence of juror misconduct, the Court cannot grant defendant's motion based on the cases cited. Therefore, because *Wecht* suggests that the Court's trial conduct was proper and defendant's cited cases do not demonstrate otherwise, the Court shall deny defendant's Motion [114].

**C.  The Prosecutorial Misconduct Alleged in Motion [128] Does Not Rise to a Level Justifying Dismissal of the Indictment or Preclusion of Khouj's Future Testimony**

Defendant moves [128] to dismiss the indictment or, in the alternative, to preclude government witness Abdullah Khouj from testifying in a retrial. Defendant argues that dismissal is the proper remedy for Khouj's allegedly false statements—allegedly made with the knowledge of the government—during defendant's first trial. But defendant spends most of his time describing Khouj's alleged acts of perjury themselves and relatively little time on the more important issue of whether the government knew the statements were false when Khouj made them. Defendant offers no legal support that dismissal, or preclusion of future testimony, is the proper remedy absent government knowledge of Khouj's perjury. And although dismissal of the indictment could be proper remedy for egregious actions by government prosecutors, the defendant's spotty allegations do not provide grounds for such extraordinary action by the Court. In the alternative, defendant alleges that Khouj obstructed justice by paying and secreting away a potential key witness for defendant during the original trial. Defendant argues that this obstruction provides grounds for precluding Khouj from testifying at any future retrial, but

16

defendant offers no legal support for that position.  Thus, as explained below, the Court will deny defendant's motion.

   *1.*     *The Claimed Government Knowledge of Khouj's Alleged Perjury Does Not Justify Dismissing the Indictment.*

Defendant prefaces his allegations of Khouj's various allegedly perjurious statements by contending that "the Government knowingly grounded its prosecution on perjurious and false accusations." (Def.'s Mot. at 10.)  But a careful reading of defendant's allegations reveals only a few claims of prosecutors' actual or constructive knowledge of Khouj's perjury:[10]

- Khouj testified at trial that he had never heard of "Blue Line Travel"—a Darui entity to which some of the checks at issue were written—before August 23, 2006. (Mot. at 19.) Defendant claims that the government was in possession of pretrial evidence showing that Khouj engaged in transactions with Blue Line Travel on five instances between 2001 and 2003. (*Id.* at 19–20.)

- Khouj testified at trial that he had donated his Islamic Center salary to charity in 2003 and 2004. This was material because it bolstered the government's argument that Khouj had sacrificed for the good of the Center. Defendant claims that the government had Khouj's bank records pre-trial, and that those bank records showed that the money he donated was not in fact his salary. (*Id.* at 29–31.)

- Khouj testified at trial that he gave two checks from the Saudi Embassy to defendant to deposit in the "Special Account"—an Islamic Center account for which Khouj was the sole named account holder and signatory—and that Khouj did not know whether defendant had deposited those checks. Defendant now claims that that testimony conflicted with Khouj's pre-trial statements to the FBI and bank records in the government's possession (which defendant alleges indicate that the checks were deposited in Khouj's personal account). (*Id.* at 31–34.)

---

[10]Not listed in the text are defendant's various weak inferences of government knowledge. For example, defendant in several cases alleges that the government should have known that an element of Khouj's testimony was false because it conflicted with evidence submitted by defendant. (*See, e.g.*, Mot. at 26–29 (concerning a check made out to Aston James); Mot. at 15 n.8, 38 (concerning Khouj's relationship with Debbi Estrada).)  Such weak allegations will not be credited by the Court in this context.

As defendant notes, government prosecutors have a duty to do justice. "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935) (*quoted in* Mot. at 35). Defendant's motion cites to *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991), in which the court ordered a new trial for defendant based on "(1) the materiality of the government witness's perjury to the verdict and (2) the extent to which the prosecution was aware of the perjury." (Mot. at 36.)  But even in *Wallach*, the remedy for such perjury was a new trial, not dismissal of the indictment. Defendant argues that Khouj's perjury was more egregious than that in *Wallach*. However—even assuming defendant's allegations are true—defendant's motion cites to no case in which similar perjury (and government knowledge thereof) justified dismissal of the indictment. Similarly, defendant cited *Napue v. Illinois*, 360 U.S. 264 (1959), in which a prosecutor's failure to correct false testimony resulted in reversal of the conviction (*not* dismissal of an indictment).

Defendant's Reply did provide a few Ninth Circuit cases indicating that dismissal of the indictment might be an appropriate remedy.  For example:

> A district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. If the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers. These powers may be exercised for three reasons: to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct.

*United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991) (internal citations omitted) (*quoted in* Def.'s Reply at 7).  While this Court does not consider the isolated

allegations against the government to rise to the level of a due process violation,[11] *Barrero-Moreno* does indicate that the Court's supervisory powers might allow it to dismiss the indictment if, in the Court's discretion, justice requires it.  (*See also* Def.'s Reply at 8 (citing *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993) (giving the trial court the option on remand to "dismiss the indictment with prejudice as a sanction for the government's misbehavior").  However, defendant's allegations do not convince this Court of the need for it to exercise its supervisory powers and dismiss the indictment.[12]  Accordingly, defendant's prayer that the indictment be dismissed shall be denied.

_____

[11]The *Barrero-Moreno* court explained that "[t]o violate due process, governmental conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." *Barrera-Moreno*, 951 F.2d at 1092 (internal citations and quotation marks omitted). Defendant has not shown the government's conduct to rise to such a level.

[12]That is not to say that the government's conduct up until this point has been exemplary. The government has at times demonstrated neglect.  For example, during a status conference on September 30, 2008, the government (AUSA Sharp) represented to the Court that it had not interviewed Ms. Estrada.  (Trans. at 6–7 ("THE COURT:  Has the government interviewed Ms. Estrada?  MR. SHARP: No, we have not, Your Honor.").)  However, the FBI's 302 interview summary from September 25, 2008 indicates that the FBI agent investigating the case did speak with a woman identified as Estrada only a few days prior to the hearing:

> [Fatima] GOODWIN[, Administrative Assistant for the Islamic Center,] advised [Estrada] that SA McGillicuddy was from the Federal Bureau of Investigation (FBI) and wanted to ask [her] a few questions.  GOODWIN then asked [Estrada] if she would answer questions for SA McGillicuddy.  The woman responded, "No.  Is there anything else?"
>
> SA McGillicuddy then asked [Estrada] if there was any place outside the Center where she would feel more comfortable talking to him. [Estrada] responded, "No.  I've seen the X-Files.  I've watched it my whole life.  I have nothing to say to the FBI."

FBI 302 dated Sept. 25, 2008 (submitted to the Court on Feb. 25, 2009) at 1.  The government should have revealed this interaction in response to the Court's question.  But although the government's conduct has at times not been exemplary, it has also not, in the Court's opinion, sunk anywhere near the point where dismissal pursuant to the Court's supervisory powers would be appropriate.

19

    2.      *Khouj's Alleged Obstruction of Justice Does Not Justify Precluding Him From Testifying at Any Future Retrial.*

In the alternative, defendant argues that Khouj obstructed justice during the original trial and thus should be precluded from testifying in any future retrial. The first part of defendant's obstruction claim is the ten alleged instances of Khouj's perjury at trial. (*See* Mot. at 11–34, 41–42.) The second element is defendant's allegation that Khouj paid potential witness Debbi Estrada to stay hidden in Virginia during the trial.[13] Defendant credibly claims that Estrada's testimony would have benefitted him at trial. After spending several paragraphs arguing that Khouj should be indicted under 18 U.S.C. § 1503 for secreting Estrada—a matter not before the Court—defendant fails to provide any legal support for his assertion that preclusion of future testimony is appropriate here, even assuming his allegations against Khouj are true. Defendant only argues that, if allowed to testify again, Khouj will again commit perjury. Without legal support for the requested remedy, the Court will not grant it.

Because the Court concludes that neither remedy requested by defendant is appropriate, the Court shall deny Motion [128].

## D.    Defendant's Motion [142] Fails to Make Plain Allegations of Evidentiary Misconduct and Does Not Justify Dismissal of Indictment or Sanctions.

Defendant's fourth and final motion before the Court, Motion [142] for Dismissal of Indictment and Sanctions, alleges evidentiary misconduct by the government. As explained above in relation to the government's alleged suborning of perjury, this Court will only dismiss

---

[13]The government states that its investigation does not support defendant's allegation.

an indictment for government misconduct if the misconduct rises to the level of a due process violation or the Court deems dismissal appropriate under its supervisory powers. It is clear that defendant is attempting to claim of government misconduct, but the convoluted nature of the motion leaves the Court unable to make out any specific claims. This is not to affirmatively state that there was no evidentiary misconduct by the government, but rather that if there was, defendant's motion does not clearly identify it. Especially if he seeks to obtain extraordinary remedies such as dismissal of the indictment and sanctions against the government (as he does here), defendant must clearly identify the alleged government misconduct. Defendant has not done so. Defendant's Motion [142] shall be denied.

## CONCLUSION

As described above, defendant has not justified a judgment of acquittal, dismissal of the indictment, or sanctions against the government. Accordingly, all four motions shall be denied. A separate Order shall issue this date.

_5/7/09_

DATE

ROYCE C. LAMBERTH
CHIEF JUDGE